## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTINE POWELL, GORDON ARMSTRONG, CARL ECKHARDT, PAUL GEISLER, HUNTER MILLS, SANDY MORENO, LOUIE NEVAREZ, ANDREW VIERRA, DANIEL BINKLEY, RYAN HICKS, STEPHEN MERMAN, ARNOLD MILSTEIN, JASON MOORE, KATHERINE KINSEY, JEFFREY BARR, and JULIE WOTRING, individually and on behalf of all others similarly situated, | Civil Action No. 1:19-CV-19114-NLH-JS<br><br>CONSOLIDATED  CLASS  ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| SUBARU OF AMERICA, INC. and SUBARU CORPORATION f/k/a FUJI HEAVY INDUSTRIES, LTD. | |
| Defendants. | |

Plaintiffs Christine Powell, Gordon Armstrong, Carl Eckhardt, Paul Geisler, Hunter Mills, Sandy Moreno, Louie Nevarez, Andrew Vierra, Daniel Binkley, Ryan Hicks, Stephen Merman, Arnold Milstein, Jason Moore, Katherine Kinsey, Jeffrey Barr, and Julie Wotring ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Subaru of America, Inc. ("SOA") and Subaru Corporation f/k/a Fuji Heavy Industries, Ltd. ("Subaru Corp.") (together, "Defendants" or "Subaru").  Plaintiffs allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel as to all other allegations:

### INTRODUCTION

1.     Plaintiffs  bring  this  consumer  class  action  lawsuit  because  Defendants manufactured, marketed, distributed, and sold 2017-2020 Subaru Forester, 2017-2020 Subaru

Outback, 2017-2020 Subaru Crosstrek, 2017-2020 Subaru Legacy and 2017-2020 Subaru Impreza vehicles (the "Class Vehicles") without disclosing that the Class Vehicles' windshields are defective and dangerous due to the fact that the windshields are spontaneously and/or unreasonably cracking, chipping and otherwise breaking (the "Defect").  Defendants failed to disclose material facts and a safety concern to purchasers and lessees of the Class Vehicles.

2.      Further, replacement windshields provided by Defendants and paid for by Plaintiffs and the Class suffer from the same defect and are, therefore, equally defective and dangerous.

3.      Upon information and belief, the Class Vehicles all contain the same type of windshields, and the Defect is inherent in each Class Vehicle and was present at the time of sale.

4.      Subaru has built a loyal customer base by marketing itself as "More than a car company.™" As part of that image, Subaru emphasizes that it cares about its customers and is committed to their safety. Indeed, Subaru touts its "industry-leading safety innovations" and represents to Plaintiffs and the class members on its website and elsewhere:



5.      Subaru emphasizes in its advertising that consumers should trust the company, should trust that its vehicles are reliable, and should know that Subaru is working for "a greater good." This is reflected on its website, wherein Subaru states:

As Kelley Blue Book's Most Trusted Brand for five years running[1], Subaru of America is committed to building vehicles our customers can rely on while being a part of a greater good.

6.      However, upon information and belief during the relevant period Defendants have known that the Class Vehicles contain the Defect but have concealed their knowledge from the public and continue to deny that the Defect exists.

7.      A large number of Class Vehicle owners and lessees have reported experiencing the Defect, often shortly after purchase. One consumer with a Class Vehicle complained to the National Highway Transportation Safety Authority ("NHTSA") as follows:

> MY WINDSHIELD IS CRACKED FOR THE 2ND TIME NOW IN ITS FIRST YEAR OF OWNERSHIP. THE FIRST TIME IT CRACKED IT WAS BECAUSE OF A PEBBLE STRIKE FROM THE ROAD. EXTREMELY SMALL FRAGMENT STRUCK THE GLASS, MADE A POCK MARK, AND THE WINDSHIELD WAS REPLACED. TODAY, LESS THAN A MONTH LATER A NEW CRACK APPEARED WHILE DRIVING WITHOUT ANY STRIKE FROM AN OBJECT. SUBARU DEALER CLAIMS IT WAS STRUCK BUT FIND A CRACK ONLY WITHOUT ANY POINT ALONG IT OF AN IMPACT MAKES ME VERY VERY SUSPICIOUS. NOW I HAVE TO WAIT FOR THE INSURANCE COMPANY TO SETTLE ON CHARGES AND SEND A CHECK BEFORE THE NEXT WINDSHIELD CAN BE APPLIED. MY WIFE AND I WERE CALMLY DRIVING ON COMPLETELY PAVED ROADS WHEN WE BOTH WATCHED THE CRACK APPEAR AND GROW DURING OUR DRIVE. :-( I HAVE DRIVEN FOR 50+ YEARS, AND OWNED 20+ CARS. I'VE NEVER HAD THIS HAPPEN.[1] )

8.      The Defect poses a serious safety hazard to drivers, passengers, and pedestrians. A spontaneously cracking or severely cracked windshield can impair the driver's view and distract the driver. "Even a small crack on glass means your windshield's structural integrity has been compromised, which means it is now a safety hazard to you and your

---

[1] https://www.nhtsa.gov/vehicle/2018/SUBARU/OUTBACK/SW/AWD (last accessed November 13, 2019).

passengers." https://info.glass.com/can-a-cracked-windshield-shatter (last visited November 10, 2019). "Driving with a damaged or cracked windshield can hinder a motorist's visibility and also compromise the structural integrity of the automobile during a roll-over incident." http://news.aaa-calif.com/news/07-01-19-windshield-damage (last visited November 10, 2019). In addition, "[a]uto glass is supposed to meet federal safety standards and is imperative for airbags to function properly. " *Id.*

9. Moreover, cracks in the windshield prevent the safe and proper operation of Subaru's "EyeSight® Driver Assist Technology". According to Subaru,

> EyeSight Driver Assist Technology is capable of detecting vehicles traveling in front and can activate in order to mitigate or even avoid the collision. The system reduces rear-end crashes with injuries by up to 85 percent according to IIHS. *

> With the help of two Subaru-developed color cameras mounted behind the windshield, EyeSight can identify vehicles traveling in front, traffic lanes, obstacles and pedestrians. The system has helped reduce the rate of pedestrian-related insurance claims by 41 percent according to the Highway Loss Data Institute. **[2]

10. Without the EyeSight® system, vehicle owners and lessees are deprived of an important safety feature that customers pay for and rely upon.

11. Selling vehicles with dangerously defective windshields and refusing to take responsibility for the defects is directly contrary to the safety conscious, trustworthy, and reliable image Subaru advertises.   Nevertheless, Subaru refuses to honor its commitment to its loyal customers, is jeopardizing the safety of the public, and is forcing its customers to bear the expense of Subaru's mistakes and malfeasance.

---

[2] *See* Subaru Press Release, Oct. 16, 2018. "Subaru Sells One-Millionth Vehicle With Eyesight® Driver Assist Technology." available at: http://media.subaru.com/pressrelease/1350/120/subaru-sells-one-millionth-vehicle-eyesight-driver-assist

12.     In addition to the obvious safety hazard which jeopardizes the driver's personal safety and that of the public, vehicle owners and lessees incur substantial monetary losses because Defendants refuse to replace the broken windshields under warranty. In addition to the windshield replacement cost, consumers incur other expenses resulting from the defect, such as having the Eyesight system recalibrated, and the time and expense of bringing their vehicles in for repair, while also losing use of the vehicles. Furthermore, many consumers report having to replace their windshields multiple times due to the Defect because their windshields are being replaced with equally defective products.

13.     Defendants were aware of the Defect from pre-production testing, design failure mode analysis, calls to their customer service hotline, a prior Technical Service Bulletin (TSB) that it sent to its dealers but did not share directly with consumers which detailed a defect in the windshields of prior model years for certain Class Vehicles, and customer complaints made to dealers.

14.     The Defect is material because it poses a serious safety concern. As attested by Class Members in scores of complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Defect can impair a driver's visibility, cause a distraction, affect Subaru's "EyeSight® Driver Assist Technology," and greatly increase the risk of collision.

15.     The Defect also is material because consumers incur significant and unexpected repair costs. Defendants' failure to disclose the defect at the time of purchase is material because no reasonable consumer expects to spend hundreds of dollars to repair or replace windshields that  crack either spontaneously or due to a mild impact that should not result in cracking.

16.     Had Defendants disclosed the Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them.

17.     Plaintiffs demand that Defendants accept responsibility for replacing damaged windshields under Subaru's new vehicle warranty at no charge to Plaintiffs and the Classes (as

defined below) and reimburse Plaintiffs and the Classes for losses suffered as a result of the Defect. In addition, or alternatively, Subaru should be required to buy back the Class Vehicles.

**JURISDICTION AND VENUE**

18.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiffs and many members of the Class are citizens of states different from Defendants' home state, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class and Classes.

19.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because SOA has its principal place of business and headquarters in this District; Subaru conducts substantial business in this District through SOA; and upon information and belief, significant conduct involving Defendants giving rise to the Complaint took place in this District.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, SOA has its principal place of business and regularly conducts business in this District, and SOA is a resident of this District under 28 U.S.C. § 1391(c)(2) and subject to personal jurisdiction in this District.

**PARTIES**

21.     Plaintiff Gordon Armstrong is a citizen and resident of the state of California. On or around June 3, 2019, Plaintiff Armstrong purchased a used 2017 Subaru Outback from First Kia of Simi Valley in Simi Valley, California.

22.     Plaintiff Carl Eckhardt is a citizen and resident of the state of Texas.  In or around December 2017, Plaintiff Eckhardt purchased a new 2018 Subaru Outback from Livermore Subaru, an authorized dealer in Livermore, California.

23.     Plaintiff Paul Geisler is a citizen and resident of the state of California.  On or around March 5, 2018, Plaintiff Geisler purchased a new 2018 Subaru Outback from Autonation Subaru, an authorized dealer in Roseville, California.

24.     Plaintiff Hunter Mills is a citizen and resident of the state of California.  In or around December 2018, Plaintiff Mills purchased a new 2019 Subaru Outback from an authorized dealer in California.

25.     Plaintiff Sandy Moreno is a citizen and resident of the state of California.  On or around October 28, 2018, Plaintiff Moreno purchased a new 2019 Subaru Outback from Elk Grove Subaru, an authorized dealer in Elk Grove, California.

26.     Plaintiff Louie Nevarez is citizen and resident of the state of California.  On or around May 9, 2018, Plaintiff Nevarez purchased a new 2018 Subaru Impreza Sport vehicle from Subaru Antelope Valley, an authorized dealer in Lancaster, California.

27.     Plaintiff Andrew Vierra is a citizen and resident of the state of California.  On or around May 26, 2019, Plaintiff Vierra purchased a new 2019 Subaru Outback from Ocean Subaru, an authorized dealer in Fullerton, California.

28.     Plaintiff Daniel Binkley is a citizen and resident of the state of Colorado.  In September 2017, Plaintiff Binkley utilized the services of a broker to purchase a new 2018 Subaru Outback from Heuberger Subaru, an authorized dealer in Colorado Springs, Colorado.

29.     Plaintiff Ryan Hicks is a citizen and resident of the state of Colorado.  On or around February 21, 2018, Plaintiff Hicks purchased a new 2018 Subaru Crosstrek from a broker in Littleton, Colorado who obtained the vehicle from an authorized Subaru dealer.

30.     Plaintiff Stephen Merman is a citizen and resident of the state of Colorado.  On or around July 15, 2019, Plaintiff Merman purchased a certified pre-owned 2018 Subaru Forester from AutoNation Subaru West in Golden, Colorado.

31.     Plaintiff Arnold Milstein is a citizen and resident of the state of Florida.  On or around September 19, 2019, Plaintiff Milstein purchased a new 2020 Subaru Outback from Schumaker Automotive, an authorized dealer in Delray Beach, Florida.

32.     Plaintiff Jason Moore is a citizen and resident of the state of Michigan.  On or around March 30, 2019, Plaintiff Moore purchased a new 2019 Subaru Outback from Fox Subaru, an authorized dealer in Grand Rapids, Michigan.

33.     Plaintiff Katherine Kinsey is a citizen and resident of the state of Missouri.  On or around August 21, 2018, Plaintiff Kinsey purchased a new 2018 Subaru Forester from Webster Groves Subaru, an authorized dealer in Missouri.

34.     Plaintiff Jeffrey Barr is a citizen and resident of the state of New Jersey.  In or around November 2018, Plaintiff Barr leased a new 2019 Subaru Forester from Liberty Subaru, an authorized dealer in Emerson, New Jersey.

35.     Plaintiff Julie Wotring is a citizen and resident of the Commonwealth of Pennsylvania.  On or around July 20, 2019, Plaintiff Wotring purchased a new 2019 Subaru Outback from John Kennedy Subaru, an authorized dealer in Plymouth Meeting, Pennsylvania.

36.     Plaintiff Christine Powell is a citizen and resident of the state of Wisconsin.  On or around August 19, 2017, Plaintiff purchased a new 2018 Subaru Forester from Don Miller Subaru, an authorized dealer in Madison, Wisconsin.

37.     Defendant Subaru Corporation f/k/a Fuji Heavy Industries Ltd.("Subaru Corp.") is a Japanese corporation located at The Subaru Building, 1-7-2 Nishishinjuku, Shinjuku-ku, Tokyo, 160-8316, Japan. Defendant Subaru Corp. is the parent company of SOA and is responsible for the design, manufacturing, distribution, marketing, sales and service of Subaru vehicles, including the Vehicles, around the world, including in the United States.

38.     Defendant SOA is incorporated in New Jersey and has its principal place of business and headquarters in Camden, New Jersey.  It is there that SOA has a 250,000 square foot headquarters campus wherein approximately 600 employees, including its officers, and the sales, marketing, and distribution departments, among others, are based and carry out the business of SOA.  There also is an approximately 100,000 square foot national service training center for SOA adjacent to its headquarters campus which houses service training, service

engineering and product engineering functions.  SOA markets and distributes automobiles throughout the United States and is a division of the Japanese conglomerate Subaru Corp.

39.     SOA is the U.S. sales and marketing subsidiary of Subaru Corp. and wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States.  SOA has a nationwide dealership network and operates offices and facilities throughout the United States.

40.     Subaru Corp. and SOA (collectively "Subaru") have common management. Indeed, SOA's sales, marketing and distribution efforts in the United States are headed by corporate officers of Subaru Corp. For example, Takeshi Tacihmori, the chairman and CEO of SOA is also a Director and Corporate Executive Vice President for Subaru Corp. in charge of the Subaru Global Marketing Division, Subaru Japan Sales and Marketing Division and Subaru Overseas Sales and Marketing Divisions 1 and 2. The incoming Chairman of SOA is also a Corporate Senior Vice President of Subaru Corp. who is Chief General Manager of Subaru Overseas and the Vice President in charge of Sales and Marketing, Division 1.

41.     Upon information and belief, Defendant Subaru Corp. communicates with Defendant SOA concerning virtually all aspects of the Subaru products it distributes within the United States.

42.     Defendants manufactured, marketed, sold and warranted the Class Vehicles, including Plaintiffs' vehicles.

## FACTUAL ALLEGATIONS

43.     For years, Defendants have designed, manufactured, distributed, sold, leased and warranted the Class Vehicles. Defendants have marketed and sold thousands of Class Vehicles nationwide, including through their nationwide network of authorized dealers and service providers.

44.     Defendants advertise and emphasize the safety benefits and innovativeness of their engineering group to consumers, specifically representing the following on Subaru's website:



45.     Subaru touts its Eyesight® Driver Assist Technology in its advertising as:

> . . . the culmination of everything Subaru engineers know about safety, and Subaru has sold over 1 million EyeSight-equipped vehicles. Adding confidence to every trip, EyeSight monitors traffic movement, optimizes cruise control, and warns you if you sway outside your lane. EyeSight has been found to reduce the rate of rear-end crashes with injuries by up to 85%.

46.     Subaru repeatedly advertises the benefits and importance of the Eyesight® system on its website, including the following:



47.     However, the existence of the Defect renders the Class Vehicles unsafe and deprives Plaintiffs and the Class Members of the EyeSight® system's benefits. The Defect causes the Class Vehicles' front windshield to unreasonably crack, chip and/or fracture, including for no reason at all and/or under circumstances that would not cause non-defective windshields to similarly fail. The Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers due to, *inter alia*, the impact of the Defect on driver visibility, driver distraction, and impairment of the EyeSight® safety system.

48.     Defendant issued Technical Service Bulletin (TSB) Number 12-192-15R on October 26, 2016, revised on November 19, 2016, that sets forth a defect as it existed in prior model years for two of the Class Vehicles at issue here and states the known cause of the defect in 2015-2016 Legacy and Outback models as follows: "Further investigation has determined the root cause for many of these failures to be the ceramic materials used for the black-colored printed perimeter combined with the silver-colored material used for the wiper deicer portion of the windshield glass." On information belief, this is at least one cause or a contributing cause of the Defect in the Class Vehicles.

49.     Plaintiffs further are informed and believe and based thereon allege that Defendants are incorporating "acoustic glass" into windshields of Class Vehicles and glass that is thinner than is safe and proper and/or are utilizing windshields that are unreasonably susceptible to failure due to the amount of tension in the glass.

50.     Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, Defendants knew, or should have known, about the Defect through their exclusive knowledge of non-public, internal data about the Defect, including: pre-release testing data; early consumer complaints about the Defect to Defendants' dealers who are their agents for vehicle repairs; aggregate data from Defendants' dealers; consumer complaints to the NHTSA and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; and other internal sources of aggregate information about the problem. Nevertheless, Defendants have actively concealed and failed to disclose this Defect to

Plaintiffs and Class Members at the time of purchase or lease and thereafter and disclaim liability for the Defect when consumers suffer damages to the windshields in their Class Vehicles.

51.     Furthermore, on information and belief, when vehicles are brought in for repair, Defendants' dealers refuse to replace the defective windshields under warranty, often claiming that an impact caused the failure, notwithstanding the fact that the customers witnessed no impact and/or that any impact was foreseeable in normal use and to be expected by a manufacturer and seller of vehicles and should not have caused the windshield to fail but for the presence of the Defect. On information and belief, Defendants' dealers' systematic denial of valid warranty claims is part of a concerted effort orchestrated by Defendants to minimize the cost of warranty claims and unfairly shift the cost of repairs to consumers.

52.     Moreover, on information and belief, when consumers have their windshields repaired, their defective windshields are merely replaced with similarly defective windshields, so that their Class Vehicles are not actually repaired and suffer from the same Defect.

53.     At all relevant times, Defendants acted through their authorized agents and representatives in their dealer network while performing activities associated with advertising, marketing and selling Class Vehicles, and supplying and/or replacing broken windshields in Class Vehicles.

54.      In its advertising, Subaru emphasizes the safety, quality and reliability of the Class Vehicles knowing that consumers, including Plaintiffs and Class members, rely upon such representations when purchasing or leasing vehicles.

55.     Before making their purchases, the Plaintiffs performed onlines searches for the Class Vehicles on websites including Google.com, Youtube.com, Edmunds.com, KBB.com, Carfax,.com autodtrader.com, cars.com, truecar.com, and carmax.com. and/or they watched Subaru television ads, visited SOA's website to research the vehicle, and/or test drove their vehicles and received information about the safety and reliability of the Class Vehicles and warranty information from Subaru's dealers.

56.     When Plaintiffs and Class members purchased or leased their Class Vehicles they relied on the reasonable expectation that the Class Vehicles would be safe to operate and equipped with windshields that were free from defects and did not pose a threat to their health or safety.

57.     When Plaintiffs and Class members replaced windshields in their Class Vehicles after breaks and other physical damage occurred, they reasonably expected that the Subaru-specific replacement windshields would be free of defects and otherwise safe and merchantable.

58.     Plaintiffs and the Class members operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used but nevertheless suffered significant damages to their windshields as a result of the defect.

59.     Plaintiffs and the Class members have suffered ascertainable losses as a result of Defendant's wrongful conduct.

**I.      The Warranty**

60.     Subaru provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty (the "Warranty") with the purchase or lease of the Class Vehicles.

61.     The Warranty is consistent throughout the Class Period and across the Class Vehicles and provides a three-year/36,000 mile warranty for the vehicles that expressly covers defects in materials or workmanship.

62.     Subaru represents as part of its Warranty terms that "Every owner of the vehicle during the warranty period shall be entitled to the benefits of these warranties." In other words, the Warranty remains with the vehicle to the benefit of subsequent purchasers throughout the duration of the Warranty period.

63.     All of the Plaintiffs' Class Vehicles at issue in this complaint were within the mileage and time limits of the Warranty when the windshields needed to be replaced.

64.      Using the 2017 Warranty by way of example, the Warranty states in relevant part:

**2017 Warranty**

Below is a brief description of the Subaru Limited Warranty for 2017 model year Subaru vehicles that is provided to each buyer by Subaru at no additional charge. Your Subaru Dealer has complete details concerning the warranty and any exclusions and/or restrictions that may apply. Please visit your nearest Subaru Dealer for this further information. Click here for optional extended protection beyond the warranty.

**Who Makes These Warranties**

These warranties are made by SUBARU of America, Inc. ("SOA")[1], One Subaru Drive, P.O. Box 9103, Camden, NJ 08101.

**When These Warranties Apply**

These warranties only apply if the vehicle was imported or distributed by SOA and sold to the first retail purchaser by an Authorized SUBARU Retailer in the United States. Any and all repairs must be performed by an Authorized SUBARU Retailer located in the United States. **Every owner of the vehicle during the warranty period shall be entitled to the benefits of these warranties**. If the vehicle is sold or otherwise transferred, it is recommended and requested that the new owner promptly send written notice of the transfer of ownership to SOA at the address indicated above. (emphasis added)

**Warranty Periods**

Warranty coverage begins on the date the vehicle is delivered to the first retail purchaser. If the vehicle was used as a demonstrator or company vehicle before being sold at retail, warranty coverage begins on the date the vehicle was first placed in such service.

**What is Covered**

These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use:

- In any part of the 2017 model year SUBARU which is identified on the inside front cover of this Warranty & Maintenance Booklet(the "vehicle").

- Any Genuine SUBARU Optional Accessories[2]

- In addition, adjustment services are covered one time only during the first 36 months/36,000 miles of operation, whichever comes first.

**New Vehicle Limited Warranty**

> BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first. Subject to the exclusions listed in this warranty, it covers the entire vehicle.

65.     The warranties and representations contained in the Warranty were and are material to Plaintiffs because Plaintiffs would not have purchased the Class Vehicles or would not have paid as much as they did if the windshields in the Class Vehicle were not covered by the| Warranty.

## II.     The Defect Poses a Serious Safety Concern

66.     The Defect is material to consumers because it presents a serious safety concern. Class Members have repeatedly reported disturbing failures to the National Highway Traffic Safety Administration ("NHTSA"). Below are complaints reflecting the Defect and the safety risk posed.

67.     On NHTSA's website where consumer complaints about 2017 Subaru Crosstrek are posted,[3] the following incident posted on October 29, 2019 and reported on January 18, 2019 was reported:

> I AM THE OWNER OF A 2017 SUBARU CROSSTREK THAT WAS SUBJECT TO A FAULTY WINDSHIELD RESULTING IN REPLACEMENT. THE VEHICLE HAD DEVELOPED A SPONTANEOUS CRACK FROM NO APPARENT OR OBVIOUS SOURCE OTHER THAN NORMAL CONDITIONS. SPECIFICALLY, THIS CRACK DEVELOPED OVERNIGHT WHILE SITTING IN THE DRIVEWAY NOT IN MOTION AND NOT EXPOSED TO DAMAGE CAUSING DEBRIS. THE NEXT MORNING, AN INCONSPICUOUS CRACK AT ONLY A FEW MILLIMETERS APPEARED. OVER THE COURSE OF THE

---

[3] https://www.nhtsa.gov/vehicle/2017/SUBARU/CROSSTREK/SW/AWD (last viewed February 3, 2020)

> NEXT FEW DAYS, THE CRACK HAD GROWN TO TENS OF
> CENTIMETERS. THE END RESULT WAS AN UNSAFE AND
> HAZARDOUS WINDSHIELD CREATING VISIBILITY
> ISSUES AND A RISK OF INTEGRITY FAILURE. THE
> WINDSHIELD WAS REPLACED BY THE DEALER AT FULL
> COST NOT COVERED UNDER WARRANTY. THIS WAS
> NOT COVERED UNDER RECALL AND WAS PAID FOR OUT
> OF POCKET. ATTACHED IS A COPY OF THE INVOICE
> WITH COSTS FOR THE WINDSHIELD PARTS AND LABOR.

68.     On NHTSA's website where consumer complaints about 2017 Subaru Outbacks are posted,[4] the following incident posted on August 2, 2017 and dated July 27, 2017 was reported:

> WINDOW CRACKED BUT WAS NOT HIT WITH ANYTHING.
> CRACK APPEARED ON THE DRIVERS SIDE, HALFWAY
> DOWN THE WINDSHIELD, AND OBSTRUCTS VIEW OF
> THE DRIVER. CAR HAS LESS THAN 1600 MILES ON IT.
> DEALER STATED IT WAS NOT COVERED AS A DEFECT
> AND WE ARE ON OWN OWN TO REPLACE IT. THERE ARE
> NUMEROUS COMPLAINTS OF SUBARU OUTBACK
> WINDSHIELDS CRACKING BECAUSE THEY ARE TOO
> THIN. DANGEROUS TO DRIVE DUE TO VISIBILITY
> ISSUES.

69.     On NHTSA's website where consumer complaints about 2018 Subaru Outbacks are posted,[5] the following incident posted on February 16, 2019 and dated February 16, 2019 was reported:

> SECOND CRACKED WINDSHIELD IN ONE WEEK. FIRST
> ONE WAS REPLACED 2/8/18. BOTH TIMES TRAVELED AT
> LOW TO MODERATE SPEED 25-40 MPH ON LOCAL FWY

---

[4]https://www.nhtsa.gov/vehicle/2017/SUBARU/OUTBACK/SW/AWD (last viewed February 3, 2020).

[5] https://www.nhtsa.gov/vehicle/2018/SUBARU/OUTBACK/SW/AWD (last viewed November 10, 2019).

IN LOS ANGELES, CA. SUNNY MILD, DRY CONDITIONS, NO WIND. SMALL PEBBLE HIT WINDSHIELD. COULDN'T SEE HIT, ONLY HEARD A SMALL CRACK SOUND. DAMAGED WINDSHIELD, FIRST TIME SMALL PEBBLE MARK GREW TO LONG CRACK. INITIAL IMPACT SIZE ABOUT 1.5 - 2 MM. ONE WEEK LATER ANOTHER PEBBLE HIT WINDSHIELD IN SLOW TRAFFIC,35 MPH, NO TRUCKS NEAR BY. SAME SIZE OF MARK. SUBARU REQUIRES THEIR WINDSHIELD REPAIR AT CUSTOMER COST OF $930. WARRANTY DOES NOT COVER ANY DEBRIS DAMAGE, BUT SMALL PEBBLES SHOULD NOT CAUSE THIS KIND OF DAMAGE AND COSTS. HAD A GRAND CHEROKEE 184K MILES AND NEVER A CRACK OR DING, NEVER ISSUE FOR OUR 2005 SAAB, OR ANY OREVIOUS VEHICLE. SHOULD NOT COST US $1860 MONTH ADDITIONAL TO MAINTAIN CAR, PLUS SAFETY ISSUE. ACCORDING TO SUBARU CORPORATE: DOES NOT RECOMMEND US TO DRIVE IT WITH I-SITE CAMERA WITH A DAMAGED WINDSHIELD. THEY SAY THAT THE GLASS IS THINNER/LIGHTER IN ORDER TO WORK WITH CAMERA AND BE MORE FUEL EFFICIENT/LIGHTER. CARS SHOULD BE ABLE TO WITHSTAND NORMAL DRIVING AND ROAD CONDITIONS.

70.     On NHTSA's website where consumer complaints about 2019 Subaru Outbacks are posted,[6] the following incident posted on January 24, 2019 and dated January 7, 2019 was reported:

THE CAR WAS NOT USED OVER THE WEEKEND EXCEPT FOR A 5 MILE TRIP TO CHURCH WHERE IT DID NOT ENCOUNTER ANY ROCKS, HITS, ETC. DROVE HOME AND THE CAR WINDSHIELD WAS FIND. THE NEXT MORNING WHEN I GOT INTO THE CAR, AFTER I USED MY REMOTE TO START AND WARM UP MY OUTBACK, THERE WAS ABOUT AN 8-10 INCH CRACK IN THE WINDSHIELD THAT ORIGINATED FROM BEYOND THE WINDSHIELD WIPER ON THE PASSENGER SIDE OF THE CAR. THE CRACK GREW WORSE TO ABOUT 12 INCHES.

---

[6] https://www.nhtsa.gov/vehicle/2019/SUBARU/OUTBACK/SW/AWD (last viewed November 10, 2019).

CALLED SUBARU DEALER WHO DIRECTED ME TO THEIR WINDSHIELD SERVICE AGENT. TOOK TIME OFF FROM WORK AND THEY INSTALLED OEM GLASS (INSURANCE COVERS THIS) AND CALIBRATED THE WINDSHIELD. AFTER DRIVING HOME, THE CAR MADE WIND TUNNEL NOISES, WINDSHIELD FLUID SYSTEM DID NOT WORK, NAVIGATION DID NOT WORK SO I BROUGHT THE CAR TO THE DEALER (TOOK MORE TIME OFF FROM WORK). THEY FOUND A LEAK IN THE WINDSHIELD, REPAIRED THE FLUID UNIT AND IGNORED THE NAVIGATION ISSUE. THEY SENT ME BACK TO THEIR AGENT. THEY TOOK OUT THE WINDSHIELD REPOSITIONED IT AND SENT ME ON MY WAY. TODAY I FOUND PUDDLES OF WATER ON THE FLOOR OF MY CAR (LEAK), NAVIGATION DOES NOT WORK AND WIND TUNNEL NOISE IS STILL THERE. THIS WINDSHIELD IS SUPPOSED TO PROTECT THE DRIVER AND PASSENGER AS EXTRA SUPPORT FOR THE ROOF, PREVENTION OF OBJECTS FLYING AT YOU AND ALLOW FOR THE EYESIGHT SYSTEM TO DO ITS JOB. THIS CAR IS ONE MONTH OLD AND THE CRACK IN THE WINDSHIELD EXPERIENCE SOUNDS EERILY SIMILAR TO OTHERS' COMPLAINTS. WHEN YOU PAY THE MONEY FOR A TOP SAFETY PICK, YOU WANT THE SAFETY AND I DO NOT HAVE IT.

71.    On NHTSA's website where consumer complaints about 2017 Foresters are posted,[7] the following incident dated March 21, 2018 was reported:

OWN A 2017 SUBARU FORESTER, WE HAVE LESS THAN 11,000 MILES AND LESS THAN ONE YEAR OF OWNERSHIP. A SMALL STONE HITTING THE WINDSHIELD, QUICKLY ENDS UP IN A 24" TO 30" LONG LINEAR CRACK UNLIKE MY OTHER TWO VEHICLES. WE ARE IN PROCESS OF REPLACING 3RD WINDSHIELD GLASS IN LESS THAN ONE YEAR. IT APPEARS THAT THERE MAY BE AN OEM DEFECT. THIS LONG CRACK CREATES DANGER VISION PROBLEM. EVERY WINDSHIELD REPLACEMENT REQUIRES RE-CALIBRATION OF EYESIGHT TOO. THIS IS AN ADDITIONAL BURDEN ON INSURANCE AS WELL AS OWNERS AND SHOULD BE ADDRESSED ASAP. MANUFACTURER HAS NOT YET ACKNOWLEDGE THE

---

[7] https://www.nhtsa.gov/vehicle/2017/SUBARU/FORESTER/SUV/AWD

EXISTENCE OF DEFECTIVE WINDSHIELD. WE REQUEST THAT CONSUMER PRODUCT RECALL INVESTIGATE THIS ISSUE ASAP.

72.     The Defect presents a safety concern because it impairs the driver's visibility, impairing the driver's ability to accurately see the road, signage, other vehicles, and potential road hazards. In addition, the cracks are visually distracting to the driver. Impaired visibility is unsafe at any time, particularly when combined with bright sunlight or hazardous weather conditions and when changing lanes, merging onto highways, making turns, and responding to hazards or changing conditions on the road.

**A.     Defendants Had Superior and Exclusive Knowledge of the Defect**

73.     Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, Defendants knew, or should have known, about the Defect through their exclusive knowledge of non-public, internal data about the Defect, including: pre-release testing data; early consumer complaints about the Defect to Defendants' dealers who are their agents for vehicle repairs; aggregate data from Defendants' dealers; consumer complaints to the NHTSA and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; Technical Service Bulletins issued for a cracked windshield defect on 2015-2016 Subaru Legacy and Outback models; and other internal sources of aggregate information about the problem.

**1.     Numerous Consumer Complaints on the NHTSA Website Demonstrate That Defendants are Aware of the Defect.**

74.     Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

75.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers

monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id.* Thus, Defendants knew or should have known of the many complaints about the Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendants to the Defect.

76.     Owners and lessees of Class Vehicles have lodged numerous complaints regarding the spontaneous cracking of windshields and the extremely unusual rate and instances of failure of windshields in the Class Vehicles as compared to other vehicles that they have owned. Consumers advise that windshields in the Class Vehicles are breaking and cracking for no known reason or under circumstances in which it is unreasonable and unexpected for a windshield to break. Because the majority of owners do not take the time to complete a NHTSA report, it is reasonable to presume that the number of consumers who have already experienced one or more windshield failures in their Class Vehicles is many multiples higher than reported to NHTSA.

77.     With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Defect. In addition, the complaints indicate that despite having knowledge of the Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose or acknowledge the defect and refuse to replace the windshields under warranty. Further, replacement windshields suffer from the same Defect, thus exposing consumers to multiple losses and ongoing risks to their safety.

78.     On NHTSA's website where consumer complaints about **2017 Subaru Outbacks** are posted,[8] the following incident posted on December 20, 2016 and dated February 11, 2017 was reported:

> STAR CRACK IN WINDSHIELD DISCOVERED STATIONARY (IN CARPORT) THE DAY AFTER PURCHASING THE VEHICLE (ODOMETER READING 200 MILES). LOCATION OF CRACK SLIGHTLY ABOVE WIPER BLADE ON PASSENGER SIDE. IMPACT STRIKE THE SIZE OF A PINHEAD. THE DAMAGE IS CHARACTERISTIC OF PRIOR MODEL YEARS 2015 AND 2016 IN WHICH THE MANUFACTURER INITIATED RECALLS. IT IS APPARENT THIS PROBLEM CONTINUES AND HAS YET TO BE RESOLVED.

79.     On July 10, 2017 the following incident dated June 14, 2017 was reported:

> OUR WINDSHIELD BEGAN SLOWLY CRACKING STARTING AT THE BASE OF THE DRIVER SIDE FRONT WINDOW. IT BEGAN AT THE BOTTOM EDGE (HEAT STRIP) AND MOVED HALF UP THE WINDSHIELD BEFORE WE REPLACED. COST $569 FOR OEM WINDSHIELD. SUBARU DEALER DENIED THE WARRANTY CLAIM, WHILE ADMITTING A PROBLEM WITH EARLIER VERSIONS THAT YEAR'S OUTBACK.

80.     On August 2, 2017, the following incident dated July 27, 2017 was reported:

> WINDOW CRACKED BUT WAS NOT HIT WITH ANYTHING. CRACK APPEARED ON THE DRIVERS SIDE. HALFWAY DOWN THE WINDSHIELD. AND OBSTRUCTS VIEW OF THE DRIVER. CAR HAS LESS THAN 1600 MILES ON IT. DEALER STATED IT WAS NOT COVERED AS A DEFECT AND WE ARE ON OWN OWN TO REPLACE IT. THERE ARE NUMEROUS COMPLAINTS OF SUBARU OUTBACK WINDSHIELDS CRACKING BECAUSE THEY ARE TO THIN. DANGEROUS TO DRIVE DUE TO VISIBILITY ISSUES.

---

[8] https://www.nhtsa.gov/vehicle/2017/SUBARU/OUTBACK/SW/AWD

81.　On October 5, 2017, the following incident dated September 28, 2017 was reported:

> PURCHASED A 2015 OUTBACK AND EXPERIENCED 4 CRACKED WINDSHIELDS IN AN 18 MONTH PERIOD. TRADED THE CAR IN FOR A 2017 OUTBACK HOPING THEY FIXED THE DESIGN FLAW. NOW 6 MONTHS AFTER 2017 OUTBACK PURCHASE AN OUTRAGEOUS CRACK FORMED ON THIS NEW VEHICLE. ALL 5 CRACKS BEGAN NOT FURTHER THAN 2 TO 3 INCHES FROM THE FRAME. SO 5 CRACKED WINDSHIELDS IN A 2 YEAR PERIOD FROM SUBARU OUTBACK.
>
> AUTOMOBILES. THE DEALERSHIP AND MANUFACTURER NEVER WOULD ACKNOWLEDGE THAT THERE ARE SO MANY OTHER PEOPLE EXPERIENCING THIS PROBLEM. SOMETIMES THE CRACK WOULD APPEAR SPONTANEOUSLY. SOMETIMES IT ACTUALLY SOUNDED LIKE CRACKLING SOUNDS HAPPENING IN FRAME AND MAYBE (?) ONE TIME THERE MIGHT HAVE BEEN A SMALL PEBBLE HIT THE WINDSHIELD. TWICE I WASN'T EVEN DRIVING THE VEHICLE. IMPEDES VISION. DISTRACTS DRIVER.

82.　On October 19, 2017, the following incident dated October 17, 2017 was reported:

> I VERY SMALL ROCK CHIP HIT MY WINDSHIELD INITIALLY CAUSING AN 8 INCH CRACK AND IS NOW OVER TWO FEET LONG. THE CHIP DID NOT EVEN LEAVE AN IMPACT MARK: IF YOU TRIED RIGHT NOW TO SEE WHERE THE CRACK STARTED YOU WOULD NOT BE ABLE TO. I REVIEWED FORUMS ONLINE AND HAVE SEEN NUMEROUS COMPLAINTS ABOUT OUTBACK WINDSHIELDS. WEAK OR CHEAP IS HOW THEY WERE OFTEN DESCRIBED. THIS WAS A VERY SMALL ROCK CHIP THAT HIT MY WINDSHIELD. THIS AMOUNT OF DAMAGE SHOULD NOT HAVE HAPPENED. I AGREE WITH THE FORUMS: WEAK AND CHEAP. I SEE THERE IS EVEN A CLASS ACTION LAWSUIT AGAINST SUBARU.

83.     On NHTSA's website where consumer complaints about **2018 Subaru Outbacks** are posted,[9] the following incident posted on April 29, 2018 and dated April 28, 2018 was reported:

> WINDSHIELD DEVELOPED CRACKED, LOWER MID AREA EXTENDED UPWARD ABOUT 12 INCHES. VEHICLE WAS STATIONARY, PARKED. WAS NOT HIT BY ANY ROAD DEBRIS. NOTICED DEFECT WHEN STARTING CAR.

84.     On May 22, 2018, the following incident dated May 18, 2018 was reported:

> WINDSHIELD EASILY CRACKS - WE HAVE HAD OUR 2018 OUTBACK FOR LESS THAN 6 MONTHS AND LESS THAN 5000 MILES AND HAVE HAD 3 WINDSHIELDS DEVELOP SEVERE CRACKING. THE FIRST TWO WERE REPLACED WITH FACTORY WINDSHIELDS BY PROFESSIONAL INSTALLERS. THE SLIGHTEST IMPACT, THE LAST TWO BEING BARELY PERCEIVABLE, RESULTS IN AN ELONGATED CRACK FORMING. WITH FOUR VEHICLES IN OUR HOUSEHOLD, WE HAVE ONLY HAD 2 WINDSHIELDS REPLACED IN 14 YEARS SINCE MOVING TO THIS AREA SO HAVE RULED OUT BAD LUCK OR DRIVING HABIT. SUBARU (BOTH DEALER AND CORPORATE) HAVE BEEN UNRESPONSIVE. THE CURRENT CRACKING AND STAR FORMED AFTER A BARELY AUDIBLE IMPACT. THE STAR GREW AND IS NOW CRUMBLING IN THE CENTER WITH 3 FRACTURE LINES EXTENDING FROM IT.
>
> FIRST INCIDENT - ON I-17 WHILE PASSING A SEMI APPROX SPEED 75 MPH
>
> SECOND INCIDENT - ON AZ 69 IN NORMAL TRAFFIC APPOX SPEED 45 MPH
>
> THIRD INCIDENT - ON I-17 WHILE FOLLOWING A VEHICLE USING ISIGHT DYNAMIC CRUISE CONTROL APPROX SPEED 75 MPH
>
> FIRST TWO CLAIMS COVERED BY INSURANCE WHICH

---

[9] https://www.nhtsa.gov/vehicle/2018/SUBARU/OUTBACK/SW/AWD (last viewed November 10, 2019).

WE ATTRIBUTED TO BAD LUCK. THIRD INCIDENT IN SO FEW MONTHS/MILES SEEMS TO POINT TO QUALITY/DESIGN ISSUE SINCE OTHER VEHICLES (PAST AND PRESENT) HAVE NEVER DEVELOPED THIS SEVERE CRACKING (PICTURE PROVIDED) WHICH PROMPTED THIS COMPLAINT.

85.   On July 26, 2018, the following incident dated July 11, 2018 was reported:

DRIVING INTERSTATE, 65MPH, SMALL OBJECT THROWN FROM ANOTHER VEHICLE HIT MY WINDSHIELD ON THE LEFT EDGE. SHORT CRACKS APPEARED IMMEDIATELY. TWO SPREAD ALL THE WAY TO THE REAR VIEW MIRROR AREA WITHIN DAYS. VEHICLE IS ONLY TWO MONTHS OLD.

86.   On December 17, 2018, the following incident dated December 16, 2018 was reported:

MY WINDSHIELD IS CRACKED FOR THE 2ND TIME NOW IN ITS FIRST YEAR OF OWNERSHIP. THE FIRST TIME IT CRACKED IT WAS BECAUSE OF A PEBBLE STRIKE FROM THE ROAD. EXTREMELY SMALL FRAGMENT STRUCK THE GLASS, MADE A POCK MARK, AND THE WINDSHIELD WAS REPLACED. TODAY, LESS THAN A MONTH LATER A NEW CRACK APPEARED WHILE DRIVING WITHOUT ANY STRIKE FROM AN OBJECT. SUBARU DEALER CLAIMS IT WAS STRUCK BUT FIND A CRACK ONLY WITHOUT ANY POINT ALONG IT OF AN IMPACT MAKES ME VERY VERY SUSPICIOUS. NOW I HAVE TO WAIT FOR THE INSURANCE COMPANY TO SETTLE ON CHARGES AND SEND A CHECK BEFORE THE NEXT WINDSHIELD CAN BE APPLIED. MY WIFE AND I WERE CALMLY DRIVING ON COMPLETELY PAVED ROADS WHEN WE BOTH WATCHED THE CRACK APPEAR AND GROW DURING OUR DRIVE. :-( I HAVE DRIVEN FOR 50+ YEARS, AND OWNED 20+ CARS. I'VE NEVER HAD THIS HAPPEN.

87.   On December 21, 2018, the following incident dated December 20, 2018 was reported:

2 WINDSHIELD CRACKS IN LOWER PORTION OF WINDSHIELD DURING 1ST YEAR OF OWNERSHIP. BOTH CRACKS OCCURRED WHILE DRIVING AROUND TOWN ~35 MPH, ONCE DURING A 100 DEGF SUMMER DAY, AND THE OTHER DURING A 40 DEGF RAINY WINTER MORNING. INSPECTION OF CRACK AFTER STOPPING SHOWED POSSIBLE ORIGINATION FROM ~1MM CHIPS.

24

DURING THE SUMMER, THE FIRST CHIP, LOCATED IN THE DE-ICER AREA, GREW RAPIDLY TO A CRACK ACROSS THE WINDSHIELD WITH A LOUD 'POP' SOUND AFTER THE AIR CONDITIONER WAS TURNED ON HIGH USING DEFROSTER AIR MODE. SUBARU OF AMERICA (NOT THE DEALER) REPLACED THE WINDSHIELD AND RECALIBRATED THE EYESIGHT SYSTEM AS A 'GOODWILL' REPAIR.

DURING THE WINTER, ANOTHER CHIP BETWEEN THE VIN# DISPLAY WINDOW AND THE PERIMETER OF THE LOWER WINDSHIELD EXPLOSIVELY GREW TO A CRACK WHEN HEATED DEFROSTER AIR WAS ACTIVATED. REPAIR PENDING.

MAIN CONCERN IS THE FRAGILE NATURE AND TEMPERATURE DEPENDANCE OF THIS GLASS TEMPER, ESPECIALLY NEAR WINDOW BOUNDARY CONDITIONS AND WHERE DEFROSTER AIR IS THE STRONGEST.

OVER 20 YEARS OF DRIVING OTHER VEHICLES ON THE SAME ROUTE HAVE CAUSED LITTLE CHIPS ON OTHER WINDSHIELDS, BUT NEVER HAS A CHIP GROWN INTO A CRACK, WITH OR WITHOUT HOT OR COLD DEFROSTER AIR HITTING IT. I SUSPECT THAT THE THICKNESS AND TEMPER OF THE LATEST GENERATION OF OUTBACK CARLEX WINDSHIELDS WILL CONTINUE TO CAUSE ISSUES SIMILAR TO TSB# 12-192-15R.

88.   On January 17, 2019, the following incident dated January 17, 2019 was reported:

A TINY PEBBLE STRUCK THE WINDSHIELD ON THE INTERSTATE, BUT IT SUDDENLY GREW TO A CRACK APPROXIMATELY 6 INCHES LONG. NEVER HAD THIS PROBLEM BEFORE, AND MY CAR IS FAIRLY NEW ON THE ROAD (LESS THAN 8,000 MILES, BOUGHT IN JULY, 2018). DEEPLY CONCERNED THAT SUBARU STILL HAS NOT FIGURED OUT ITS NOTORIOUS WINDSHIELD-RELIABILITY PROBLEM THAT HAS FRUSTRATED SO MANY DRIVERS THROUGHOUT THE PAST 5 YEARS.

89.   On February 16, 2019, the following incident dated February 16, 2019 was reported:

SECOND CRACKED WINDSHIELD IN ONE WEEK. FIRST ONE WAS REPLACED 2/8/18. BOTH TIMES TRAVELED AT LOW TO MODERATE SPEED 25-40 MPH ON LOCAL FWY IN LOS ANGELES, CA. SUNNY MILD, DRY CONDITIONS, NO WIND. SMALL PEBBLE HIT WINDSHIELD. COULDN'T SEE HIT, ONLY HEARD A SMALL CRACK SOUND. DAMAGED WINDSHIELD, FIRST TIME SMALL PEBBLE

MARK GREW TO LONG CRACK. INITIAL IMPACT SIZE
ABOUT 1.5 - 2 MM. ONE WEEK LATER ANOTHER PEBBLE
HIT WINDSHIELD IN SLOW TRAFFIC,35 MPH, NO
TRUCKS NEAR BY. SAME SIZE OF MARK. SUBARU
REQUIRES THEIR WINDSHIELD REPAIR AT CUSTOMER
COST OF $930. WARRANTY DOES NOT COVER ANY
DEBRIS DAMAGE, BUT SMALL PEBBLES SHOULD NOT
CAUSE THIS KIND OF DAMAGE AND COSTS. HAD A
GRAND CHEROKEE 184K MILES AND NEVER A CRACK
OR DING, NEVER ISSUE FOR OUR 2005 SAAB, OR ANY
OREVIOUS VEHICLE. SHOULD NOT COST US $1860
MONTH ADDITIONAL TO MAINTAIN CAR, PLUS SAFETY
ISSUE. ACCORDING TO SUBARU CORPORATE: DOES
NOT RECOMMEND US TO DRIVE IT WITH I-SITE
CAMERA WITH A DAMAGED WINDSHIELD. THEY SAY
THAT THE GLASS IS THINNER/LIGHTER IN ORDER TO
WORK WITH CAMERA AND BE MORE FUEL
EFFICIENT/LIGHTER. CARS SHOULD BE ABLE TO
WITHSTAND NORMAL DRIVING AND ROAD
CONDITIONS.

90.   On NHTSA's website where consumer complaints about **2019 Subaru Outbacks**
are posted,[10] the following incident posted on January 24, 2019 and dated January 7, 2019 was
reported:

THE CAR WAS NOT USED OVER THE WEEKEND EXCEPT
FOR A 5 MILE TRIP TO CHURCH WHERE IT DID NOT
ENCOUNTER ANY ROCKS, HITS, ETC. DROVE HOME
AND THE CAR WINDSHIELD WAS FINE. THE NEXT
MORNING WHEN I GOT INTO THE CAR, AFTER I USED
MY REMOTE TO START AND WARM UP MY OUTBACK,
THERE WAS ABOUT AN 8-10 INCH CRACK IN THE
WINDSHIELD THAT ORIGINATED FROM BEYOND THE
WINDSHIELD WIPER ON THE PASSENGER SIDE OF THE
CAR. THE CRACK GREW WORSE TO ABOUT 12 INCHES.
CALLED SUBARU DEALER WHO DIRECTED ME TO
THEIR WINDSHIELD SERVICE AGENT. TOOK TIME OFF
FROM WORK AND THEY INSTALLED OEM GLASS
(INSURANCE COVERS THIS) AND CALIBRATED THE
WINDSHIELD. AFTER DRIVING HOME, THE CAR MADE
WIND TUNNEL NOISES, WINDSHIELD FLUID SYSTEM

_____

[10] https://www.nhtsa.gov/vehicle/2019/SUBARU/OUTBACK/SW/AWD (last viewed November
10, 2019).

26

DID NOT WORK, NAVIGATION DID NOT WORK SO I BROUGHT THE CAR TO THE DEALER (TOOK MORE TIME OFF FROM WORK). THEY FOUND A LEAK IN THE WINDSHIELD, REPAIRED THE FLUID UNIT AND IGNORED THE NAVIGATION ISSUE. THEY SENT ME BACK TO THEIR AGENT. THEY TOOK OUT THE WINDSHIELD REPOSITIONED IT AND SENT ME ON MY WAY. TODAY I FOUND PUDDLES OF WATER ON THE FLOOR OF MY CAR (LEAK), NAVIGATION DOES NOT WORK AND WIND TUNNEL NOISE IS STILL THERE. THIS WINDSHIELD IS SUPPOSED TO PROTECT THE DRIVER AND PASSENGER AS EXTRA SUPPORT FOR THE ROOF, PREVENTION OF OBJECTS FLYING AT YOU AND ALLOW FOR THE EYESIGHT SYSTEM TO DO ITS JOB. THIS CAR IS ONE MONTH OLD AND THE CRACK IN THE WINDSHIELD EXPERIENCE SOUNDS EERILY SIMILAR TO OTHERS' COMPLAINTS. WHEN YOU PAY THE MONEY FOR A TOP SAFETY PICK, YOU WANT THE SAFETY AND I DO NOT HAVE IT.

91.     The following incident dated February 15, 2019 was reported:

WINDSHIELD SPONTANEOUSLY CRACKED AT THE BASE OF THE WINDSHIELD, UNDER THE WIPER BLADE WHILE DRIVING ON THE HIGHWAY. I WAS NOT FOLLOWING ANY VEHICLES SO A ROCK CHIP COULD NOT BE THE CAUSE. THIS IS POOR WINDSHIELD QUALITY AND DESIGN BY SUBARU.

92.     On April 10, 2019, the following incident dated March 27, 2019 was reported:

ON TWO SEPARATE OCCASIONS, SOMETHING WAS KICKED UP AND HIT THE WINDSHIELD OF THE VEHICLE. BOTH TIME AN IMMEDIATE CRACK WAS SENT THROUGHT THE WINDSHIELD. BOTH TIMES WERE ON AN HIGHWAY, TRAVELING ABOUT 45MPH. I HAVE HAD THINGS POP UP AND HIT MY WINDSHIELD IN OTHER VEHICLES AND MAYBE THEY JUST CHILL OR STAR . I FEEL THERE IS A SIGNIFICANT DIFFERENCE IN THE STRENGTH OF THE GLASS THAT IS USED, IN THIS VEHICLE I FEEL IT IS EXTREMELY WEAK.

93.     On April 12, 2019, the following incident dated April 10, 2019 was reported:

ON 4/10/19 AS I WAS GETTING INTO MY CAR, I NOTICED A HUGE CRACK ON MY DRIVER SIDE OF THE WINDSHIELD THAT STARTS FROM THE BASE RUNNING TOWARD THE CENTER OF THE WINDSHIELD. THE CAR WAS BOUGHT ON JAN 20TH OF 2019 AND HAS 4200 MILES. CALLED SAFELITE AND THEY ARE ESTIMATING $1300+ TO REPLACE.

94.    On April 19, 2019, the following incident dated April 17, 2019 was reported:

MY CONCERN IS WITH THE QUALITY AND SAFETY OF THE WINDSHIELD ON THE 2019 SUBARU OUTBACK. I PURCHASED A 2019 SUBARU OUTBACK ON 12/31/18. IT NOW HAS 3200 MILES ON IT. ON 04/17/19 I NOTICED AN 8-10 INCH CRACK IN THE WINDSHIELD. THERE WAS A VERY SMALL, BARELY NOTICEABLE, CHIP WITHIN THE CRACK. AT NO TIME DID I HEAR ANYTHING HIT THE WINDSHIELD WHILE DRIVING. THEREFORE, A CRACKED WINDSHIELD WAS SHOCKING AND ENTIRELY UNEXPECTED FROM SUCH MINIMAL CONTACT WITH THE WINDSHIELD. WHEN THE CAR IS NOT IN USE IT IS GARAGE KEPT. MY COMMUTE HAS NOT CHANGED SINCE BUYING THIS CAR AND I HAVE NEVER HAD A CAR WINDSHIELD CRACK IN OVER 30 YEARS OF DRIVING. DUE TO THE SIZE OF THE CRACK, THE ENTIRE WINDSHIELD MUST BE REPLACED AND THE SUBARU "EYESIGHT" SYSTEM RE-CALIBRATED. IT IS MY OPINION THAT THE WINDSHIELD SHOULD NOT HAVE CRACKED IN THIS SITUATION. A SIMPLE GOOGLE SEARCH INDICATES THAT OTHERS HAVE CONCERNS WITH THE 2019 SUBARU OUTBACK WINDSHIELD.

95.    On NHTSA's website where consumer complaints about **2017 Subaru Foresters** are posted,[11] the following incident posted on February 10, 2018 and dated January 26, 2018 was reported:

THE WINDSHIELD SPONTANEOUSLY CRACKED, MIDDLE PASSENGER SIDE (NOT AWARE WHEN IT HAPPENED. ONE TIME CAME OUT INTO THE GARAGE AND NOTICED IT WAS CRACKED). IT ALSO WAS SEVERELY CHIPPED ONE TIME BEFORE (2500 MILES). SO IT HAS HAD TO BE REPLACED 2 TIMES WITHIN 16,000 MILES AND LESS THAN ONE YEAR OWNERSHIP.

96.    On February 22, 2018, the following incident dated February 12, 2018 was reported:

---

[11] https://www.nhtsa.gov/vehicle/2017/SUBARU/FORESTER/SUV/AWD (last viewed November 10, 2019).

WHILE DRIVING SUBARU FORESTER 2017, A SMALL ROCK HIT THE WINDSHIELD AND SMALL CRACK QUICKLY TURNED INTO 24" TO 30" LONG LINEAR CRACK AND AS A RESULT ENDED UP REPLACING WIND SHIELD GLASS AND RE-CALIBRATION OF EYESIGHT. THIS HAPPENED TWICE IN LAST 8 MONTHS. IT APPEARS TO BE AN OEM ISSUE. UNLIKE MY OTHER TWO VEHICLES, THEY HAD SIMILAR ISSUE HOWEVER THE CRACK WAS SHIELD BY PROFESSIONALS AND NEVER DEVELOPED LINEAR CRACK.

97.     On March 21, 2018, the following incident dated March 21, 2018 was reported:

OWN A 2017 SUBARU FORESTER, WE HAVE LESS THAN 11,000 MILES AND LESS THAN ONE YEAR OF OWNERSHIP. A SMALL STONE HITTING THE WINDSHIELD, QUICKLY ENDS UP IN A 24" TO 30" LONG LINEAR CRACK UNLIKE MY OTHER TWO VEHICLES. WE ARE IN PROCESS OF REPLACING 3RD WINDSHIELD GLASS IN LESS THAN ONE YEAR. IT APPEARS THAT THERE MAY BE AN OEM DEFECT. THIS LONG CRACK CREATES DANGER VISION PROBLEM. EVERY WINDSHIELD REPLACEMENT REQUIRES RE-CALIBRATION OF EYESIGHT TOO. THIS IS AN ADDITIONAL BURDEN ON INSURANCE AS WELL AS OWNERS AND SHOULD BE ADDRESSED ASAP. MANUFACTURER HAS NOT YET ACKNOWLEDGE THE EXISTENCE OF DEFECTIVE WINDSHIELD. WE REQUEST THAT CONSUMER PRODUCT RECALL INVESTIGATE THIS ISSUE ASAP.

98.     On NHTSA's website where consumer complaints about **2018 Subaru Foresters** are posted,[12] the following incident posted on September 7, 2018 and dated September 4, 2018 was reported:

WINDSHIELD CRACKED ALL THE WAY ACROSS FROM THE TINIEST LITTLE DING FROM A ROCK.

---

[12] https://www.nhtsa.gov/vehicle/2018/SUBARU/FORESTER/SUV/AWD (last viewed November 10, 2019).

99.   On November 2, 2018, the following incident dated September 1, 2018 was reported:

> THE WINDSHIELD SIMPLY CRACKED UNDER THE PASSENGER WIPER AND QUICKLY SPREAD ACROSS THE WINDSHIELD. THERE WAS NO VIABLE IMPACT AND IT APPEARED OVERNIGHT. THIS HAPPENED IN EARLY SEPTEMBER AND WE ARE STILL WAITING FOR AN OEM REPLACEMENT FROM SUBARU.

100.   On March 17, 2019, the following incident dated December 21, 2018 was reported:

> I PURCHASED THIS CAR 7/31/18. ON 12/21/18 (ODOMETER 3,427 MILES), THE FIRST MORNING WITH A HARD FROST, I FOUND THAT MY 2018 SUBARU FORESTER (STATIONARY AND PARKED IN MY DRIVEWAY) HAD DEVELOPED A CRACK OVERNIGHT FROM THE LOWER LEFT CORNER OF THE DRIVER'S SIDE UPWARD. (NO CRACK THE DAY BEFORE) I DROVE THE CAR 3 MILES TO WORK, CALLED THE DEALERSHIP WHERE I PURCHASED IT, AND SCHEDULED A SERVICE MANAGER EVALUATION APPOINTMENT THAT MORNING. I DROVE 12 MORE MILES TO THE DEALERSHIP. IN UNDER 3 HOURS, DRIVING TOTAL 15 MILES, SINCE DISCOVERING THE CRACK AND ARRIVING AT THE DEALERSHIP, THE CRACK HAD PROGRESSED UP AND ACROSS THE DRIVER'S SIDE OF THE WINDSHIELD. THE SERVICE MANAGER AGREED TO REPLACE THE WINDSHIELD AT NO COST TO ME, "AS A ONE-TIME GOOD WILL GESTURE". HE POINTED TO THE BASE OF THE CRACK WHICH BEGAN AT THE BOTTOM OF THE BLACK AREA BORDERING THE BASE OF THE WINDSHIELD, CLAIMED HE COULD SEE A CHIP, AND DUG HIS PEN INTO THE GLASS TO ENLARGE THE CRACK. TO ME, THIS ARE LOOKED MORE A FLAW IN THE GLASS WHERE BROKEN WINDSHIELD MAY HAVE HAD A FLAW HAD FLEXED DUE TO THE FREEZING WEATHER. HE DESCRIBED THE DAMAGE AS A CHIP ON MY REPAIR TICKET, WHICH IS MISLEADING IF AN ANALYSIS IS DONE ON THE CRACK, BUT IT SUPPORTS THE TICKET'S NOTE THAT THIS WAS A 1-TIME REPAIR AT NO CHARGE, WITH NO GUARANTEE OF FUTURE SIMILAR REPAIRS. THE DEALER DELAYED THE REPAIR DUE TO CHRISTMAS, AND THE CRACK CONTINUED TO PROGRESS ACROSS THE WINDSHIELD. REPLACEMENT INSTALLATION SCHEDULED FOR 12/26/18. ARRIVING FOR MY APPOINTMENT I WAS TOLD THE WINDSHIELD WAS ORDERED BUT THE DEALER FAILED TO SCHEDULE AN INSTALLER. THEY KEPT MY CAR UNTIL

THE REPAIR WAS COMPLETED ON 12/28/19. THEY PROVIDED A LOANER CAR. RESEARCHING SUBARU WINDSHIELD CRACKS ONLINE, I LEARNED THAT SUBARU WINDSHIELDS HAVE A PROBLEM WITH SPONTANEOUSLY CRACKING, BEGINNING WITH A 2016 OUTBACK RECALL, BUT FORESTER OWNERS ALSO ARE REPORTING CRACKS.

101.    On March 18, 2019, the following incident dated March 13, 2019 was reported:

OUR WINDSHIELD CRACKED SPONTANEOUSLY, STARTING AT THE WIPER PARK HEATER ON THE DRIVER SIDE. THE CAR WAS PARKED IN A PARKING GARAGE WHEN THE CRACK SPONTANEOUSLY APPEARED.

102.    On NHTSA's website where consumer complaints about **2019 Subaru Foresters** are posted,[13] the following incident posted on February 5, 2019 and dated January 31, 2019 was reported:

I AM HERE TO REPORT MY 2019 SUBARU FORRESTER WINDSHIELD CRACK. I THE CAR IS ONLY 1 MONTH OLD AND WE FOUND THE CRACK IN THE MORNING WHILE SITTING IN THE DRIVEWAY I HEARD THE SAME PROBLEM HAPPENS ON 2015 OUTBACK I CALLED THE SHOP AND THEY TOOK PICTURES AND THEY DID NOT FIND ANY CHIPS THAT WOULD INDICATE A ROCK OR PEBBLE HIT THE CAR AND SAID THEY WILL CALL SUBARU AND GET BACK TO ME

103.    On March 8, 2019, the following incident dated February 13, 2019 was reported:

WINDSHIELD CRACKED FOR NO REASON NOTHING HIT IT WENT TO DEALER NO HELP FROM THEM TOOK CAR TO GLASS EXPERT. SAID WINDSHIELD WAS NOT HIT (SPONTANEOUS CRACK) HAPPENS ON 02/13/2019 FOUND OUT NO REPLACEMENT IN THE USA. WINDOW OUT OF CAR 02/26/2019) SUBARU NO HELP LEFT WITHOUT CAR

---

[13] https://www.nhtsa.gov/vehicle/2019/SUBARU/FORESTER/SUV/AWD (last viewed November 10, 2019).

104.    On March 13, 2019, the following incident dated March 12, 2019 was reported:

WHILE DRIVING ON THE FREEWAY, THERE WERE SOME
BUMPS ON THE ROAD AND SUDDENLY A CRACKLING
NOISE AND A VERTICAL CRACK DEVELOPED ON THE
DRIVER SIDE WINDSHIELD. THE CRACKED RUN FROM
THE UPPER RIGHT CORNER TOWARDS THE BOTTOM OF
THE WINDSHILED.

105.    On March 14, 2019, the following incident dated January 1, 2019 was reported:

WINDSHIELD CRACK AND ROCK CHIP. THE SUBARU
OEM WINDSHIELD IS VERY WEAK AND I'VE ALREADY
NOTICED A CHIP ON THE WINDSHIELD FOR A CAR
THAT IS 5 MONTHS OLD. SEVERAL OWNERS HAVE
ALREADY FILED A COMPLAINT FOR THE PREVIOUS
YEARS, AND ITS THE SAME FOR 2019 AS WELL.

106.    On March 15, 2019, the following incident dated January 5, 2019 was reported:

BOUGHT THE CAR 11/23/2018, AND IN JANUARY 2019
THE WINDSHIELD CRACK FROM THE BOTTOM UP AND
BRANCH OUT FOR NO REASON. THE CAR PARKED
INSIDE OF OUR GARAGE. CONTACTED SUBARU HQ AND
DEALERSHIP SUBARU OF ONTARIO CALIFORNIA, BOTH
DENIED THE WINDSHIELD HAS ANY DEFECT. AND THE
DEALERSHIP SERVICE MANAGER ONLY LOOKED AT IT
2 SECONDS AND SAID IT'S IMPACTED!!

107.    On April 1, 2019, the following incident dated April 1, 2019 was reported:

THE    FORESTER    ARRIVED    TO    US    FROM    THE
DEALERSHIP WITH A CRACKED WINDSHIELD. IT WAS
REPLACED BY THE DEALERSHIP. THE REPLACEMENT
WAS CRACKED WITHIN A DAY OF DRIVING THE
VEHICLE. THERE SEEMS TO BE AN ONGOING ISSUE
WITH THE 2019 SUBARU FORESTER WINDSHIELDS.
BOTH TIMES OF INCIDENT THE VEHICLE WAS IN
MOTION ON THE HIGHWAY AND WAS IMPACTED BY A
VERY SMALL ROCK - YET THE ENTIRE WINDSHIELD
BECAME DAMAGED.

108.    On NHTSA's website where consumer complaints about **2017 Subaru Legacies** are posted,[14] the following incident posted on July 6, 2017 and dated July 6, 2017 was reported:

> HELLO,
>
> I HAVE NOTICED AN ISSUE WITH 2017 SUBARU LEGACY WINDSHEILDS. WHEN THE OUTSIDE TEMPERATURE IS ABOVE 88°F AND THE "AUTO" CLIMATE CONTROL IS SET TO 68°C THE DIFFERENCE IN THE TEMPERATURE BETWEEN THE OUTSIDE AIR, AND THE COOLING INSIDE AIR DRAMATICALLY INCREASES THE WEAKNESS AND BRITTLENESS OF THE WINDSHEILD, SUCH THAT WHEN SOMETHING HITS IT, IT ALMOST INSTANTANEOUSLY CRACKS MORE THAN 7-8 INCHES IN LENGTH. I AM NIW HAVING MY SECOND WINDSHEILD REPLACED IN THE LAST 2 MONTHS BECAUSE OF THIS ISSUE.
>
> BOTH TIMES I WAS DOING ABOUT 70MI/HR ON I-94...I KNOW WINDSHEILDS CRACK WHEN SOMETHING HITS THEM, BUT THIS WAS DIFFERENT THE STRIKE WAS BARELY    NOTICEABLE,    SOMETHING    THAT    IF CONDITIONS WERE COOLER OR THE TEMPERATURE EQUALIZED, I DONT THINK THE THERMODYNAMICS WOULD BE RIGHT FOR.
>
> ****

109.    On June 12, 2018, the following incident dated June 12, 2018 was reported:

> NEW 2017 SUBARU LEGACY WAS BOUGHT IN MAY 2017. WITH IN A MONTH, WINDSHIELD CRACKED WHEN THE CAR WAS STATIONARY IN A SHOPPING MALL PARKING LOT. DEALER DID NOT COVER STATING IT WAS ROCK HIT. IT GOT FIXED WITH INSURANCE CLAIM. AFTER FIXING IT, THE SAME DAY EVENING IN THE OFFICE PARKING LOT, IT CRACKED AT THE SAME SPOT. WITH COURTESY OF THE REPAIRER IT WAS CHANGED WITH WARRANTY. NOW, EXACTLY AFTER ONE YEAR, WHILE DRIVING ON THE HIGHWAY, HEARD LOUD NOISE AS IF MY TIRE GOT BURST. WHILE LOOK AROUND I SAW THE WINDSHIELD CRACK AT THE SAME SPOT. IT CAN NOT

---

[14]https://www.nhtsa.gov/vehicle/2017/SUBARU/LEGACY/4%252520DR/AWD (last viewed November 14, 2019).

> BE COINCIDENT TO HAPPEN 3 CRACKS AT THE SAME
> SPOT.

110.    On NHTSA's website where consumer complaints about **2018 Subaru Legacies** are posted,[15] the following incident posted on April 4, 2019 and dated March 25, 2019 was reported:

> THE SUBARU LEGACY WINDSHIELD IS EXTREMELY
> BRITTLE, SMALL SALT DEBRIS CAUSED THE
> WINDSHIELD TO HAVE SEVERAL CHIPS ALL OVER THE
> WINDSHIELD, IN ALL MY YEARS I'VE NEVER SEEN
> WINDSHIELDS BEING THIS BRITTLE. THERE ARE
> THOUSANDS OF COMPLAINTS ON SUBARU FORUMS
> ABOUT WINDSHIELDS THAT HAVE THE EYESIGHT
> EQUIPPED THAT THEY ARE PRONE TO CRACKING AND
> CHIPPING EASILY. RECENTLY SUBARU LOST A
> LAWSUIT ABOUT THEIR WINDSHIELD CRACKING ON
> THE 2015 AND 2016 SUBARU OUTBACKS, I BELIEVE
> SUBARU HAS NOT ADDRESSED THIS ISSUE YET.
>
> WHILE I WAS DRIVING ON THE HIGHWAY ON MY WAY
> TO VACAVILLE CALIFORNIA MY WINDSHIELD ENDED
> UP WITH AT LEAST DOZENS OF CHIPS ALL OVER MY
> WINDSHIELD. THIS IS UNACCEPTABLE BECAUSE I'VE
> MADE THIS TRIP COUNTLESS AMOUNT OF TIMES ON
> MY OLD CAR AND NEVER HAD THIS ISSUE.

111.    On NHTSA's website where consumer complaints about **2019 Subaru Legacies** are posted,[16] the following incident posted on November 7, 2018 and dated November 4, 2018 was reported:

> MY CAR IS 2 WEEKS OLD. I USED THE DEFROSTER ON
> SATURDAY NIGHT AND ON SUNDAY MORNING THERE
> WAS A CRACK ON MY WINDSHIELD FROM THE
> BOTTOM CENTER. UP AND TO THE PASSENGER'S SIDE. I
> DO NOT HEAR A STONE HIT MY WINDSHIELD WHILE

---

[15]https://www.nhtsa.gov/vehicle/2018/SUBARU/LEGACY/4%252520DR/AWD (last viewed November 14, 2019).

[16]https://www.nhtsa.gov/vehicle/2019/SUBARU/LEGACY/4%252520DR/AWD (last viewed November 14, 2019).

DRIVING. SUBARU SAID IT WAS A STONE AND IS
CHARGING ME OVER $700.00 TO REPLACE IT. I HAVE
BEEN DRIVING FOR MANY YEARS AND HAVE NEVER
GOTTEN A CRACK LIKE THIS. I BELIEVE IT IS A FAULTY
WINDSHIELD THAT CRACKED WITH THE CHANGE IN
TEMPERATURE.

112.    On November 27, 2018, the following incident dated November 23, 2018 was

reported:

THE VEHICLE IS LESS THAN ONE MONTH OLD AND IT
WAS FOUND ONE MORNING WITH AN 8 INCH CRACK IN
THE WINDSHIELD. THERE WAS NO IMPACT MADE ON
THE WINDSHIELD. THE CRACK IS COMING FROM THE
BOTTOM LEFT CORNER AND GOES TOWARDS THE
CENTER.

113.    On August 29, 2019, the following incident dated August 28, 2019 was reported:

I'VE OWNED MY 2019 SUBARU LEGACY FOR EXACTLY
ONE MONTH. YESTERDAY, WHILE DRIVING ON ROUTE
13 IN DELAWARE, I SAW A CRACK SPREAD FROM THE
OUTSIDE RIGHT SIDE OF THE WINDSHIELD ON THE
PASSENGER SIDE OF THE CARD AND SPREAD FOR
ABOUT 15 INCHES SORT OF IN THE SHAPE OF AN "S".
NEITHER MYSELF NOR THE PASSENGER SITTING IN THE
FRONT SEAT HEARD ANYTHING HIT THE CAR NOR DID
WE SEE ANYTHING. I TOOK THE CAR TO THE SUBARU
DEALERSHIP THIS MORNING AND I WAS TOLD THAT
SOMETHING VERY TINY HIT THE WINDSHIELD. HOW
COULD SOMETHING THAT TINY CAUSE THAT KIND OF
DAMAGE? I AM STILL UNABLE TO SEE THE IMPACT. THE
SUBARU WINDSHIELDS MUST BE PAPER THIN. I WAS
INFORMED BY THE SERVICE CLERK THAT THERE WAS
NOTHING THAT SUBARU COULD DO TO HELP. I AM
EXTREMELY DISAPPOINTED IN THEIR RESPONSE.

114.    On December 24, 2019, the following incident dated March 31, 2019 was

reported:

I HAD THE CAR LESS THAN A MONTH AND GOT HOME
FROM WORK, PARKED THE CAR IN THE GARAGE AND
EVERYTHING WAS FINE, THE VERY NEXT MORNING

WHEN I WENT OUT TO GET IN MY CAR THE WINDSHIELD HAD A HUGE CRACK IN IT. I GOT THE WINDSHIELD REPLACED AND IN LESS THAN A MONTH THE WINDSHIELD CRACKED AGAIN.

115.   On January 20, 2020, the following incident dated January 20, 2020 was reported:

I'LL BE REPLACING MY WINDSHIELD FOR THE SECOND TIME WITHIN A YEAR TOMORROW AND HAVING IT REPAIRED OVERALL FOR THE THIRD TIME WITHIN A YEAR. THE FIRST REPLACEMENT WAS DUE TO A SMALL PEBBLE KICKING UP FROM THE HIGHWAY CAUSING A SMALL STAR CRACK IN MY LINE OF SIGHT FORCING A REPLACEMENT BECAUSE THE PATCH STILL CAUSED LINE OF SIGHT ISSUES. LESS THAN A MONTH LATER ANOTHER SMALL PEBBLE CAUSED A SECOND CRACK. THIS TIME A PATCH WAS FINE AND LUCKILY WAS FREE. THIS MORNING I CAME OUT TO MY CAR, WHICH HAD BEEN PARKED ALL WEEKEND, AND WHEN I GOT IN SAW THAT THERE IS A LONG J SHAPED CRACK STARTING FROM THE TOP OF THE WINDSHIELD NEAR THE PASSENGER SIDE EYESIGHT CAMERA GOING ALL THE WAY DOWN AND AROUND THE DOT MATRIX PATTERN THAT COMES DOWN THE WINDSHIELD NEAR THE REAR VIEW MIRROR. THESE WINDSHIELDS ARE TERRIBLE AND I'VE NEVER HAD AN ISSUE WITH A WINDSHIELD BEFORE OWNING A SUBARU. IT'S UNFORTUNATE BECAUSE THE REST OF THE CAR IS GREAT. IF YOU'RE GOING TO BUY A SUBARU PROBABLY PREPARE FOR AN ANNUAL WINDSHIELD REPLACEMENT AND GET READY FOR THAT DEDUCTIBLE.

116.    On NHTSA's website where consumer complaints about **2018 Subaru Crosstrek** are posted,[17] the following incident posted on July 26, 2018 and reported on July 17, 2018 was reported:

> CRACK APPEARED IN LOWER DRIVER'S SIDE PORTION OF WINDSHIELD. CAR WAS PARKED WHEN CRACK APPEARED. NO KNOWN SIGNIFICANT DAMAGE TO WINDSHIELD. CRACK APPEARS TO HAVE STARTED UNDERNEATH WINDSHIELD WIPER AT THE DE-ICER AREA AND THEN SPREAD UPWARDS.

117.    The following incident that occurred on June 28, 2019 was reported:

> THE WINDSHIELD DEVELOPED 2 LARGE CRACKS THAT HINDER THE VISIBILITY ON BOTH THE DRIVER AND PASSENGER SIDE. THE CRACKS DEVELOPED OVER APPROXIMATELY 4 MONTHS WHILE PARKED.

118.    The following incident that was posted on October 28, 2019 and reported on November 20, 2018 was reported:

> I WAS DRIVING ON THE FREEWAY 3 MONTHS AFTER PURCHASING THE CAR BRAND NEW, AND THE WINDSHIELD CRACKED ON THE DRIVERS SIDE ABOUT HALFWAY UP. I REPLACED THE WINDSHIELD ONLY TO HAVE IT CRACK IN THE SAME SPOT 3 MONTHS LATER.

119.    The following incident that was posted on October 28, 2019 and reported on February 27, 2018 was reported:

---

[17] https://www.nhtsa.gov/vehicle/2018/SUBARU/CROSSTREK/SW/AWD (last viewed February 3, 2020)

> WINDSHIELD CRACKED WITHIN 30 TO 45 DAYS OF
> PURCHASE FOR NO APPARENT REASON. HAD A SECOND
> CRACK LESS THAN A YEAR LATER

120.　On NHTSA's website where consumer complaints about **2019 Subaru Crosstrek** are posted,[18] the following incident posted on April 2, 2019 and reported on March 15, 2019 was reported:

> BOUGHT A BRAND NEW 2019 SUBARU CROSSTREK, A
> CRACK AT THE BOTTOM OF THE WINDSHIELD JUST
> APPEARED ONE MORNING AFTER WARMING IT UP IN 20
> DEGREE WEATHER, IN MICHIGAN. CRACK STARTED IN
> THE WIPER HEATING ELEMENT AREA AND THE CRACK
> SPREAD ALL THE WAY TO THE TOP. NO ROCK CHIPS
> ARE PRESENT. THE CAR IS JUST OVER 3 MONTHS OLD,
> 1700 MILES. I READ ELSEWHERE THAT THE NEWER
> OUTBACKS HAD THE SAME ISSUES. DOES CROSSTREK
> HAVE THE SAME ISSUES? SUBARU WON'T COVER IT.
> TOTAL BS.

121.　The following incident that was posted on April 29, 2019 and reported on April 28, 2019 was reported:

> I BOUGHT NEW 2019 SUBARU OUTBACK 3 WEEKS AGO
> AND I SEE A CRACK DEVELOPED FROM PASSENGER
> SIDE OF THE WINDSHIELD IN THE CENTER FOR NO
> REASON WHILE THE CAR WAS PARKED IN THE GARAGE
> FOR MORE THAN 36 HOURS.I DIDN'T EXPERIENCE
> ANYTHING HITTING THE WINDSHIELD, AND ITS

---

[18] https://www.nhtsa.gov/vehicle/2019/SUBARU/CROSSTREK/SW/AWD (last viewed February 3, 2020)

> SPREADING OVER 2 FT ACROSS THE WINDSHIELD. THE
> CAR HAS 1,300 MILES ON IT. THIS IS CLEARLY A
> DEFECTIVE WINDSHIELD.

122.    The following incident that was posted on October 27, 2019 and reported on
August 1, 2019 was reported:

> I WAS DRIVING DOWN A ROAD THAT IS A 45MPH ROAD,
> AND I DONT HEAR A ROCK HIT MY WINDSHIELD BUT I
> LOOK DOWN AND NOTICE I HAVE A SMALL CRACK
> STARTING AT THE VERY EDGE OF MY WINDSHIELD,
> WHICH THEN SPREAD ACROSS MY WINDSHIELD
> RATHER QUICKLY.

123.    The following incident that was posted and reported on October 31, 2019 was
reported:

> WAS SITTING IN MY CAR WAITING IN A PARKING LOT
> AND I LOOK OUT MY WINDSHIELD AND A CRACK WAS
> HAPPENING RIGHT IN FRONT OF MY EYES, I'VE ONLY
> HAD THE CAR FOR A WEEK AND HAD AROUND 300
> MILES ON IT.

124.    On NHTSA's website where consumer complaints about **2017 Subaru Impreza**
are posted,[19] the following incident posted on October 27, 2019 and regarding an incident on
March 23, 2019 was reported:

> 3 CRACKED WINDSHIEDS IN LESS THAN 2 YEARS
> SPONTANEOUSLY CRACKED WINDSHIELDS TWICE
> WHILE PARKED

---

[19] https://www.nhtsa.gov/vehicle/2017/SUBARU/IMPREZA/4%252520DR/AWD
 (last viewed February 3, 2020)

125.    On NHTSA's website where consumer complaints about **2018 Subaru Impreza** are posted,[20] the following incident posted on October 5, 2018 and regarding an incident on October 4, 2018 was reported:

> PURCHASED THIS CAR BRAND NEW ABOUT A MONTH AGO. A LARGE FRACTURE CRACK APPEARED IN THE MIDDLE MY WINDSHIELD, ORIGINATING FROM THE BASE UNDERNEATH THE PLASTIC STRIPPING, EXTENDING UPWARD IN AN INVERTED L SHAPE. HAPPENED FOR NO APPARENT REASON; THE CAR WAS STATIONARY, PARKED INSIDE MY CLOSED GARAGE, SO THERE WAS NO REASON OR CAUSE FOR A CRACK TO OCCUR. APPARENTLY SUBARU IS AWARE OF THEIR WINDSHIELD DEFECTS AS THEY RECENTLY LOST A LAWSUIT CASE OVER THIS ISSUE FOR THEIR OUTBACK MODELS.

126.    On NHTSA's website where consumer complaints about **2019 Subaru Impreza** are posted,[21] the following incident posted on August 13, 2019 and regarding an incident on August 10, 2019 was reported:

> WINDSHIELD CRACKED SPONTANEOUSLY. WAS DRIVING DOWN A SMOOTH OPEN ROAD AT 40MPH AND HEARD THE SOUND OF A CRACK. I LOOK TO MY PASSENGER SIDE AND A LONG CRACK WAS THERE. THE CRACK ITSELF STARTS FROM THE BOTTOM OF THE GLASS AND MAKES ITS WAY UP AND ACROSS. AGAIN, DRIVING DOWN AN OPEN ROAD SO THERE WAS NO OTHER VEHICLE IN FRONT OF ME TO KICK UP DEBRIS.

---

[20] https://www.nhtsa.gov/vehicle/2018/SUBARU/IMPREZA/4%252520DR/AWD (last viewed February 3, 2020)

[21] https://www.nhtsa.gov/vehicle/2019/SUBARU/IMPREZA/4%252520DR/AWD (last viewed February 3, 2020)

127.    On June 22, 2019 the following regarding an incident on June 19, 2019 was reported:

> WINDSHIELD SPONTANEOUSLY CRACKED. I WAS PULLING OUT OF DRIVEWAY AND STOPPED TO PLUG IN MY PHONE WHEN THE WINDSHIELD POPPED AND CRACKED. THERE WAS NO FLYING DEBRIS THAT HIT THE WINDSHIELD THEN OR PREVIOUSLY. WE TOOK TO DEALERSHIP FOR ASSESSMENT BECAUSE WE FELT IT WAS A STRESS CRACK, BUT THEY SAID IT WASN'T AND THEY WOULDN'T REPLACE IT.

## 2.    Customer Complaints on Third-Party Websites

128.    Consumers similarly complained about the defect on various online forums. Below are some examples.

129.    In a forum for **2017 Subaru Outbacks** titled "Cracked Windshield"[22] on carcomplaints.com, consumers posted as follows:

> a)    A consumer wrote on December 14, 2016:
>
> This crack appeared suddenly on the lower right side (passenger side) of windshield of my 2017 Subaru Outback, and could be observed actually spreading toward the lower center after just having left my garage 3 or 4 minutes earlier into a snow storm.
>
> There had been no sound of any impact on the vehicle since leaving the garage.
>
> Upon close inspection of the cracked windshield there appeared to be a tiny ding in the midst of the crack. I was not aware of any prior impact of any hard object to this windshield.
>
> I am disturbed about how a tiny (less than centimeter) ding could result in a crack that resulted in need for windshield replacement so soon after purchasing (3000 miles) the car. I am also unaware of any warranty with Subaru that would have covered the cost of replacement. A claim was made to my auto insurance. My

---

[22]https://www.carcomplaints.com/Subaru/Outback/2017/windows_windshield/cracked_windshield.shtml (last viewed November 13, 2019).

windshield was replaced.

Please see complaints of further windshield damages requiring repairs, and a current crack to the replacement windshield which has not yet been repaired (probably will require another replacement).

b)  Another consumer wrote on July 26, 2019:

While driving down the highway July 2017, a very small rock hit within bottom 2 inches (near the center) of the windshield that over the course of a few days grew. Took it in and due to the eye sight re-calibration had to pay $1600.00 to have it repaired by the dealer. This past week, with a bump of my hand on the front windshield it cracked again! Seriously, hitting with window with my bare hand, with little force SHOULD NEVER CAUSE THE WINDOW TO CRACK. My insurance deducible is $1,000 so hardly worth reporting it. The cost to replace is exorbitant. After doing some research online I find that that easily cracked wind shields are a common problem. I can't keep replacing my windshield at $1,600 a pop!

130.   In a forum for **2018 Subaru Outbacks** titled "Windshield Cracks Easily"[23] on carcomplaints.com, consumers posted as follows:

a)  A consumer wrote on May 13, 2018:

Our Subaru was about 2 weeks old when while on a drive on a paved highway a crack suddenly appeared on passenger side of windshield. We had not experienced any indication of getting hit by a rock, etc. It seemed to come from the edge and extended in a curved pattern about 8 inches. The crack grew to about 12 inches.

Went to local Subaru dealer in Rapid City, SD the next day. The service tech traced the crack with a ball point pen and found a "star" indicating a rock chip very near the side edge of the windshield where the crack appeared to start. Since they don't replace windshields at their dealership they referred us to the local Safelite shop. They confirmed that it was a rock chip & replaced the windshield with what they told us was am OEM Subaru windshield. Since the car has "Eyesight" potentially it

---

[23]https://www.carcomplaints.com/Subaru/Outback/2018/windows_windshield/windshield_cracks_easily.shtml (last viewed November 13, 2019).

may have had to be recalibrated, but in our case it did not, which saved us a few hundred $$.

Incidentally, within one week of the windshield replacement we had a known rock hit the windshield while driving on a paved highway when we met a pickup truck and saw & heard the rock hit. It left a chip which we had repaired by the same Safelite shop the following day.

b)  Another consumer wrote on May 17, 2018:

I know on the first event of the windshield cracking, a pebble hit in while on the highway. We had it back for 7 days when it happened again, got it back last Friday and it happened again (today is Thursday 5/17). I know the dealer claims a pebble hit it the second time, and I am sure they will this time. I cannot imagine how a pebble can cause this, been driving many years and have noted this happen previous and have had many pebbles hit my windshields over the years. I suspect faulty glass, I shared that with the dealer but no success. I will examine options under Virginia's Lemon law. Each time this occurs it takes the car away for 2 days as with all the technology the windshield must be calibrated as well.

c)  Another consumer wrote on June 1, 2018:

I had just drove off the lot and not 24 hrs. past brand new, got hit by a small rock...I thought it was a bug didn't even flinch and then a little thud afterwards 3 mins....crack appeared to move all the way across my vision. 12 inches immediately.

d)  Another consumer wrote on July 22, 2018:

This is my second Subaru in 1 year. My 2017 was totaled by hail (all the windows were knocked out). We were driving on the highway, and we got hit with a small rock. It hit right at the bottom, and it instantly started to crack. Within 30 seconds, it grew to well over 12 inches. It was a very small rock, that should've only been a starburst of a ding, and easily fixed. My 2017, had the exact same crack before it was totaled out from hail. I actually had a pending insurance claim to get the windshield fixed because they cost around $600-$700 to replace.

The car has less then 500 miles and I already have to get the windshield replaced. I read there was a pending lawsuit on other Outback years, and obviously, nothing has changed. I even have the windshield coverage for the outback, but it only covers dings, not large cracks. Didn't even stand a chance.

e)  Another consumer wrote on September 18, 2018:

> I am here to report my 2018 Subaru Outback windshield crack. I heard the same problem happens on 2015 Outback (I owned one before). So I found the document from Internet, Subaru 12-192-15R, about extend warranty for 2015 windshield. I took the file to a Subaru shop, they just refused 2018 has the same problem - no same warranty. Now I don't know what to do.

131. In a forum for **2018 Subaru Outbacks** titled "Cracked Windshield"[24] on carcomplaints.com, consumers posted as follows:

a) A consumer wrote on December 27, 2018:

> I had replaced my first windshield within 48 hrs of driving the car off the lot brand new....not even a year old now and another crack has appeared. I am going to replace it with an independent dealer without using Subaru's Abra who over charged me exorbitantly... $313.45 which was supposedly just 50% of the total told to me by Subaru). Abra didn't give me any warranty and says needs to be replaced at full cost to me.

> Again...hard to see if a rock hit it, it was raining and cold outside on the highway...didn't hear a rock again.

b) Another consumer wrote on April 19, 2019:

> I have a spontaneous crack in my windshield, driver's side, starting in the upper left hand of the front windshield and going diagonally to my eyesight line, then the crack continues horizontally. Both legs of the crack are at least 6-7 inches in length. The crack happened while stored in my garage for the night. No stones or rocks hit my windshield before the crack. I went to drive it the next morning and there it was.

> There was a class action lawsuit against Subaru for faulty windshields that would crack for no reason on the 2015-2016 Outback & Legacy models. I think this problem is still happening.

****

---

[24]https://www.carcomplaints.com/Subaru/Outback/2018/windows_windshield/cracked_windshield.shtml (last viewed November 13, 2019).

c)   Another consumer wrote on April 29, 2019:

Windshield cracked just sitting at work parking lot. Staring from the frame on the driver side small fine S curve at first about 20" but couple days later expanding halfway across the glass. Called the dealer and it is clear that they are well aware of the problem and referred me to a designated person handling just windshields. Being very careful with her instruction basically assuming no responsibility unless you have some kind of "extension" on your warranty. Basically instructing me to Subaru America. She did way to bring the car to the dealer so they can determine the cause. I am not sure what are their methods and what they can determine. Possibly just collecting data so they Subaru can address this with their glass supplier. Cost estimated at $2000. This is clearly not an isolated incident and I hope that there is a class action suit on the way to address this issue. Very frustrating and expansive repair. I currently own two and this is my third Subaru and possibly last.

132.   In a forum for **2019 Subaru Outbacks** titled "Windshield Crack"[25] on

carcomplaints.com, consumers posted as follows:

a)   A consumer wrote on November 24, 2018:

Returning from Rochester and a crack appears in the corner of the windshield by the passenger about 4-5 inches long. The next morning it's like 18 inches. There is no ding, no star, no full moon or half moon. I will update after I take it to a dealer.

b)   Another consumer wrote on January 11, 2019:

I am writing to express my concern regarding the quality of the Subaru Outback windshield. On December 21, 2018 I purchased my first Subaru. On January 11,2019 my windshield spontaneously cracked below the wipers and spread very quickly. Because it was obstructing my view I had to have the entire windshield replaced.

On February 15,2019, four days after the windshield was replaced, I received a rock chip that immediately cracked to a size

---

[25]https://www.carcomplaints.com/Subaru/Outback/2019/windows_windshield/windshield_crack. shtml (last viewed November 13, 2019).

larger than a dollar bill, beyond repair. I had expected better from the Subaru brand. I decided to purchase a Subaru Outback for the quality and reliability however after experiencing the poor windshield quality, I may not purchase another Subaru.

For a little background, I have had the same commute for over ten years. With other vehicles I have experienced rock chips, which I have been able to get repaired and never had to replace the windshield. I have driven lesser quality and less reliable vehicles and have never had to incur the out of pocket cost that I have with the Subaru Outback with 3 months of ownership.

To put this in perspective, the cost of one windshield replacement equals the cost of one month of daycare for a toddler, one year of auto and homeowner's insurance or two Epi Pens. This expense goes far beyond the annual routine maintenance I expect to pay on any vehicle.

c)   Another consumer wrote on April 10, 2019:

On Jan 20th 2019, purchased a brand new 2019 Subaru Outback 3.6R. The car is garaged inside everyday on 4/10/2019 I noticed a huge crack on front of my driver side windshield as I was getting into my car after work. I researched and on the Youtube I also see a video with exact crack that starts from the bottom of the windshield the person who posted the video had 2018 Outback. I've had Volvo, Honda and Acura MDX and never had I a window crack like this before even with little chip that would occur from driving highways or going off road on a ski trip.

d)   Another consumer wrote on May 29, 2019:

2019 Subaru Outback purchased February 2019 with 7500 miles. Windshield crack developed on the passenger side edge, 1/2 up and grew toward the center. The vehicle has eyesight and that will need to be re-calibrated after the replacement. One estimate is up to $1500 including calibration. Subaru doesn't want to know anything. Funny how our 2005 Sienna has 263,000 miles and the original windshield.

133.  In a forum for **2017 Subaru Foresters** titled "Windshield Cracks"[26] on carcomplaints.com, a consumer wrote on March 5, 2018:

> My windshield cracked with no apparent impact about 6 months ago. Then the other day, my husband noticed 4 new cracks appearing in my new windshield. He was upset because I had just been in a Fuller's Car Wash and he said those cloth car washes are too rough for this car. I knew there was no way that car's windshield was damaged in the car wash. We had to have the windshield replaced again! This car was purchased brand new, and this should not be happening. I just want a glass that won't crack.

134.  In a forum for **2018 Subaru Foresters** titled "Cracked Windshield"[27] on carcomplaints.com, consumers posted as follows:

> a)  A consumer wrote on August 25, 2018:
>
> A small stone cracked my windshield on 8/25/2018, and the crack continues to grow while not even driving the vehicle. I live in Massachusetts where it is illegal to drive a car with a cracked windshield. The glass company told me that the part is on backorder from Subaru (verified with a second glass company) and will not be available before the beginning of October. This means that I will not be able to operate my car for at least 5 weeks.
>
> I have tried to get the dealer where I purchased the car to give me a loaner, but so far no luck. I talked to someone at Subaru Customer Service about this issue and am waiting to see for a response. I have also been in touch with the Massachusetts Attorney General's Office (They just talked about the lemon law here.) and a local TV station's consumer complaint division (They suggested writing to the head of Subaru USA -- I plant to do this next.)
>
> There was a class action suit for windshield issues for earlier years Outbacks and Legacys.

---

[26]https://www.carcomplaints.com/Subaru/Forester/2017/windows_windshield/windshield_cracks.shtml (last viewed November 14, 2019).

[27]https://www.carcomplaints.com/Subaru/Forester/2018/windows_windshield/cracked_windshield.shtml (last viewed November 13, 2019).

b) Another consumer wrote on December 10, 2018:

Add my wife and I to the list of disgruntled Subaru owners. Our 2018 Outback suffered a spontaneous windshield crack, without impact to the glass, originating in the deicer area on the driver's side (like countless others reported online). At least three separate service bulletins have been issued related to this problem, and a class action lawsuit is underway in California. We purchased the extended bumper-to-bumper warranty, but after speaking with a service center rep who says she's aware of the issue but can't remember the dealership ever covering a warranty claim for windshield damage, I have little faith this will be resolved satisfactorily.

135.    In a forum for **2017 Subaru Legacies** titled "Cracked Windshield"[28] on carcomplaints.com, consumers posted as follows:

a) A consumer wrote on March 30, 2018:

Few months after buying the vehicle, windshield cracks while driving on the highway. No apparent reason was heard or noticed. Insurance paid for the replacement minus the deductible.

b) Another consumer wrote on June 12, 2018:

New car purchased in May 2017 and first windshield crack happen in June 2017 at shopping parking lot parked car. After fixing it with the Subaru parts, same day evening at the office parking lot it cracked again at the same spot. Non in June 2018 again another crack at the same spot. It can not be coincident to happen at the same spot for times.

136.    In a forum titled "Windshield cracked, 3 day old 2017 Limited"[29] on subaruoutback.org, a consumer with the username "davidaug" wrote regarding his 2017 Outback on January 1, 2017:

---

[28]https://www.carcomplaints.com/Subaru/Legacy/2017/windows_windshield/cracked_windshiel d.shtml (last viewed November 14, 2019).

[29] https://www.subaruoutback.org/threads/windshield-cracked-3-day-old-2017-limited.398690/ (last viewed November 13, 2019).

> Hi - new Subaru owner, bought the car last Saturday and Wednesday there developed a crack starting at the bottom of the center of the windshield, radiating upward. Turned on defroster and watched the crack start going laterally toward the driver side. There is a small chip about 1" above the start of the crack, but I do not recall hearing an impact. I previously drove a 1998 Mercedes Wagon for 290000 miles with many stone impacts, etc, but never any sort of crack resulted, the most damage was a small chip. So, I guess this is my question - is the 2017 also affected by previous model years windshield issues, or am I just the victim of bad luck (as the dealer service manager says)?

137.   A consumer with the username "jeffoutback" responded on this thread on October 25, 2017:

> Apparently we're in the same boat
>
> 2017 Subaru outback 15000 miles - long crack going up from a "tiny" impact to windshield a few inches from the bottom ( below the horizon of the hood and below the windshield wiper). Must be some pretty weak glass - had a Toyota RAV 4 since 2008 and never had a crack.

138.   In a forum titled "2017 xt windshield - I will be on my 4th soon"[30] on subaruforester.org, a consumer with the username "hoshie" with a 2018 Forester XT began the thread on December 24, 2017:

> realize there have been a couple threads on this but it needs another aha.
>
> These are by far the worst windshields I have ever experienced. Nothing comes close.
>
> They pit at negative temperatures from the tiniest rocks. They crack soon after.
>
> I will be on my 4th soon.
>
> Considering the footprint, something needs to be rectified.

---

[30]https://www.subaruforester.org/threads/2017-xt-windshield-i-will-be-on-my-4th-soon.743937/ (last viewed November 13, 2019).

Absolute design flaw. Garbage product.

a) A consumer with the username "Rick's17" with a 2017 Forester Limited

    responded on this thread on December 24, 2017:

Maybe. I got a tiny chip near my windshield pillar and with cold
weather, crack is now halfway across windshield

b) A consumer with the username "saab93ddriver" with a 2017 Forester XT

    responded on this thread on December 25, 2017:

I have to say the glass seems to be pretty tender. I'm on my third
windshield within a year. I'm in Florida, I'm not sure temperature
is a controlling factor. Last time I had it replaced the glass was on
national back order and I had to wait 6 weeks, which says to me
there is a pretty good demand. Now I got a chip last week, it's not
growing so maybe this one can be repaired rather than replacing
the whole piece of glass. In my 35 years of driving, before the
Forester experience, I replaced 1 windshield in my Honda
Element and never had to have any repaired in any of my other
vehicles.

c) A consumer with the username "regajohn" with a 2014 Forester XT CVT

    responded on this thread regarding his sister's 2017 Forester on December 25,

    2017:

My sister's new (2017) is on its 3rd windshield in fewer than
4,000 miles. The 2nd one broke while she was leaving the
dealership (the new glass didn't make it a mile).

Both replacements have been paid for by the dealer / SoA.

The glass is definitely thin / weak.

    139. In a forum titled "2018 Subaru Forester Windshield crack (merged thread)"[31] on

subaruforester.org, a consumer with the username "safebet" wrote on July 18, 2018:

--------------------

[31] https://www.subaruforester.org/threads/2018-subaru-forester-windshield-crack-merged-
thread.780995/ (last viewed November 13, 2019).

My 3 week old 2018 XT windshield just broke this afternoon driving down the road with no cars nearby. No reason at all. A friend and I were returning from lunch and bang! A huge crack straight down from the drivers side and cutting over to the middle of vision. It was 78 degrees outside and no reason whatsoever for this to happen. Not happy.

140.    A consumer with the username "cheeksf16" responded on this thread on July 26, 2018:

We have had the same issue with our 2017 Forester Touring that we bought new in May 2017. In Jun 2018, we experienced the third windshield crack by a strike so small we didn't hear anything, just saw the crack as it appeared and spread about 12". I have read up on the failed Subaru windshield redesign of the Forester for 2017, called an 'Acoustic' windshield, it was designed to cut down on cabin noise and also to reduce weight, but actually appears to increase the occurrence of cracks versus chips, because the windshields are made using two thin pieces of glass with a laminate in between. The thinner glass on the outside cracks rather than chips requiring replacement rather than repair. Subaru of America (SoA) will not acknowledge there is a problem and therefore, as far as I know, is not working to correct the (non) problem. I have owned 19 cars in over 50 years of driving; I have only replaced one windshield on a 1997 Volvo because of an "excessive number of chip repairs" (not a crack) before buying this Forester. It has been a month since our windshield cracked and it is still not replaced. I tried to replace it on the trip on which it occurred, but an OEM windshield was not available (Subaru of America denies there was/is a shortage of windshields), but I verified the shortage in Richmond, VA with two sources. Once I returned home I took the car to the dealer where I bought it and petitioned to get SoA to replace the windshield but as others have noted on this thread, Subaru claims no responsibility if the crack was caused by "foreign debris" (rock) regardless of the fact that it is their failed design that leads to an abnormal rate of crack damage. An automaker that claims replacing a windshield every 8000 miles (in my case) is normal, is not an automaker to be trusted. In my opinion, Subaru should: 1) acknowledge there is a problem with their windshield design, 2) immediately attack this engineering issue with the objective of a 'counter' redesign of the windshield to normalize its life expectancy, 3) replace any affected windshield under warranty pending redesign, then once a solution is determined, 4) issue a recall of all affected vehicles to replace remaining faulty windshields. Unfortunately, I don't think we should hold our breath for Subaru to do the right thing and so I am adopting my own policy regarding this problem; that is, I won't replace a cracked windshield unless and until it becomes a distraction to my vision or EyeSight's function, extends from one edge to another, or a second crack occurs (which I know will happen). Additionally, beginning with my current replacement, I will

replace with AS1 aftermarket non 'Acoustic' windshield.…[]…
had I known of this problem ahead of time, I would not have
bought the Forester, or any other Subaru. (emphasis added)

141.    In    a    forum    titled    "2019 -  Windshield   on   LONG   backorder!"[32]   on
subaruforester.org, a consumer with the username "hammersc" wrote on February 6, 2019:

cracked windshield

1st day my wife drove her '19 touring, she had a windshield crack
from a little rock while on the interstate.

142.    A consumer with the username "ctina8" responded on this thread on February 7,
2019:

Same here, first day out with my 18, ended up with a crack in
windshield, does Subaru use some kind of cheap glass, ever little
stone that hits windshield is making a chip. So annoyed!!

143.    In a subforum for Subaru Outback owners on reddit.com, a consumer wrote on
January 1, 2017:[33]

2017 Outback's supercrackable windshield

My wife's 2017 Outback ran into one tiny gravel pellet at
25miles/hr, and boom, we have a growing crack on the
windshield now. Googled up windshield replacement and saw
there was a Class action on this against Subaru. Called up the
dealer, he said they don't handle windshield replacements and
asked me to contact Insurance. Called Subaru America, they
registered my complaint, and mentioned they don't cover stone
hits, and don't know about any faults with the current windshields
and asked me to contact the dealer. Its gonna cost either
myself/insurance&myself $550 to get this replaced ($350
windshield + $200 labor). On top of it, the dealer gets to re
calibrate the eyesight for another $250 For a car that is designed

---

[32]https://www.subaruforester.org/threads/2019-windshield-on-long-backorder.794211/ (last
viewed November 13, 2019).

[33]https://www.reddit.com/r/subaruoutback/comments/7zavlo/2017_outbacks_supercrackable_wi
ndshield/ (last visited November 14, 2019).

> for offroad use, the size of stone that cracked the windshield was something we could have protected with our face without injury. Wondering how many folks here has faced this problem and what they have done about it?

144.   In the reviews section for the 2019 Subaru Forester on cars.com,[34] a consumer

wrote on November 21, 2018:

> I've only had mine for 2 1/2 weeks. After driving it for 1 week a small rock hit the windshield. I brought it to a reputable glass shop to have it fixed and it spidered when they attempted to fix it. I ordered a new windshield from the dealership last week and it will be another 2 1/2 weeks to get here. Today another very tiny rock hit the windshield and made a star chip that looks like it will spider rapidly. It seems to me that it's a pretty weak windshield and at a $1,000.00 for a new one it's a moneymaker for Subaru/dealership. My 2014 Forester did not have this problem. I am not happy.

a)   On the same cars.com page, another consumer wrote on March 12, 2019:

> I've driven the 2019 Subaru Forester Touring model for a month, about 2500 miles.
>
> – – –
>
> The windshield seems to break easily. I got one small rock chip and it put a crack through the entire windshield. I've never had a car that the window breaks in half over a tiny rock chip, and don't think that you're going to get a replacement easily. The replacement windshields are very expensive and there is a two month wait. . . . (emphasis added)

b)   On the same cars.com page, another consumer wrote on September 4, 2019:

> We bought the 2019 Forested less than 2 months ago in mid July 2019 at 500 miles the windshield cracked from driver side to middle of the passenger side. When we took it into Hueberger a Subaru, Colorado Springs, amazingly the service manager's what he called a chip the size of the end of a ball point pen. It cracked

---

[34] https://www.cars.com/research/subaru-forester-2019/consumer-reviews/ (last viewed November 13, 2019)

over nite while in the garage. We are at a time there is not gravel on the road and we did not see or hear a rock. Then <u>he said because of the eyesight cameras the glass is thinner than other windshields</u>. Major design flaw in a vehicle built for snow and off road driving! The windshields are 1100.00 installed..so guess we'll have to drive my 2010 Jetta in the snow.. original windshield, or the 2005 Pontiac vibe, original windshield. We have a case # with Subaru and they may warranty one time. I am not happy and the thought that we already have this issue is concerning. (emphasis added)

145.    In the reviews section for the 2019 Subaru Outback on cars.com,[35] a consumer wrote on March 11, 2019:

> Very happy with ride, safety features, fit, finish, quality. Gas mileage not great but good. Coincidentally bought it a day before a big snow hit Seattle and was glad to have the AWD. Adaptive cruise control wonderful once you get used to it. StarLink functionality and UI is confusing and frustrating; doubt we will extend the free trial subscription. <u>A month after buying, found a crack that will require an expensive windshield replacement</u>. It traces to a tiny chip, presumably from a small rock we didn't notice. Subaru user forums online discuss potentially vulnerable/weak windshields so prospective buyers might want to have low deductible on your comprehensive insurance. (emphasis added)

146.    Defendants had superior and exclusive knowledge of the Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

147.    Plaintiffs are informed and believe, and based thereon allege, that before Plaintiffs purchased their respective Class Vehicles Defendants knew about the Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Defendants and their dealers, testing conducted in response to those consumer complaints, high

--------

[35] https://www.cars.com/research/subaru-outback-2019/consumer-reviews/ (last viewed November 13, 2019)

cracking rates of the windshield, the data demonstrating the inordinately high volume of replacement part sales, and other aggregate data from Defendants' dealers about the problem.

148.    Defendants are experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendants conduct tests, including pre-sale testing, on incoming components, including the windshield, to verify the parts are free from defect and align with Defendants' specifications. Thus, Defendants knew or should have known the windshield was defective and prone to put consumers in a dangerous position due to the inherent risk of the Defect.

149.    Defendants should have learned of this widespread defect from the sheer number of reports received from dealerships. Defendants' customer relations department, which interacts with individual dealerships to identify potential common defects, has undoubtedly received numerous reports regarding the Defect. Defendants' customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

150.    Defendants' warranty department similarly analyzes and collects data submitted by their dealerships to identify warranty trends in their vehicles. It is Defendants' policy that when a repair is made under warranty the dealership must provide Defendants with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

151.    Defendant issued Technical Service Bulletin (TSB) Number 12-192-15R on October 26, 2016, revised on November 19, 2016, that shows its knowledge of a defect as it existed in prior model years for two of the Class Vehicles at issue here. This TSB states that:

> Subaru of America, Inc. (SOA) Quality Assurance has identified an increase in the number of cracked windshields on some 2015 and 2016MY Legacy and Outback models. Further investigation

has determined the root cause for many of these failures to be the ceramic materials used for the black-colored printed perimeter combined with the silver-colored material used for the wiper deicer portion of the windshield glass. In response to this increase, SOA is extending the original warranty on applicable factory-installed windshields to 5 years / unlimited miles. This warranty extension will cover windshield replacement a maximum of **ONE TIME** where applicable on a vehicle with a VIN prior to those listed in the Production Change Information on page 2 and meeting the guidelines outlined in this bulletin.

152.   The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiffs and other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

153.   Reasonable consumers, like Plaintiffs, expect that a vehicle's windshield will function in a manner that will not pose a safety risk and is free from defects. Plaintiffs and Class Members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Defect, and will disclose any such defects to their consumers when they learn of them. Plaintiffs and Class Members did not expect Defendants to conceal and fail to disclose the Defect to them, and to then continually deny its existence and disclaim warranty coverage.

### III.   Defendants Have Actively Concealed the Defect

154.   Despite their knowledge of the Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Defendants failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a)   any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the windshield;

b)   that the Class Vehicles, including the windshields, were not in good in working order, were defective, and were not fit for their intended purposes; and

c) that the Class Vehicles and the windshields were defective, despite the fact that Defendants knew of such defects years ago.

155.    When consumers present their Class Vehicles to an authorized Defendants' dealer for windshield repairs, rather than repair the problem under warranty, Defendants' dealers disclaim liability under the warranty.

156.    Defendants have caused Class Members to expend money at their dealerships to replace the Class Vehicles' windshields and pay for related repairs, despite Defendants' knowledge of the Defect.

**IV.    Defendants Have Unjustly Retained A Substantial Benefit**

157.     On information and belief, Plaintiffs allege that Defendants unlawfully failed to disclose the alleged defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

158.    Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

159.    As discussed above therefore, Plaintiffs allege that Defendants unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the defect.

160.    Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

**V.    Plaintiffs' Experiences**

**Plaintiff Gordon Armstrong**

161.    Plaintiff Armstrong is a California resident who lives in Santa Clarita, California.

162.    On June 3, 2019, Plaintiff Armstrong purchased a used 2017 Subaru Outback from First Kia of Simi Valley in Simi Valley, California.

57

163.    Plaintiff Armstrong purchased his vehicle primarily for personal, family, or household use.

164.    Passenger safety and reliability were important factors in Plaintiff Armstrong's decision to purchase his vehicle. Before making his purchase, Plaintiff Armstrong did an online search for the vehicle, including on "Google," "Youtube", Edmunds.com, KBB.com, Carfax,.com autodtrader.com, cars.com, truecar.com, and carmax.com. He watched SOA television ads, visited SOA's website to research the vehicle, and test drove his vehicle. He visited Subaru Sherman Oaks in Van Nuys, CA to learn more about and inspect the model vehicle. Plaintiff Armstrong believed that the Outback would be a safe and reliable vehicle. When Plaintiff Armstrong purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

165.    Defendants' omissions were material to Plaintiff Armstrong. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Armstrong would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Armstrong would not have purchased his vehicle, or would have paid less for it.

166.    Specifically, on September 9, 2019, with approximately 30,000 miles on the odometer of his Subaru Outback, a pebble or small stone hit his windshield and created a small chip less than one-half inch long near the wiper blade. Over the course of the next 5 weeks, the chip slowly and steadily grew into a T-shaped crack, with the top of the T comprised of one crack approximately 8 inches long and the other crack approximately 14 inches long.



167.   On October 15, 2019, Plaintiff Armstrong took his vehicle to Santa Clarita Auto Glass, Inc., where his cracked windshield was replaced with a new Subaru OEM windshield, paying $490 for the repair.

168.   Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Armstrong's Class Vehicle.

**Plaintiff Carl Eckhardt**

169.   Plaintiff Eckhardt is a Texas citizen who resides in Texas.

170.   In or around December 2017, Plaintiff Eckhardt purchased a new 2018 Subaru Outback from Livermore Subaru in Livermore, California.

171.   Plaintiff Eckhardt purchased his vehicle primarily for personal, family, or household use.

172.   Passenger safety and reliability were important factors in Plaintiff Eckhardt's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Eckhardt believed

that the Outback would be a safe and reliable vehicle. When Plaintiff Eckhardt purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

173.    Defendants' omissions were material to Plaintiff Eckhardt. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Eckhardt would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Eckhardt would not have purchased his vehicle, or would have paid less for it.

174.    Plaintiff Eckhardt is now on his third windshield in his 2018 Subaru Outback. Within months of purchasing his new Outback, Plaintiff Eckhardt was driving when a small pebble hit the windshield and, to Plaintiff's surprise, caused the windshield to crack.

175.    Plaintiff brought his vehicle to Subaru of Austin, and after complaining when he was told the windshield was not covered under warranty, the Subaru dealer eventually agreed to replace it for him without charge.  Unfortunately, less than two weeks later—despite the fact that the vehicle was parked and not being driven, and was facing towards the morning sun—when Plaintiff entered the vehicle in the afternoon he discovered that the windshield had a large crack in it. Nothing had hit the windshield; there was no mark or other evidence of the windshield having been struck by an object.

176.    Subaru's dealership in Austin refused to replace the windshield under warranty. Plaintiff and his insurer paid for the second replacement, with Plaintiff paying his $500 deductible plus additional charges.

177.    Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Eckhardt's Class Vehicle.

**Plaintiff Paul Geisler**

178.    Plaintiff Paul Geisler is a California citizen who resides in California. On or about March 5, 2018, Plaintiff Geisler purchased a new 2018 Subaru Outback from Autonation Subaru, an authorized Subaru dealer in Roseville, California.

179.    Plaintiff Geisler purchased his vehicle primarily for personal, family, or household use.

180.    Passenger safety and reliability were important factors in Plaintiff Geisler's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Geisler believed that the Outback would be a safe and reliable vehicle. When Plaintiff Geisler purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

181.    Defendants' omissions were material to Plaintiff Geisler. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Geisler would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Geisler would not have purchased his vehicle, or would have paid less for it.

182.    In July 2018, just a few months after purchasing his new 2018 Subaru Outback, Plaintiff Geisler observed a long crack running through his windshield.  He was aware of no incident that would have caused such damage.

183.    Plaintiff Geisler was forced to pay $200 out of pocket for a replacement windshield.  Plaintiff Geisler's Outback has fewer than 36,000 miles and is within the warranty period.

184.    Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Geisler's Class Vehicle.

**Plaintiff Hunter Mills**

185.    Plaintiff Mills is a California citizen who resides in California.

186.    In or around December 2018, Plaintiff Mills purchased a new 2019 Subaru Outback from an authorized Subaru dealer in California.

187.    Plaintiff Mills purchased his vehicle primarily for personal, family, or household use.

188.    Passenger safety and reliability were important factors in Plaintiff Mills's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Mills believed that the

Outback would be a safe and reliable vehicle. When Plaintiff Mills purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

189.    Defendants' omissions were material to Plaintiff Mills. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Mills would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Mills would not have purchased his vehicle, or would have paid less for it.

190.    In January 2019, just a few weeks after purchasing his new 2019 Subaru Outback, Plaintiff Mills' windshield cracked without any apparent reason.  The vehicle had been driven approximately 1,000 miles at the time.

191.    Plaintiff Mills contacted his local Subaru dealer to advise of the cracked windshield and the need for a replacement.  Rather than replace his windshield under warranty, the Subaru dealer replaced the windshield and required Mr. Mills to pay.  As a result, Plaintiff Mills submitted a claim to his insurer and was forced to pay a $1,000 deductible.

192.    Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Mills's Class Vehicle.

**Plaintiff Sandy Moreno**

193.    Plaintiff Moreno is a California citizen who resides in California.

194.    On October 28, 2018, Plaintiff Moreno purchased a new 2019 Subaru Outback from Elk Grove Subaru in Elk Grove, California.

195.    Plaintiff Moreno purchased her vehicle primarily for personal, family, or household use.

196.    Passenger safety and reliability were important factors in Plaintiff Moreno's decision to purchase her vehicle. She had previously owned a 2003 Subaru WRX and was familiar with the brand. She went to Modesto Subaru in Modesto, California where she test drove a Subaru Outback. She later went to Elk Grove Subaru in Elk Grove, California where she spoke extensively with a salesperson before she purchased the vehicle from that dealership. She

had also seen Subaru television ads. Plaintiff Moreno believed that the Outback would be a safe and reliable vehicle. When Plaintiff Moreno purchased her vehicle, she was unaware that the vehicle's windshield contained the Defect.

197.    Defendants' omissions were material to Plaintiff Moreno. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Moreno would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Moreno would not have purchased her vehicle, or would have paid less for it.

198.    Specifically, on December 31, 2018, with approximately 5,000 miles on the odometer of her Subaru Outback, a pebble or small stone hit her windshield in the lower driver's side corner. She expected that a small chip in the windshield would result. Instead, a large crack appeared.

199.    On January 7, Plaintiff Moreno took her vehicle to Safelite Auto Glass in Stockton, California where her cracked windshield was replaced with a new Subaru OEM windshield, paying $100.00 for the repair, which was the amount of her insurance deductible.

200.    Upon information and belief, the replacement windshield supplied by Subaru suffered from the same defect as the original windshield installed in Plaintiff Moreno's Class Vehicle.

201.    On February 27, 2019, Plaintiff Moreno was driving to Elk Grove Subaru dealership for a basic vehicle service appointment when a chip appeared in her recently replaced Subaru windshield. She does not recall any debris hitting the windshield. That day, after the service appointment, she immediately drove the vehicle over to Safelite Auto Glass in Stockton, California and had the chip filled in at a cost of $75.

**Plaintiff Louie Nevarez**

202.    Plaintiff Nevarez is a California citizen who resides in California.

203.    On or around May 9, 2018, Plaintiff Nevarez purchased a new 2018 Subaru Impreza Sport vehicle from Subaru Antelope Valley in Lancaster, California.

204.     Plaintiff Nevarez purchased his vehicle primarily for personal, family, or household use.

205.     Passenger safety and reliability were important factors in Plaintiff Nevarez's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Nevarez believed that the Impreza would be a safe and reliable vehicle. When Plaintiff Nevarez purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

206.     Defendants' omissions were material to Plaintiff Nevarez. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Nevarez would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Nevarez would not have purchased his vehicle, or would have paid less for it.

207.     On or about August 15, 2019, Plaintiff Nevarez was driving his Subaru vehicle when, suddenly, the vehicle's windshield cracked. The crack stretched from the driver's side of the windshield all the way to the passenger's side. Mr. Nevarez does not know what caused the windshield to crack, and it appears to have occurred spontaneously, and not as a result of a foreign object impacting the windshield. At the time of the damage, the vehicle had approximately 15,000 miles, and was within the warranty period. Because of the severity of the crack, Mr. Nevarez had the windshield replaced by an independent repair shop, the cost of which replacement was over $300.

208.     Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Nevarez's Class Vehicle.

**Plaintiff Andrew Vierra**

209.     Plaintiff Vierra is a California citizen who resides in California.

210.     On May 26, 2019, Plaintiff Vierra purchased a new 2019 Subaru Outback from Ocean Subaru in Fullerton, California.

211.     Plaintiff Vierra purchased his vehicle primarily for personal, family, or household use.

212.    Passenger safety and reliability were important factors in Plaintiff Vierra's decision to purchase his vehicle. He test drove a Subaru Outback at Ocean Subaru. He spoke extensively with a salesperson at Ocean Subaru before he purchased the vehicle from that dealership and read promotional brochures about the vehicle at the dealership. He ran a Google search of the vehicle before he purchased, and carefully reviewed information presented through the search results. As a result of this search, he viewed Youtube Subaru Outback new car video reviews, Subaru Outback videos posted by Consumer Reports, videos posted by independent Subaru Outback owners, and videos posted by Subaru itself. He had also seen Subaru television ads. Plaintiff Vierra believed that the Outback would be a safe and reliable vehicle. When Plaintiff Vierra purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

213.    Defendants' omissions were material to Plaintiff Vierra. Had Defendants disclosed their knowledge of the Defect before he purchased her vehicle, Plaintiff Vierra would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Vierra would not have purchased her vehicle, or would have paid less for it.

214.    Specifically, on or around November 14, 2019, with approximately 10,500 miles on the odometer of his Subaru Outback, Plaintiff Vierra was driving his vehicle when he heard a popping sound, but saw no visual evidence of any impact. He later noticed a fishhook-shaped crack in the windshield behind the rear-view mirror. Within several days, this crack extended to the middle of the driver's side of the windshield.

215.    Soon after the crack appeared, Plaintiff Vierra called Ocean Subaru and he was told that the dealership would not repair his windshield under any warranty. He then called his insurance provider who told him to have the windshield replaced at All Star Glass and that he would be responsible to pay $379 for the replacement.

216.    On November 18, 2019, Allstar Glass in La Habra, California sent an agent to Vierra's residence to repair his windshield. The agent inspected the windshield and determined

that it could not be done at that location and that it needed to be taken to All Star Glass' business location. Vierra scheduled an appointment with All Star Glass for November 26, 2019.

217.    On November 26, 2019, Plaintiff Vierra took his vehicle to All Star Glass in San Diego, California where his cracked windshield was replaced with a new Subaru OEM windshield. He was to be charged $250 for the repair, which was the amount of his insurance deductible. However, the windshield installation technician could not properly calibrate the vehicle's front view camera with the new windshield and informed Vierra that a new windshield had to be ordered and another service appointment scheduled for a second attempt at replacing the windshield.

218.    Upon information and belief, any replacement windshield supplied by Subaru will suffer from the same defect as the original windshield installed in Plaintiff Vierra's Class Vehicle.

**Plaintiff Daniel Binkley**

219.    Plaintiff Binkley is a Colorado citizen who resides in Colorado.

220.    In September 2017, Plaintiff Binkley utilized the services of a broker to purchase a new 2018 Subaru Outback from Heuberger Subaru in Colorado Springs, Colorado.

221.    Plaintiff Binkley purchased his vehicle primarily for personal, family, or household use.

222.    Passenger safety and reliability were important factors in Plaintiff Binkley's decision to purchase his vehicle.  Based upon Subaru's advertising, Plaintiff Binkley believed that the Outback would be a safe and reliable vehicle. When Plaintiff Binkley purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

223.    Defendants' omissions were material to Plaintiff Binkley. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Binkley would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Binkley would not have purchased his vehicle, or would have paid less for it.

224.   On or about November 26, 2018, Plaintiff Binkley noticed a crack in the windshield of his 2018 Subaru Outback.  He was aware of no incident that would have caused such damage.  He paid $593.91 to have the windshield replaced and recalibration done by an independent repair shop.  Plaintiff's Subaru Outback has fewer than 36,000 miles and is within the warranty period.

225.   Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Binkley's Class Vehicle.

**Plaintiff Ryan Hicks**

226.   Plaintiff Hicks is a Colorado citizen who resides in Colorado.

227.   On or about February 21, 2018, Plaintiff Hicks purchased a new 2018 Subaru Crosstrek from a broker in Littleton, Colorado who obtained the vehicle from an authorized Subaru dealer.

228.   Plaintiff Hicks purchased his vehicle primarily for personal, family, or household use.

229.   Passenger safety and reliability were important factors in Plaintiff Hicks's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Hicks believed that the Crosstrek would be a safe and reliable vehicle. When Plaintiff Hicks purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

230.   Defendants' omissions were material to Plaintiff Hicks. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Hicks would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Hicks would not have purchased his vehicle, or would have paid less for it.

231.   On or about July 7, 2019, Plaintiff Hicks noticed a chip in the windshield of his 2018 Subaru Crosstrek where a small stone had hit it.  Mr. Hicks has owned other vehicles for many years and never had a windshield damaged from such a minor event.  Later that month, he subsequently noticed a separate crack in his windshield.  He was aware of no incidents that

would have caused such damage.  In October 2019, cracking spread throughout the windshield, preventing the continued use of the vehicle.

232.    Plaintiff Hicks contacted a Subaru dealership to request replacement under warranty, but he was advised there was no coverage for the windshield.  As a result, Plaintiff had his windshield replaced by Premium Auto Glass in Centennial, CO.  Mr. Hicks paid a $500 deductible to Geico Insurance for the windshield replacement.  Plaintiff's Crosstrek has fewer than 36,000 miles and is within the warranty period.

233.    Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Hicks's Class Vehicle.

**Plaintiff Stephen Merman**

234.    Plaintiff Merman is a Colorado citizen who resides in Golden, Colorado.

235.    On July 15, 2019, Plaintiff Merman purchased a certified pre-owned 2018 Subaru Forester from AutoNation Subaru West in Golden, Colorado.

236.    Plaintiff Merman purchased his vehicle primarily for personal, family, or household use.

237.    Passenger safety and reliability were important factors in Plaintiff Merman's decision to purchase his vehicle. He had directly previously owned a 2016 Subaru Outback and other Subarus before that and was familiar with the brand. Before purchasing his vehicle, he test drove it and spoke extensively with a salesperson at the dealership. He had also seen Subaru television ads. He also inspected the Subaru pre-owned window sticker before purchasing. Plaintiff Merman believed that the Forester would be a safe and reliable vehicle. When Plaintiff Merman purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

238.    Defendants' omissions were material to Plaintiff Merman. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Merman would

have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Merman would not have purchased his vehicle, or would have paid less for it.

239.    Specifically, on October 26 or 27, 2019, with approximately 23,000 miles on the odometer of his Subaru Forester, his life partner's daughter was driving the vehicle with his life partner in the car when a crack occurred in the top left corner of the windshield. Neither his life partner nor her daughter heard or saw any debris hit the windshield.  On October 28, 2019, he saw that the crack had spread from the top left corner of the windshield to the rear-view mirror area of the windshield.

240.    During the week of October 28, 2019, Plaintiff Merman took the vehicle to AutoNation Subaru West dealership to complain about the windshield crack and was told that his Subaru maintenance agreement did not cover windshield replacement, that the dealership does not replace windshields, and that he should have the windshield replaced at Safelite Auto Glass.

241.    On November 4, 2019, Plaintiff Merman took his vehicle to Safelite Auto Glass in Lakewood, Colorado where his cracked windshield was replaced with a new Subaru OEM windshield. The total cost of the replacement was $772, of which he paid $500.00 for the repair, which was the amount of his insurance deductible.

242.    Upon information and belief, the replacement windshield supplied by Subaru suffered from the same defect as the original windshield installed in Plaintiff Merman's Class Vehicle.

243.    On November 13, 2019, Plaintiff Merman took his vehicle, which had 25,638 miles at the time, to AutoNation Subaru West to recalibrate the "EyeSight® Driver Assist Technology" feature with his new windshield. The dealership charged him, and he paid, $220 for this recalibration.

## Plaintiff **Arnold Milstein**

244.    Plaintiff Milstein is a Florida citizen who resides in Florida.

245.    On September 19, 2019, Plaintiff Milstein purchased a new 2020 Subaru Outback from Schumaker Automotive in Delray Beach, Florida.

246.    Plaintiff Milstein purchased his vehicle primarily for personal, family, or household use.

247.    Passenger safety and reliability were important factors in Plaintiff Milstein's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Milstein believed that the Outback would be a safe and reliable vehicle. When Plaintiff Milstein purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

248.    Defendants' omissions were material to Plaintiff Milstein. Had he known of the Defect, Plaintiff Milstein would not have purchased his vehicle, or would have paid less for it.

249.    On or about October 15, 2019, just weeks after purchasing his new 2020 Subaru Outback, Plaintiff Milstein noticed a crack running through his windshield and brought his Subaru to All American Subaru in Old Bridge, NJ.  He was aware of no incident that would have caused such damage.   The dealership denied a defect in the windshield was the cause and ordered a replacement windshield.

250.    On or about October 17, 2019, All American Subaru provided Mr. Milstein an estimate of $1,166.14 to replace the windshield. Subaru would not cover the replacement windshield under the warranty.  Plaintiff Milstein's Outback has fewer than 36,000 miles and is within the warranty period.

251.    Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Milstein's Class Vehicle.

**Plaintiff Jason Moore**

252.    Plaintiff Moore is a Michigan citizen who resides in Michigan.

253.    On or about March 30, 2019, Plaintiff Moore purchased a new 2019 Subaru Outback from Fox Subaru, an authorized Subaru dealer in Grand Rapids, Michigan.

254.    Plaintiff Moore purchased his vehicle primarily for personal, family, or household use.

255.     Passenger safety and reliability were important factors in Plaintiff Moore's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Moore believed that the Outback would be a safe and reliable vehicle. When Plaintiff Moore purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

256.     Defendants' omissions were material to Plaintiff Moore. Had he known of the Defect, Plaintiff Moore would not have purchased his vehicle, or would have paid less for it.

257.     In May 2019, less than two months after purchasing his new 2019 Subaru Outback, a loud pop occurred as his vehicle was being backed out of his garage at home and sunlight fell upon it.  Instantly, a fracture occurred at the base of the windshield and spread across the entire width of the windshield.

258.     The Subaru dealership advised Mr. Moore that it would not cover the cost of the replacement windshield under warranty.  Mr. Moore then contacted another representative of Subaru who denied there was any defect in the windshield.  As a result, Mr. Moore was forced to submit a claim to his insurance company and paid a $500 deductible for a replacement windshield, which was installed by Gerber Collision & Glass in Newaygo, MI.  Plaintiff Moore's Outback has fewer than 36,000 miles and is within the warranty period.

259.     Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Moore's Class Vehicle.

**Plaintiff Katherine Kinsey**

260.     Plaintiff Kinsey is a Missouri citizen who resides in Missouri.

261.     On or about August 21, 2018, Plaintiff Kinsey purchased a new 2018 Subaru Forester from Webster Groves Subaru, an authorized Subaru dealer in Missouri.

262.     Plaintiff Kinsey purchased her vehicle primarily for personal, family, or household use.

263.     Passenger safety and reliability were important factors in Plaintiff Kinsey's decision to purchase her vehicle. Based upon Subaru's advertising, Plaintiff Kinsey believed that

the Forester would be a safe and reliable vehicle. When Plaintiff Kinsey purchased her vehicle, she was unaware that the vehicle's windshield contained the Defect.

264.    Defendants' omissions were material to Plaintiff Kinsey. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Kinsey would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Kinsey would not have purchased her vehicle, or would have paid less for it.

265.    Shortly after purchasing her 2018 Subaru Forester, Plaintiff Kinsey noticed numerous chips and dings appearing in her windshield and even observed a small starburst shaped crack form as she was sitting in the vehicle while parked.  She had those chips and crack repaired.

266.    In or around May 2019, after owning the vehicle for approximately nine months, a two inch crack formed spontaneously in the windshield near the bottom driver's side corner and rapidly spread across one half of the windshield while Plaintiff Kinsey was driving.

267.    Plaintiff Kinsey contacted a local Subaru dealer to advise of the cracked windshield and her need for a replacement.  Rather than replace her windshield under warranty, the Subaru dealer referred her to a third party repair shop.  Ms. Kinsey paid $330.94 for a replacement windshield and is unsure whether the Eyesight system needs to be recalibrated.

268.    Upon information and belief, the replacement windshield supplied by Subaru suffered from the same defect as the original windshield installed in Plaintiff Kinsey's Class Vehicle.

## Plaintiff Jeffrey Barr

269.    Plaintiff Barr is a New Jersey citizen who resides in New Jersey.

270.    In or around November 2018, Plaintiff Barr leased a new 2019 Subaru Forester from Liberty Subaru, an authorized Subaru dealer in Emerson, New Jersey

271.    Plaintiff Barr purchased his vehicle primarily for personal, family, or household use.

272.    Passenger safety and reliability were important factors in Plaintiff Barr's decision to purchase his vehicle. Based upon Subaru's advertising, Plaintiff Barr believed that the Forester would be a safe and reliable vehicle. When Plaintiff Barr purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

273.    Defendants' omissions were material to Plaintiff Barr. Had he known of the Defect, Plaintiff Barr would not have purchased his vehicle, or would have paid less for it.

274.    In September 2019, as Plaintiff Barr was in his 2019 Subaru Forester driving on a highway with his wife, the windshield suddenly and inexplicably cracked.  There were no vehicles near them or any other roadway obstructions or anomalies when the crack occurred. Plaintiff heard the loud sound of the windshield cracking and saw the approximate 12-inch long crack appear.

275.    As a result, Mr. Barr was forced to submit a claim to his insurance company and paid a $500 deductible for a replacement windshield.

276.    Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Barr's Class Vehicle.

**Plaintiff Julie Wotring**

277.    Plaintiff Julie Wotring is a Pennsylvania citizen who resides in Pennsylvania.

278.    On or around July 20, 2019, Plaintiff Wotring purchased a new 2019 Subaru Outback from John Kennedy Subaru, an authorized dealer in Plymouth Meeting, Pennsylvania.

279.    Plaintiff Wotring purchased her vehicle primarily for personal, family, or household use.

280.    Passenger safety and reliability were important factors in Plaintiff Wotring's decision to purchase her vehicle. Based upon Subaru's advertising, Plaintiff Wotring believed that the Outback would be a safe and reliable vehicle. When Plaintiff Wotring purchased her vehicle, she was unaware that the vehicle's windshield contained the Defect.

281.    Defendants' omissions were material to Plaintiff Wotring. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Wotring

would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Wotring would not have purchased her vehicle, or would have paid less for it.

282.    On the evening of September 4, 2019, Plaintiff Wotring parked her new 2019 Subaru Outback in her driveway.  On the morning of September 5, 2019, the windshield was cracked on the passenger side, halfway up and halfway across the windshield. No one had disturbed the vehicle while it was in the driveway and there had been no chips or dings or other physical damage to the windshield prior to this crack occurring.

283.    At the time of the incident, the Class vehicle had been driven approximately 3,874 miles and was still within the new vehicle warranty.  As a result of the broken windshield, on or about September 11, 2019, Plaintiff took her Class Vehicle to John Kennedy Subaru, an authorized Subaru dealer. Defendant's dealer did not replace the windshield under warranty, but rather, replaced the windshield at the expense of Plaintiff Wotring and her insurer.  Plaintiff paid $500 towards the repair cost.

284.    Upon information and belief, the replacement windshield supplied by Subaru suffered from the same defect as the original windshield installed in Plaintiff Wotring's Class Vehicle.

**Plaintiff Christine Powell**

285.    Plaintiff Powell is a Wisconsin citizen who resides in Wisconsin.

286.    On or around August 19, 2017, Plaintiff purchased a new 2018 Subaru Forester from Don Miller Subaru, an authorized Subaru dealer in Madison, Wisconsin.

287.    Plaintiff Powell purchased her vehicle primarily for personal, family, or household use.

288.    Passenger safety and reliability were important factors in Plaintiff Powell's decision to purchase her vehicle. Based upon Subaru's advertising, Plaintiff Powell believed that the Forester would be a safe and reliable vehicle. When Plaintiff Powell purchased her vehicle, she was unaware that the vehicle's windshield contained the Defect.

289.    Defendants' omissions were material to Plaintiff Powell. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Powell would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Powell would not have purchased her vehicle, or would have paid less for it.

290.    Within a few months of purchasing her new 2018 Subaru Forester, Plaintiff Powell's windshield suddenly cracked for no apparent reason.  As a result of the broken windshield, on or about December 22, 2017, Plaintiff took her Class Vehicle to Don Miller Subaru. Defendant's authorized dealer examined the windshield, denied that it was Subaru's responsibility and replaced the windshield at the expense of Plaintiff and her insurer.

291.    At the time the windshield was replaced, the mileage on Plaintiff's Class Vehicle was 3,502. Don Miller advised Plaintiff that Subaru was not replacing broken windshields under the new vehicle warranty that comes with the Class Vehicles.

292.    Unfortunately, the replacement windshields supplied by Subaru suffer from the same defect as the original windshields installed in the Class Vehicles.   In or around May 2019, Plaintiff's vehicle suffered another break in the windshield for no apparent cause.  At the time, her vehicle had approximately 15,000 miles.  Because Plaintiff resides several hours from the nearest Subaru dealer, Plaintiff hesitates to incur additional monetary losses and other damages, including substantial loss of use of her vehicle, to replace the windshield with yet another that will suffer from the same defect.  Plaintiff's vehicle is still within the warranty mileage and time limits.

293.    Upon information and belief, the replacement windshield supplied by Subaru suffered from the same defect as the original windshield installed in Plaintiff Powell's Class Vehicle.

## CLASS ACTION ALLEGATIONS

294.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil

Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

      295.    The Class and Sub-Classes (collectively "Classes") are defined as:

> **Class**: All persons or entities who purchased or leased a Class Vehicle in the United States and (i) suffered a damaged windshield or (ii) who own or lease a Class Vehicle with the original or replacement windshield.

> **California Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of California or who reside in California.

> **Colorado Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Colorado or who reside in Colorado.

> **Florida Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Florida or who reside in Florida.

> **Michigan Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Michigan or who reside in Michigan.

> **Missouri Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Missouri or who reside in Missouri.

> **New Jersey Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of New Jersey or who reside in New Jersey.

> **Pennsylvania Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the Commonwealth of Pennsylvania or who reside in Pennsylvania.

> **Texas Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Texas or who reside in Texas.

> **Wisconsin Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Wisconsin or who reside in Wisconsin.

      296.    Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's

staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

297.    Numerosity:  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles and/or other third parties.

298.    Typicality:  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants.  The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have| incurred or will incur the cost of repairing or replacing the defective windshield.  Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

299.    Commonality:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually.  These common legal and factual issues include the following:

   a)  Whether Class Vehicles suffer from defects relating to the windshield;

   b)  Whether the defects relating to the windshield constitute an unreasonable safety risk;

   c)  Whether Defendants knew about the defects pertaining to the windshield and, if so, how long Defendants have known of the defect;

   d)  Whether the defective nature of the windshield constitutes a material fact;

e) Whether Defendants have had an ongoing duty to disclose the defective nature of the windshield to Plaintiffs and Class Members;

f) Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

g) Whether Defendants knew or reasonably should have known of the defects pertaining to the windshield before they| sold and leased Class Vehicles to Class Members;

h) Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective windshields;

i) Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective windshields;

j) Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

k) Whether Defendants breached the implied warranty of merchantability pursuant to the Song-Beverly Act;

l) Whether Defendants breached their express warranties under state law and/or the UCC; and

m) Whether Defendants breached written warranties pursuant to the Magnuson-Moss Warranty Act.

300. Adequate Representation: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

301. Predominance and Superiority: Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful

conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, et seq.)
### (On behalf of the Class, or alternatively, all Sub-Classes)

302.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

303.    This claim is brought on behalf of Plaintiffs and the Class, or alternatively, on behalf of all Sub-Classes.

304.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

305.    Subaru is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

306.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

307.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

308.     Subaru's new vehicle warranties and representations as to the quality of the Class Vehicles are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)(A), (B).

309.     The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

310.     Subaru breached these warranties, as described in more detail above.  Without limitation, the Class Vehicles are equipped with defective windshields that are failing and jeopardize the safety of vehicle occupants and the public.  The Class Vehicles share a common defect in that the vehicles are manufactured with defective materials and/or with poor workmanship.  Contrary to Subaru's representations about its vehicles, the defective windshields are defective in manufacture, materials and/or workmanship and are unsafe.  The Class Vehicles share a common defect that causes or allows the windshields to spontaneously and/or otherwise unreasonably break under circumstances in which non-defective windshields would not.  The windshield failures are occurring within the warranty terms and period.

311.     Subaru further breached its written warranties by not repairing and replacing the broken windshields, or performing additional repairs such as recalibrating driver assist systems in the Class Vehicles, pursuant to the three year/36,000 mile new vehicle written warranty.

312.     Plaintiffs and the members of the Class and Sub-Classes have had sufficient dealings with either Subaru or its agents (e.g., dealerships and technical support) to establish privity between Subaru on one hand, and Plaintiffs and each of the Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically, of Subaru's express and implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

313.    Affording Subaru a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Subaru has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy.

314.    At the time of sale or lease of each Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' defective windshields and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

315.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Subaru is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

316.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

317.    Plaintiffs, individually and on behalf of all members of the Classes, seek all damages permitted by law, in an amount to be proven at trial.

**COUNT II**
**Breach of Express Warranty**
**(On behalf of the Class, or alternatively, all Sub-Classes)**

318.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

319.    Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes.

320.    Subaru is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

321.    With respect to leases, Subaru is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

322.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

323.    Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under California law.

324.    The windshields were manufactured and/or installed in the Class Vehicles by Defendants and are covered by the express warranty.

325.    In a section entitled "What Is Covered," Defendants' Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

326.    According to Subaru, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

327.    The Warranty formed the basis of the bargain that was reached when Plaintiffs and other members of the Classes purchased or leased their Class Vehicles equipped with the defective windshields.

328.    Plaintiffs and the Class members experienced defects within the warranty period. Despite the existence of the Warranty, Subaru failed to inform and/or denied to Plaintiffs and Class members that the Class Vehicles have defective materials and/or workmanship, and have failed to fix, repair or replace the defective windshields pursuant to the terms of the Warranty and at no charge to the Classes.

329.    Subaru breached the Warranty promising to repair and correct a manufacturing defect or defective materials or workmanship of any part of the Class Vehicles.

330.    Subaru was provided notice of the defect in the Class Vehicles' windshields by Plaintiffs and/or by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA, and through Subaru's own testing.  In addition, Subaru was specifically put on notice of a breach of express warranty claim by way of the initial complaint filed in *Powell v. Subaru of America, Inc*., 19-cv-19114-NLH (D.N.J. 2019) and subsequent complaints, but still refuses to provide remedial relief.  Accordingly, affording Defendant a further reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because Defendant has known of and concealed and denied the existence of the defect in the windshields and has failed to provide a suitable repair or replacement of the defective windshields free of charge within a reasonable time

331.    Affording Subaru any additional opportunity to cure its breach of written warranties would be unnecessary and futile.

332.    Furthermore, the warranty promising to repair and/or correct a manufacturing or workmanship defect fails in its essential purpose because the remedy is insufficient to make Plaintiff and Class members whole, and because the replacement windshields that have and are being installed are likewise defective, and because Subaru has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

333.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

334.    Also, as alleged in more detail herein, at the time Subaru warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to Subaru's warranties and were inherently defective, and Subaru wrongfully concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

335.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Subaru's conduct as alleged herein. Due to Subaru's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

336.    Subaru was provided notice of these issues by numerous complaints voiced by consumers, including those formal complaints submitted to NHTSA and the initial Complaint in this case, within a reasonable amount of time after the defect was discovered.

337.    Because of Defendant's breach of express warranty as set forth herein, Plaintiffs and members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

338.    As a direct and proximate result of Subaru's breach of express warranties, Plaintiffs and all members of the Classes have been damaged in an amount to be determined at trial

**Count III**
**Breach of The Implied Warranty of Merchantability**
**(On behalf of the Class, or alternatively, all Sub-Classes)**

339.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

340.    Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes.

341.    Subaru is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

342.    With respect to leases, Subaru is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

343.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

344.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under the Uniform Commercial Code and relevant state law.

345.    Subaru knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Subaru directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiffs and members of the Classes bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs and members of the Classes, with no modification to the defective windshields.

346.    Subaru provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

347.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their windshields that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their windshields would be fit for their intended use while the Class Vehicles were being operated.

348.    Contrary to the applicable implied warranties, the Class Vehicles and their windshields at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective materials, design and/or manufacture of their windshields and the existence of the Defect at the time of sale or lease and thereafter. Subaru knew of this defect at the time these sale or lease transactions occurred.

349.    As a result of Subaru's breach of the applicable implied warranties, Plaintiffs and members of the Classes of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and members of the Classes were harmed and suffered actual damages in that the Class Vehicles' windshields are substantially certain to crack or otherwise fail before their expected useful life has run.

350.    Subaru's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

351.    Plaintiffs and members of the Classes have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

352.    Plaintiffs and members of the Classes were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the windshields or components thereof, and through other internal sources.

353.    As a direct and proximate cause of Subaru's breach, Plaintiffs and members of the Classes suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs and

members of the Classes have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

354.    As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

**COUNT  IV**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**(California Civil Code § 1750, et seq.)**
**(On behalf of the California Sub-Class)**

355.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein

356.    Plaintiffs Gordon Armstrong, Carl Eckhardt, Paul Geisler, Hunter Mills, Sandy Moreno, Louie Nevarez, and Andrew Vierra ("California Plaintiffs") bring this cause of action on behalf of themselves and the California Sub-Class.

357.    Each Defendant is a "person" as defined by California Civil Code § 1761(c).

358.    California Plaintiffs and the Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

359.    By failing to disclose and concealing the defective nature of the windshield from California Plaintiffs and prospective Sub-Class members, Defendants violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their windshields had characteristics and benefits that they do not have, and represented that the Class Vehicles and their windshields were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

360.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

361.    Defendants knew that the Class Vehicles and their windshields suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

362.    As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiffs and the Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' windshields are substantially certain to crack or break before their expected useful life has run.

363.    Defendants were under a duty to California Plaintiffs and the Sub-Class members to disclose the defective nature of the windshields and/or the associated repair costs because:

a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' windshields;

b)  Plaintiffs and the Sub-Class members could not reasonably have been expected to learn or discover that their windshields had a dangerous safety defect until it manifested; and

c)  Defendants knew that Plaintiffs and the Sub-Class members could not reasonably have been expected to learn of or discover the safety defect.

364.    In failing to disclose the defective nature of windshields, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

365.    The facts Defendants concealed from or failed to disclose to Plaintiffs and the Sub-Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less.  Had California Plaintiffs and the Sub-Class members known that the Class Vehicles' windshields were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

366.   California Plaintiffs and the Sub-Class members are reasonable consumers who do not expect the windshields installed in their vehicles to exhibit problems such as the Defect. This is the reasonable and objective consumer expectation relating to a vehicle's windshield.

367.   As a result of Defendants' conduct, California Plaintiffs and the Sub-Class members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Defect.

368.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, California Plaintiffs and the Sub-Class members suffered and will continue to suffer actual damages.

369.   California Plaintiffs and the Sub-Class members are entitled to equitable relief.

370.   California Plaintiffs provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).

371.   Included at the end of this Complaint is a declaration of venue and place of trial under California Civil Code Section 1780(d).

**COUNT V**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE**
**(California Code § 17200, et seq.)**
**(On Behalf of the California Sub-Class)**

372.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

373.   California Plaintiffs bring this cause of action on behalf of themselves and the California Sub-Class.

374.   As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles, including Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and the California Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' windshields are substantially certain to fail before their expected useful life has run.

375.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

376.    Plaintiffs and the California Sub-Class members are reasonable consumers who do not expect their windshields to exhibit problems such as spontaneously and/or unreasonably cracking, chipping and otherwise breaking, and frequent replacement.

377.    Defendants knew the Class Vehicles and their windshields were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

378.    In failing to disclose the Defect, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

379.    Defendants were under a duty to Plaintiffs and the California Sub-Class members to disclose the defective nature of the Class Vehicles and their windshields because:

    a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' windshields; and

    b) Defendants actively concealed the defective nature of the Class Vehicles and their windshields from Plaintiffs and the California Sub-Class.

380.    The facts Defendants concealed from or failed to disclose to Plaintiffs and the California Sub-Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had they known of the Defect, Plaintiffs and the other California Sub-Class members would have paid less for Class Vehicles equipped with the windshields or would not have purchased or leased them at all.

381.    Defendants continued to conceal the defective nature of the Class Vehicles and their windshields even after Plaintiffs and the other California Sub-Class members began to report problems.

382.    Defendants' conduct was and is likely to deceive consumers.

383.    Defendants' acts, conduct, and practices were unlawful, in that they constituted:

    a) Violations of California's Consumers Legal Remedies Act;

b) Violations of the Song-Beverly Consumer Warranty Act;

c) Violations of the Magnuson-Moss Warranty Act; and

d) Breach of Express Warranty under California Commercial Code § 2313.

384. By their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

385. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

386. As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the other California Sub-Class members have suffered and will continue to suffer actual damages.

387. Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the other California Sub-Class members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

**COUNT VI**
**BREACH OF IMPLIED WARRANTY PURSUANT TO**
**SONG-BEVERLY CONSUMER WARRANTY ACT**
**(California Civil Code §§ 1792 and 1791.1, et seq.)**
**(On behalf of the California Sub-Class)**

388. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

389. California Plaintiffs bring this cause of action on behalf of themselves and the California Sub-Class.

390. Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

391. Defendants provided California Plaintiffs and the Sub-Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit

for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their windshields suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

392.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their windshields, which were manufactured, supplied, distributed, and/or sold by Defendants, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their windshields would be fit for their intended use.

393.    Contrary to the applicable implied warranties, the Class Vehicles and their windshields at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiffs and the Sub-Class members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the defective windshields.

394.    The alleged Defect is inherent and was present in each Class Vehicle at the time of sale.

395.    As a result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiffs and the Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' windshields are substantially certain to fail before their expected useful life has run.

396.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1

## COUNT VII
## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### (Colo. Rev. Stat. §§ 6-1-101, et seq.)
### (On behalf of the Colorado Sub-Class)

397.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein .

398.    Plaintiffs Daniel Binkley, Ryan Hicks, and Stephen Merman ("Colorado Plaintiffs") brings this cause of action on behalf of themselves and the members of the Colorado Sub-Class.

399.    Subaru is a "person" within the meaning of the Colorado Consumer Protection Act ("CCPA"), COLO. REV. STAT. § 6-1-102.

400.    The CCPA prohibits a person from engaging in a "deceptive trade practice," including "knowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods […];" "represent[ing] that goods, good, services, or property are of a particular standard, quality, or grade, […] if he knows or should know that they are of another;" and "advertis[ing] goods, services, or property with intent not to sell them as advertised." COLO. REV. STAT. § 6-1-105(1)(e), (g), and (i).

401.    Subaru participated in deceptive trade practices that violated the CCPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

402.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

403.    Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

404.    Subaru knew that the Class Vehicles and their windshields suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

405.    Subaru knew or should have known that its conduct violated the CCPA.

406.    Colorado Plaintiffs and the Colorado Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

407.    Had Colorado Plaintiffs and the Colorado Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

408.    As a direct and proximate result of Defendant's violations of the CCPA, Colorado Plaintiffs and members of the Colorado Sub-Class have suffered actual damages and/or injury in fact, including, *inter alia*: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective windshields; (2) recalibration of driver assist systems; and/or (3) the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the defective windshields.

409.    Colorado Plaintiffs and members of the Sub-Class seek actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the CCPA, as well as an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the CCPA.

**COUNT VIII**
**VIOLATION OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**
**(Fla. Stat. §§ 501.201-.213)**
**(On behalf of the Florida Sub-Class)**

410.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

411.    Plaintiff Arnold Milstein ("Florida Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Florida Sub-Class.

412.    Subaru's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq*., Florida Statutes ("FDUTPA").

413.    At all relevant times, Florida Plaintiff and the Florida Sub-Class Members were "consumers" within the meaning of the FDUTPA. Fla. Stat. § 501.203(7).

414.    Subaru's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. Fla. Stat. § 501.203(8).

415.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

416.    Subaru participated in deceptive trade practices that violated the FDUTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its Warranty and vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

417.     Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

418.     Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

419.     Subaru knew that the Class Vehicles and their windshields suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

420.     Subaru knew or should have known that its conduct violated the FDUTPA.

421.     Florida Plaintiff and the Florida Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

422.     Defendant has knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein.  Further, Defendant unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed defect and corresponding safety hazard. Defendant's unlawful acts and practices affect the public interest and trade and commerce in the State of Florida, were in bad faith, and present a continuing safety hazard to the Plaintiff and members of the Florida Subclass.

423.     As a direct and proximate result of Defendant's violations of the FDUTPA, Plaintiff and members of the Florida Sub-Class have suffered actual damages and/or injury in fact, including, *inter alia*: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective windshields; (2) recalibration of driver assist systems; and/or (3) the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the

defective windshields; and/or (4) increased insurance premiums due to submitting claims to their insurance carriers.

424.    Plaintiff and members of the Florida Sub-Class seek actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the FDUTPA.  Plaintiff and members of the Florida Subclass also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the FDUTPA.

### COUNT IX
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Mich. Comp. Laws §§ 445.903 et seq.)
### (On behalf of the Michigan Sub-Class)

425.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

426.    Plaintiff Jason Moore ("Michigan Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Michigan Sub-Class.

427.    Michigan Plaintiff and the Michigan Sub-Class Members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

428.    Subaru is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS Laws § 445.902(1)(d).

429.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a

representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

430.    Defendant knowingly failed to disclose, concealed, suppressed and/or omitted material facts regarding the defective windshields and associated safety hazard and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to the Plaintiff. Defendant knowingly failed to disclose, concealed, suppressed and/or omitted material facts regarding the defective windshields and associated safety hazard and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to the Plaintiff and the Michigan Sub-Class.  Defendant actively suppressed the fact that the windshields in Class Vehicles are defective and present a safety hazard because of materials, workmanship and/or manufacturing defects.

431.    Further, Defendant employed unfair and deceptive trade practices to deny repair or replacement of the defective windshields under warranty and within a reasonable time in violation of the Michigan CPA.  Defendant also breached its warranties as alleged herein in violation of the Michigan CPA.

432.    Defendant's unfair and deceptive trade practices were likely to deceive a reasonable consumer.  Plaintiff and members of the Michigan Sub-Class had no reasonable way to know that Class Vehicles contained windshields that were defective in materials, workmanship, and/or manufacture and posed a safety risk.  Defendant possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the defective windshields and associated safety risks, and any reasonable consumer would have relied on Defendant's misrepresentations and omissions as Plaintiff and members of the Subclass did.

433.    Defendant intentionally and knowingly misrepresented and omitted facts regarding the defective windshields and associated safety hazard with the intent to mislead

Plaintiff and Michigan Sub-Class members.  Defendant knew, or should have known, that the windshields are defective and expose drivers and the public to an associated safety hazard.

434.   Defendant owed a duty to disclose the defective windshields and its corresponding safety hazard to Plaintiff and Sub-Class members because Defendant possessed superior and exclusive knowledge regarding the defect and the hazard associated with the defective windshields.  Rather than disclose the defect, Defendant engaged in unfair and deceptive trade practices in order to sell additional Class Vehicles and avoid the cost of repair or replacement of the defective windshields.

435.   Defendant's unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the defective windshields were intended to mislead consumers and misled Plaintiff and Subclass members.

436.   At all relevant times, Defendant's unfair and deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the defective windshields and the corresponding safety hazard were material to Plaintiff and Subclass members.  When Plaintiff and Michigan Sub-Class members purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from defects and would have a safe, non-defective windshield.  Had Defendant disclosed that the windshields were defective, would pose a safety hazard, and would cause significant monetary losses, Plaintiff and Subclass members would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

437.   Defendant had a continuous duty to Plaintiff and members of the Sub-Cclass to refrain from unfair and deceptive practices under the Michigan CPA and to disclose the defect and associated safety hazard.  Defendant's unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the defective windshields, and corresponding safety hazard are substantially injurious to consumers.

438.   Defendant has knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein.  Further, Defendant unconscionably marketed the Class Vehicles to

uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed defect and corresponding safety hazard. Defendant's unlawful acts and practices affect the public interest and trade and commerce in the State of Michigan, were in bad faith, and present a continuing safety hazard to the Plaintiff and members of the Subclass.

439.    As a direct and proximate result of Defendant's violations of the Michigan CPA, Plaintiff Moore and members of the Sub-Class have suffered actual damages and/or injury in fact, including, *inter alia*: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective windshields; (2) recalibration of driver assist systems; and/or (3) the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the defective windshields.

440.    Plaintiff and the Michigan Sub-Class seek injunctive relief to enjoin Subaru from continuing its unfair and deceptive acts; monetary relief against Subaru measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Sub-Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911

**COUNT X**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Rev. Stat. §§ 407.010 et Seq.)**
**(On behalf of the Missouri Sub-Class)**

441.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

442.    Plaintiff Katherine Kinsey ("Missouri Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Missouri Sub-Class.

443.    Subaru, Missouri Plaintiff, and the Missouri Sub-Class Members are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

444.    Subaru engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

445.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020. Subaru used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA.

446.    Subaru participated in deceptive trade practices that violated the Missouri MPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

447.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

448.    Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

449.    Subaru knew that the Class Vehicles and their windshields suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

450.    Subaru knew or should have known that its conduct violated the Missouri MPA.

451.    Missouri Plaintiff and the Missouri Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

452.    Had Missouri Plaintiff and the Missouri Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

453.    Missouri Plaintiff and the Missouri Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Subaru's conduct, Missouri Plaintiff and the Missouri Sub-Class Members were harmed and suffered actual damages, including, *inter alia*: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective windshields; (2) recalibration of driver assist systems; and/or (3) the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the defective windshields.

454.    As a result of Subaru's conduct, Missouri Plaintiff and the Missouri Sub-Class Members were harmed and suffered actual damages as a result of Subaru's misrepresentations and omissions with regard to their Class Vehicles windshields because they purchased vehicles which do not perform as advertised.

455.    Subaru is liable to Plaintiff and the Missouri Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Subaru's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT XI
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. Stat. Ann. §§ 56:8-1, *et seq.*)
### (On behalf of the New Jersey Sub-Class)

456.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

457. Plaintiff Jeffrey Barr ("New Jersey Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

458. Subaru, New Jersey Plaintiff, and the New Jersey Sub-Class Members are "persons" within the meaning of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1(d).

459. Subaru engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

460. The NJCFA protects consumers against "[t]he act, the use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J. STAT. ANN. § 56:8-2.

461. Subaru engaged in unlawful trade practices including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

462. In the course of its business, Subaru willfully failed to disclose and actively concealed the defective windshield discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles. Subaru knew it sold Class Vehicles with defective windshields and knew that the defective windshields were not safe. Subaru knew this for years, but concealed all of that information. Subaru was also aware that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants and the public.

Subaru concealed this information as well.  By failing to disclose that the defective windshield was not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, Subaru engaged in deceptive business practices in violation of the NJCFA.

463.   In the course of Subaru's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the safety issues and serious defect discussed above. Subaru compounded the deception by repeatedly asserting that Subaru branded vehicles were safe, reliable, of high quality, and sold by a reputable manufacturer that valued safety and stood behind its vehicles once they were on the road.

464.   Subaru's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Sub-Class members, about the true performance of the Class Vehicles, the quality of the Subaru brand, the devaluing of safety and performance at Subaru, and the true value of the Class Vehicles. Subaru intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the New Jersey Sub-Class. Subaru knew or should have known that its conduct violated the NJCFA.

465.   As alleged above, Subaru made material statements about the safety and utility of the Class Vehicles and the Subaru brand that were either false or misleading. Subaru owed Plaintiff and the Sub-Class memebers a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at Subaru.

466.   Defendants owed a duty to disclose the defective windshields and its corresponding safety hazard to the Plaintiffs and Sub-Class members because Defendants possessed superior and exclusive knowledge regarding the defect and the hazard associated with the defective windshields.  Rather than disclose the defect, Defendants engaged in unfair and deceptive trade practices in order to sell additional Class Vehicles and avoid the cost of repair or replacement of the defective windshields.

467.   Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the defective windshields were intended to mislead consumers and misled Plaintiff Barr and the Sub-Class members.

468.   At all relevant times, Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the defective windshields and the corresponding safety hazard were material to Plaintiff Barr and the Sub-Class members.  When Plaintiff Barr and the Sub-Class members purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from defects and would have a safe, non-defective windshield.  Had Defendants disclosed that the windshields were defective, would pose a safety hazard, and would cause significant monetary losses, Plaintiff Barr and the Sub-Class members would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

469.   Defendants had a continuous duty to Plaintiff Barr and the Subclass to refrain from unfair and deceptive practices under the New Jersey CFA and to disclose the defect and associated safety hazard.  Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the defective windshields, and corresponding safety hazard are substantially injurious to consumers.

470.   Defendants' unlawful acts and practices affect the public interest and trade and commerce in the State of New Jersey, were in bad faith, and present a continuing safety hazard to Plaintiff Barr, the Sub-Class and the public.

471.   As a direct and proximate result of Defendants' violations of the NJCFA, Plaintiff Barr and the Sub-Class have suffered actual damages and/or injury in fact, including, *inter alia*: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective windshields; (2) recalibration of driver assist systems; and/or (3) the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the defective windshields.

472.   As a result of the foregoing wrongful conduct of Subaru, Plaintiff and the New Jersey Sub-Class have been damaged in an amount to be proven at trial, and seek all just and

proper remedies, including but not limited to, actual and statutory damages, treble damages, and an order enjoining Subaru's deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief

## COUNT XII
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 P.S. §§ 201-1, *et seq*.)
### (On behalf of the Pennsylvania Sub-Class)

473.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

474.    Plaintiff Julie Wotring ("Pennsylvania Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Pennsylvania Sub-Class.

475.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

476.    All of the acts complained of herein were perpetrated by Subaru in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

477.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

478.    Subaru engaged in unlawful trade practices including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class

Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

479.    In the course of its business, Subaru willfully failed to disclose and actively concealed the defective windshield discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

480.    Subaru knew it had installed defective windshields in the Class Vehicles and knew that the defective windshields were not safe.  Subaru knew this for years, but concealed all of that information. Subaru was also aware that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants and the public.  Subaru concealed this information as well.  By failing to disclose that the defective windshields were not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles and its Warranty after they were sold, Subaru engaged in deceptive business practices in violation of the Pennsylvania CPL.

481.    In the course of Subaru's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the safety issues and serious defect discussed above. Subaru compounded the deception by repeatedly asserting that Subaru branded vehicles were safe, reliable, of high quality, and sold by a reputable manufacturer that valued safety and stood behind its vehicles once they were on the road.

482.    Subaru's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Sub-Class members, about the true performance of the Class Vehicles, the quality of the Subaru brand, the devaluing of safety and performance at Subaru, and the true value of the Class Vehicles. Subaru intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead

Plaintiff and the Pennsylvania Sub-Class. Subaru knew or should have known that its conduct violated the Pennsylvania CPL.

483.   Defendants owed a duty to disclose the defective windshields and its corresponding safety hazard to the Plaintiff and Sub-Class members because Defendants possessed superior and exclusive knowledge regarding the defect and the hazard associated with the defective windshields.  Rather than disclose the defect, Defendants engaged in unfair and deceptive trade practices in order to sell additional Class Vehicles and avoid the cost of repair or replacement of the defective windshields.

484.   Defendant's unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the defective windshields were intended to mislead consumers and misled Plaintiff Wotring and the Sub-Class members.

485.   At all relevant times, Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the defective windshields and the corresponding safety hazard were material to Plaintiff Wotring and the Sub-Class members. When Plaintiff Wotring and the Sub-Class members purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from defects and would have a safe, non-defective windshield.  Had Defendants disclosed that the windshields were defective, would pose a safety hazard, and would cause significant monetary losses, Plaintiff Wotring and the Sub-Class members would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

486.   Defendants' unlawful acts and practices affect the public interest and trade and commerce in the State of Pennsylvania, were in bad faith, and present a continuing safety hazard to Plaintiff Wotring, the Sub-Class and the public.

487.   As a direct and proximate result of Defendants' violations of the Pennsylvania CPL, Plaintiff Wotring and the Sub-Class have suffered actual damages and/or injury in fact, including, *inter alia*: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective windshields; (2) recalibration of driver assist systems; and/or (3) the difference in value

between the Class Vehicles promised and warranted, and the Class Vehicles containing the defective windshields.

488.    Subaru is liable to Plaintiff and the Pennsylvania Sub-Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 Pa. Cons. Stat. § 201-9.2(a).   Plaintiff and the Pennsylvania Sub-Class are also entitled to an award of punitive damages given that Subaru's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT XIII**
**VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT**
**(Wis. Stat. § 110.18)**
**(On behalf of the Wisconsin Sub-Class)**

489.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

490.    Plaintiff Christine Powell ("Wisconsin Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Wisconsin Sub-Class.

491.    Subaru is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

492.    Wisconsin Plaintiff and the Wisconsin Sub-Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Wisconsin Plaintiff and the Wisconsin Sub-Class purchased or leased one or more Class Vehicles in Wisconsin.

493.    The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). By systematically misrepresenting the character and quality of the Class Vehicles, and the Warranty, and by omitting and concealing information about the Defect in the Class Vehicles, Subaru's conduct, acts, and practices violated the Wisconsin DTPA.

494.    Subaru participated in deceptive trade practices that violated the Wisconsin DTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by

109

concealing the Defect, by marketing its vehicles as as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

495.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

496.    Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

497.    Subaru knew that the Class Vehicles and their windshields suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

498.    Subaru knew or should have known that its conduct violated the Wisconsin DTPA.

499.    Wisconsin Plaintiff and the Wisconsin Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

500.    Had Wisconsin Plaintiff and the Wisconsin Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiff did not receive the benefit of the bargain as a result of Subaru's misconduct.

501.    Subaru's violations present a continuing risk to Plaintiff and the Wisconsin Sub-Class as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

502.    As a direct and proximate result of Subaru's violations of the Wisconsin DTPA, Plaintiff and the Wisconsin Sub-Class have suffered injury-in-fact and/or actual damages, including, *inter alia*: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective windshields; (2) recalibration of driver assist systems; and/or (3) the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the defective windshields.

503.    Plaintiff and the Wisconsin Sub-Class are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2) in an amount to be proven at trial.  Because Subaru's conduct was committed knowingly and/or intentionally, Plaintiff and the Wisconsin Sub-Class are entitled to treble damages.

504.    Plaintiff and the Wisconsin Sub-Class also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2

## COUNT XIV
## NEGLIGENT MISREPRESENTATION/OMISSION
### (On behalf of all Sub-Classes)

505.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

506.    This claim is brought on behalf of all Plaintiffs and the Sub-Classes.

507.    Subaru intentionally or negligently concealed or omitted the above-described safety and functionality information concerning the Defect in the windshields, which was material to consumers, or acted with reckless disregard for the truth, and denied Plaintiffs and the Sub-Class members information that is highly relevant to their purchasing decision.

508.     Subaru affirmatively misrepresented to Plaintiffs and the Sub-Classes in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new and reliable, were safe to operate, were engineered and manufactured with safety being a priority, had no significant defects, and would perform and operate properly when driven in normal usage and were covered by a comprehensive Warranty. Subaru knew at the time it actively concealed or omitted the information about the defective windshields that this information was material to consumers.

509.     The Class Vehicles purchased or leased by Plaintiffs and the other Sub-Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective windshields, as alleged herein.

510.     Subaru owed Plaintiffs and the Sub-Classes a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at Subaru, because Plaintiffs and the other Sub-Class members relied on Subaru's material representations that the Class Vehicles were safe and reliable.  The aforementioned concealment and omissions were material because, if they had been disclosed, Plaintiffs and the other Sub-Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Class Vehicles at the prices they paid.

511.     Plaintiffs and the other Sub-Class members relied on Subaru's representations and reputation – along with Subaru's failure to disclose the faulty and defective nature of the windshields – in purchasing or leasing the Class Vehicles. As a result of their reliance, Plaintiff and the other Sub-Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

512.     As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs and all members of the Sub-Classes have been damaged in an amount to be proven at trial.

**COUNT XV**
**UNJUST ENRICHMENT**
**(On behalf of all Sub-Classes)**

513.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

514.     Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes.

515.     Plaintiffs bring this count on behalf of themselves and all of the state Sub-Classes.

516.     Subaru has received and retained a benefit from Plaintiffs and the Sub-Classes and inequity has resulted.

517.     Subaru has benefitted from selling and leasing defective cars whose value was artificially inflated by Subaru's concealment of the defective windshields, and Plaintiffs and the Sub-Classes have overpaid for the cars and have been forced to pay other costs.  Subaru has also benefitted from selling replacement windshields and other services in connection with the defective windshields.

518.     All Sub-Class members conferred a benefit on Subaru.

519.     It is inequitable for Subaru to retain these benefits.

520.     Plaintiffs and the Sub-Classes were not aware of the true facts about the Class Vehicles, and did not benefit from Subaru's conduct.

521.     Subaru knowingly accepted the benefits of its unjust conduct.

522.     As a result of Subaru's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

523.     Plaintiffs, individually and on behalf of all the members of the Sub-Classes, seek all relief permitted in accord with the proofs at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly

situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

A. An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B. An order awarding declaratory relief and enjoining Defendants from continuing the conduct and practices alleged above and requiring Defendants to accept full liability and responsibility for the defective windshields in the Class Vehicles and all related damages;

C. An order awarding costs, restitution, disgorgement, compensatory damages and out-of-pocket expenses in an amount to be determined at trial;

D. Equitable relief in the form of buyback of the Class Vehicles;

E. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs, expenses, and attorneys' fees as permitted by law; and

G. Such other or further relief as the Court may deem appropriate, just, and equitable.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of any and all issues in this action so triable.


Dated: February 6, 2020                    LEVAN LAW GROUP LLC


                                           s/ Peter A. Muhic
                                           Peter A. Muhic
                                           NJ ID No. 041051994
                                           Peter H. LeVan Jr.

NJ ID No. 000431999
One Logan Square – 27th Floor
Philadelphia, PA 19103-6933
Tel: 215.561.1500
Fax: 215.827.5390
pmuhic@levanlawgroup.com
plevan@levanlawgroup.com


Edwin J. Kilpela, Jr
James P. McGraw, III
CARLSON LYNCH LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: 412.322.9243
Fax: 412.231.0246
ekilpela@carlsonlynch.com
jmcgraw@carlsonlynch.com
Katrina Carroll
NJ ID No. 026212000
CARLSON LYNCH LLP
111 W. Washington Street Ste. 1240
Chicago, IL 60602
Tel: 312.750.1265
kcarroll@carlsonlynch.com


Russell D. Paul
Amey J. Park
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:     (215) 875-3000
Fax:     (215) 875-4604
rpaul@bm.net
apark@bm.net


Jonathan M. Jagher
Kimberly A. Justice
FREED KANNER LONDON
& MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
Facsimile: (224) 632-4521

jjagher@fklmlaw.com
kjustice@fklmlaw.com


Steven Weinmann
Tarek H. Zohdy
Cody R. Padgett
Trisha K. Monesi
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel.:   (310) 556-4811
Fax:    (310) 943-0396
Steven.Weinmann@capstonelawyers.com
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Trisha.Monesi@capstonelawyers.com


Christopher D. Moon
Kevin O. Moon
MOON LAW APC
600 West Broadway, Suite 700
San Diego, CA 92101
Tel:  (619) 915-9432
chris@moonlawpc.com
kevin@moonlawpc.com


***Attorneys for Plaintiffs and the Proposed Classes***

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Peter A. Muhic, declare as follows:

1.    I am an attorney at law licensed to practice in the State of New Jersey and I am a member of the bar of this Court.

2.    I am interim co-lead counsel for Plaintiffs in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

3.    The Complaint filed in this action is filed in the proper place for trial under California Civil Code Section 1780(d) in that Subaru of America, Inc. has its principal place of business in this District and events giving rise to this action occurred within this District.

4.    I declare under the penalty of perjury under the laws of the State of New Jersey and the United States that the foregoing is true and correct and that this declaration was executed in New Jersey this 6th day of February, 2020.

Peter A. Muhic