**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

CHRISTINE POWELL, HUNTER        1:19-cv-19114
MILLS, PAUL GEISLER, DANIEL
BINKLEY, RYAN HICKS, ARNOLD
MILSTEIN, KATHERINE KINSEY,
JASON MOORE, JEFFREY BARR,
JULIE WOTRING, CARL ECHKARDT,
individually and on behalf of
all others similarly situated   **OPINION**

            Plaintiffs,

    v.

SUBARU OF AMERICA, INC. and
SUBARU CORPORATION

            Defendants.

---

**APPEARANCES:**

ABIGAIL GERTNER
BERGER MONTAGUE PC
1818 MARKET STREET
SUITE 3600
SUITE, PA 19103

JOHN S STAPLETON
LEVAN MUHIC STAPLETON LLC
FOUR GREENTREE CENTRE
601 ROUTE 73 N
SUITE 303
MARLTON, NJ 08053

KATRINA CARROLL
CARLSON LYNCH, LLP
111 W. WASHINGTON STREET
SUITE 1240
CHICAGO, IL 60602

MICHAEL M. WEINKOWITZ
LEVIN SEDRAN & BERMAN LLP

1

510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106

PETER HOUGHTON LEVAN, JR.
LEVAN MUHIC STAPLETON LLC
FOUR GREENTREE CENTRE
601 ROUTE 73 NORTH, SUITE 303
MARLTON, NJ 08053

PETER A. MUHIC
LEVAN MUHIC STAPLETON LLC
FOUR GREENTREE CENTRE
601 RT 73 N
SUITE 303
Marlton, NJ 08053

*Attorneys for Plaintiffs.*

CASEY GENE WATKINS
BALLARD SPAHR LLP
210 LAKE DRIVE EAST
SUITE 200
CHERRY HILL, NJ 08002

NEAL D. WALTERS
BALLARD, SPAHR LLP
210 LAKE DRIVE EAST, SUITE 200
CHERRY HILL, NJ 08002-1163

*Attorneys for Defendants.*

**<u>Hillman</u> District Judge,**

Plaintiffs have brought suit against Defendants Subaru of America, Inc. and Subaru Corporation (collectively "Subaru"), alleging that Defendants are manufacturing, marketing, and selling new vehicles with defective and dangerous windshields. This matter comes before the Court on Defendants' motion to dismiss, or alternatively, for a more definite statement. For the reasons stated below, the Court will grant in part and deny

2

in part Defendants' motion to dismiss.  The Court will deny
Defendants' motion for a more definite statement.

## BACKGROUND

Plaintiffs filed a complaint in October 2019.  Plaintiffs
filed an amended complaint on November 12, 2019.  This case was
then consolidated with three others on January 27, 2020, after
which sixteen Plaintiffs filed a consolidated class action
complaint  against Fuji Heavy Industries Ltd. and Subaru of
American Inc. on February 6, 2020.[1]  (ECF No. 27).  A related
case, Zaback v. Subaru of America Inc., 1:20-02845-RBK-JS was
consolidated with this matter in April 2020.  (ECF No. 38).  The
relevant facts will be summarized below.

Plaintiffs' Consolidated Amended Complaint ("CAC") and the
consolidated complaint from the Zaback action ("Zaback
Complaint") include a nationwide class,[2] as well as several

---

[1] The Plaintiffs in this case, between the two complaints,
include seven Plaintiffs from California (Armstrong, Nevarez,
Eckhardt, Geisler, Mills, Moreno, and Vierra), three Plaintiffs
from Colorado (Hicks, Binkley, and Merman), one from Delaware
(Zaback); one from Florida (Milstein), one from Illinois
(Robbie); one from Indiana (Funk); one from Kentucky (Garrett);
one from Michigan (Moore), one from Missouri (Kinsey), one from
New Jersey (Barr), one from North Carolina (Jones) one from
Pennsylvania (Wotring), and one from Wisconsin (Powell).  These
Plaintiff's individual experiences will be summarized below.

[2] Plaintiffs define the class in this case as "All persons or
entities who purchased or leased a Class Vehicle in the United
States and (i) suffered a damaged windshield or (ii) who own or
lease a Class vehicle with the original or replacement
windshield."  (ECF No. 27, at ¶ 295).

3

state-specific subclasses.  Specifically, these subclasses

include the: (a) California subclass, (b) Colorado subclass; (c)

Delaware subclass; (d) Florida subclass; (e) Illinois subclass;

(f) Indiana subclass; (g) Michigan subclass; (h) Missouri

subclass; (i) New Jersey subclass; (j) North Carolina subclass;

(k) Pennsylvania subclass; (l) Texas subclass; and (m) Wisconsin

subclass.  Plaintiffs define the Class of Vehicles as the "2017-

2020 Subaru Forester, 2017-2020 Subaru Outback, 2017-2020 Subaru

Crosstrek, 2017-2020 Subaru Legacy, and 2017-2020 Subaru Impreza

vehicles."  Defendants allege that this consolidated action

concerns a putative class of 2.5 million vehicles comprising

five vehicle models, crossing multiple design generations and

involving multiple windshield supplies.  (ECF No. 32-7 at 1).

Plaintiffs allege that Subaru provides purchasers and

lessees of the class of vehicles in this case with a New Vehicle

Limited Warranty ("NVLW").  According to Plaintiffs, this

Warranty provides a three-year, 36,000-mile warranty for

vehicles that expressly covers defect in materials or

workmanship.

Plaintiffs

All Plaintiffs contend that safety and reliability were

important factors in their decision to purchase a vehicle from

Subaru.  All Plaintiffs contend that they were unaware that the

vehicles contained a defect.  All Plaintiffs contend that had

4

they been aware of this defect they would have not purchased the vehicle or would have paid less for it.

Gordon Armstrong is a citizen of California.  In June 2019, Plaintiff Armstrong purchased a used 2017 Subaru Outback from Kia of Simi Valley in Simi Valley, California.  In September 2019, Armstrong alleges that a small pebble hit his windshield, creating a small chip.  At this time, Armstrong's car allegedly had 30,000 miles on it.  According to Armstrong, over the next five weeks, this chip turned into a t-shaped crack.  Armstrong alleges that when he took his vehicle in for repairs in October 2019, he had to pay $490 for the repair.

Hunter Mills is a citizen of California.  In December 2018, he purchased a new 2019 Subaru Outback from a licensed dealer in California.  Plaintiff Mills alleges that a few weeks after purchasing his vehicle, his windshield cracked without any apparent reason.  At this time, Mills alleges his vehicle had been driven approximately 1,000 miles.  Mills contacted his local Subaru dealer about a replacement windshield.  Mills alleges that the dealer replaced the windshield but required Mills to pay, causing him to submit a claim to his insurer and pay the $1,000 deductible.

Paul Geisler is a citizen of California.  In March 2018, he purchased a new 2018 Subaru Outback from AutoNation Subaru in Roseville, California.  In July 2018, Plaintiff Geisler alleges

that he observed a "long crack running through his windshield" but could not recall any incident that would have caused this damage.  Geisler alleges that his vehicle had fewer than 36,000 miles on it and was within the warranty period.  Nonetheless, Geisler alleges he was forced to pay $200 out of pocket for a replacement windshield.

Sandy Moreno is a citizen of California.  In October 2018, Plaintiff Moreno purchased a new 2019 Subaru Outback from Elk Grove Subaru in Elk Grove, California.  In December 2018, Moreno alleges that her car had approximately 5,000 miles on it when a pebble hit her windshield.  Moreno contends that this pebble caused a large crack in her windshield.  According to Moreno, she took her vehicle to Safelite Auto Glass in Stockton, California, where she was required to pay her insurance deductible of $100.  Moreno further alleges that in February 2019, she observed another chip in her recently replaced windshield.  According to Moreno, she paid an additional $75 to have the chip filled in.

Louie Nevarez is a citizen of California.  In May 2018, Plaintiff Nevarez purchased a new 2018 Subaru Impreza Sport from Subaru Antelope Valley, in Lancaster, California.  In August 2019, Nevarez alleges he was driving his car when the windshield suddenly cracked.  According to Nevarez, this crack stretched from the driver's side to the passenger's side and "appears to

6

have occurred spontaneously, and not as a result of a foreign object impacting the windshield." At the time he noticed the damage, Nevarez alleges the vehicle had approximately 15,000 miles on it and was within the warranty period. Nevertheless, Nevarez alleges the replacement cost him $300 when sought repairs from an independent repair shop.

Andrew Vierra is a citizen of California. In May 2019, Plaintiff Vierra purchased a new 2019 Subaru Outback from Ocean Subaru, in Fullerton, California. In November 2019, Vierra alleges that his vehicle had around 10,500 miles on it when he heard a popping sound, but saw no evidence of any impact. Vierra alleges that he later noticed a fishhook-shaped crack in the windshield near the rear-view mirror. According to Vierra, this crack extended to the middle of the driver's side of the windshield within days. When Vierra called Ocean Subaru, he alleges that he was informed that the windshield would not be replaced under warranty and subsequently contracted his insurance company. Vierra alleges he was responsible for paying $379 for a replacement windshield. According to Vierra, replacing his windshield was complicated by the technician's difficulty calibrating the vehicle's front view camera.

Daniel Binkley is a citizen of Colorado. In September 2017, he used a broker to purchase a new 2018 Subaru Outback from Heuberger Subaru in Colorado Springs, Colorado. Plaintiff

Binkley noticed a crack in his windshield in November 2018. Binkley alleges he was not aware of any incident that would have caused such damage, but paid $593.91 to have it replaced at an independent repair shop. Binkley alleges that his car had fewer than 36,000 miles on it and was within the warranty period.

Ryan Hicks is a citizen of Colorado. In February 2018, he purchased a new 2018 Subaru Crosstrek from a broker in Littleton, Colorado. According to Plaintiff Hicks, in July 2019 he observed a chip in his windshield where a small stone had hit it. Later in July 2019, he observed a separate crack in his windshield. In 2019, the crack in Hicks' windshield spread and prevented him from continuing to use the vehicle. Hicks alleges that he was not aware of any incidents that would have caused this damage. Hicks contacted a Subaru dealership to request a replacement windshield, and was advised there was no coverage for the windshield. Hicks had the windshield replaced by a different vendor and paid a $500 deductible. At this point, Hicks' vehicle had fewer than 36,000 miles on it and was within the warranty period.

Stephen Merman is a citizen of Colorado. In July 2019, Plaintiff Merman purchased a pre-owned 2018 Subaru Forester from AutoNation Subaru West in Golden, Colorado. In October 2019, when Merman's car had approximately 23,000 miles on it, his life partner's daughter was driving the vehicle when a crack occurred

8

in the top left corner of the windshield.  Neither Merman's life
partner, who was a passenger in the car, or his life partner's
daughter saw any debris hit the car.  Soon after, Merman alleges
that he observed the crack spread from the top left corner to
the rear-view mirror of the windshield.  Merman took the vehicle
to AutoNation Subaru West, who informed him that they do not
replace windshields.  Next, Merman alleges he took his vehicle
to Safelite Auto Glass in Lakewood, Colorado.  There Merman
alleges that the repair cost $772, of which he paid $500.  In
November 2019, Merman alleges he took his vehicle, which at this
time had 25,638 miles on it, back to the dealership to
recalibrate the EyeSight Driver Assist Technology.  According to
Merman, he was charged $220 for the recalibration.

Allan Zaback is a citizen of Delaware.  Plaintiff Zaback
purchased a 2019 Subaru Forester.  According to Zaback, his
windshield first cracked when his vehicle had around 3,000 miles
on it.  Zaback alleges that he paid a $500 insurance deductible
to replace the windshield.  Zaback's windshield cracked a second
time when his car had 12,900 miles on it.  Zaback alleges that
this crack was not covered under his warranty and he again paid
a $500 insurance deductible for a replacement.

Arnold Milstein is a citizen of Florida.  In September
2019, he purchased a new Subaru Outback from Schumaker
Automotive in Delray Beach, Florida.  In October 2019, Plaintiff

Milstein noticed a crack running through his windshield. According to Milstein, he was not aware of any incident that could have caused this damage.  Milstein brought his car to All American Subaru in Old Bridge, New Jersey.  The dealership denied that a defect caused the windshield to crack and ordered a replacement.  In October 2019, Milstein received an estimate of $1,166.14 to replace the windshield, but as of the filing of the CAC, these repairs had not yet been completed.  Milstein alleges that his car had fewer than 36,000 miles and was within the warranty period.

Randy Robbie is a citizen of Illinois.  Robbie purchased a new 2017 Subaru Forester.  One week after purchase, Plaintiff Robbie alleges that his windshield cracked.  According to Robbie, the replacement windshield was not covered under the vehicle's warranty, requiring him to pay $120.  Robbie's windshield cracked a second time when his vehicle had 20,000 miles on it.  This windshield replacement was also not covered under his vehicle's warranty, requiring him to again pay out of pocket.

Brittany Funk is a citizen of Indiana.  In June 2019, she purchased a 2019 Subaru Forester.  Plaintiff Funk alleges that when her car had 14,000 miles on it, her windshield cracked for the first time.  According to Funk, this replacement was not

covered by her vehicle's warranty, causing her to pay a $500
deductible.

Brent Garrett is a citizen of Kentucky.  In July 2019, he
purchased a new 2019 Subaru Outback in North Carolina.
Plaintiff Garrett alleges that his windshield cracked after
coming into contact with a small stone when his vehicle had
1,500 miles on it.  Though the replacement windshield was partly
covered by his vehicle's warranty, Garrett alleges he paid a
$100 deductible.  Garrett alleges that his windshield cracked a
second and third time, each requiring him to pay out of pocket
for a replacement.

Jason Moore is a citizen of Michigan.  In March 2019, he
purchased a new 2019 Subaru Outback from Fox Subaru in Grand
Rapids, Michigan.  Plaintiff Moore alleges that less than two
months after purchasing his vehicle, he heard a loud pop as he
backed out of his garage and a fracture occurred along the base
and entire width of his windshield.  Moore alleges that the
Subaru dealership he went to advised that it would not cover the
cost of the replacement windshield under warranty.  Moore
contacted a Subaru representative who denied that there was any
defect in the windshield.  Moore submitted a claim to his
insurance company and paid $500 to a third-party repair shop for
a replacement windshield.  According to Moore, his vehicle had

fewer than 36,000 miles on it and was within the warranty period.

Katherine Kinsey is a citizen of Missouri.  In August 2018, she purchased a new 2018 Subaru Forester from Webster Groves Subaru in Missouri.  Shortly after purchasing her vehicle, Plaintiff Kinsey noticed several chips and dings on her windshield and a starburst crack.  She had these cracks repaired.  In May 2019, Kinsey noticed a two-inch crack that she alleges "formed spontaneously in the windshield near the bottom driver's side corner."  According to Kinsey, this crack spread across one half of the windshield while she was driving.  Kinsey contacted a local Subaru dealer about her windshield, and alleges that the dealer referred her to a third-party repair shop where she paid $330.94 to replace the windshield.  Kinsey contends that she is unsure whether the Eyesight system needs to be recalibrated.

Jeffrey Barr is a citizen of New Jersey.  In November 2018, he leased a new 2019 Subaru Forester from Liberty Subaru in Emerson, New Jersey.  In September 2019, Plaintiff Barr alleges his windshield "suddenly and inexplicably cracked" as he drove on the highway with his wife.  Barr alleges that there were no roadway obstructions or anomalies present when he heard a loud cracking sound and observed a foot-long crack on his windshield.

Plaintiff Barr alleges he was forced to submit a claim to insurance and pay a $500 deductible.

James Jones is a citizen of North Carolina.  He purchased a new 2017 Subaru Outback.  Plaintiff Jones alleges that his windshield spontaneously cracked at 6,000 miles.  According to Jones, the replacement windshield was not covered under his vehicles warranty and he was required to pay $348 to replace it.

Julie Wotring is a citizen of Pennsylvania.  In July 2019, she purchased a new 2019 Subaru Outback from John Kennedy Subaru in Plymouth Meeting, Pennsylvania.  Plaintiff Wotring alleges that in September 2019, after having left her car parked in her driveway overnight, she observed a crack on the passenger side of her windshield.  At this time, Wotring alleges that she had driven her vehicle 3,874 miles and was still within her warranty.  According to Wotring, she took her vehicle to an authorized Subaru dealer for repairs where they refused to replace her windshield under warranty, costing her $500.

Carl Eckhardt is a citizen of Texas.  In December 2017, he purchased a new 2018 Subaru Outback from Livermore Subaru in Livermore, California.  Plaintiff Eckhardt alleges that he is on his third windshield.  He alleges that within months of purchasing his vehicle, a small pebble hit his windshield, causing a crack.  According to Eckhardt, when he took his vehicle to a dealership, the dealer initially informed him that

13

his windshield was not under warranty before agreeing to replace it for him free of charge.  Eckhardt alleges that within weeks, he discovered a large crack on his windshield.  This time, Eckhardt alleges that the dealership refused to replace the windshield under warranty, costing him over $500.

Christine Powell is a citizen of Wisconsin.  In August 2017, she purchased a new 2018 Subaru Forester from Don Miller Subaru in Madison, Wisconsin.  Plaintiff Powell alleges that in December 2017, the windshield of her vehicle cracked for no apparent reason.  Powell alleges that she took her vehicle to Don Miller Subaru and that Don Miller examined the windshield. Don Miller denied Subaru's responsibility for the windshield crack and replaced it at the expense of Powell and her insurer. At this time, Powell's vehicle had 3,502 miles on it, but Don Miller advised Powell that Subaru was not replacing broken windshields under the new vehicle warranty that comes with her class of vehicles.  Powell further alleges that this replacement windshield broke for no apparent reason in May 2019.  At this time, Powell's car had approximately 15,000 miles on it, which she claims is within the warranty mileage.  However, Powell alleges that she lives several hours from a licensed Subaru dealer and hesitates to incur further costs and damages.

14

Defendants

Subaru Corporation f/k/a/ Fuji Heavy Industries Ltd. ("SBR") is a Japanese corporation located in Tokyo, Japan.  SBR is a parent company of Subaru of America Inc.

Subaru of America Inc. ("SOA") is incorporated in New Jersey and has its principal place of business in Camden, New Jersey.  Subaru operates a nationwide dealership network that oversees offices and facilities throughout the United States. SOA is a subsidiary of Subaru Corp.

Neither SBR nor SOA sell vehicles directly to consumers. Instead, they rely on independent franchise authorized retailers to sell vehicles to consumers.  SOA provides express warranties to purchasers of Subaru vehicles that cover repairs needed to correct defects in materials or workmanship reported during the warranty period.

This Opinion will refer to SBR and SOA as "Subaru" or "Defendants" collectively.

Class Allegations

Plaintiffs' CAC (ECF No. 27) contains fifteen counts:

1. Violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq. (on behalf of nationwide class or alternatively all subclasses);

2. Breach of Express Warranty (on behalf of nationwide class or alternatively all subclasses);

15

3. Breach of Implied Warranty of Merchantability (on behalf of nationwide class or alternatively all subclasses);[3]

4. Violation of California's Consumer Legal Remedies Act, California Civil Code § 1750, et seq. (on behalf of California subclass);

5. Violation of California Business & Professions Code, California Code § 17200 (on behalf of California subclass);

6. Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, et seq. (on behalf of California subclass);

7. Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, et seq. (on behalf of Colorado subclass);

8. Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-.213 (on behalf of Florida subclass);

9. Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.903 et seq. (on behalf of Michigan subclass);

10. Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 et seq. (on behalf of Missouri subclass);

---

[3] The Complaint in Zaback alleges separate counts of Breach of Implied Warranty of Merchantability for the North Carolina, Illinois, and Indiana subclasses. See ECF No. 43-1, at 3.  In this case, these claims will be treated as a single count on behalf of all Plaintiffs in the Consolidated Class Action.

16

11.  Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, et seq. (on behalf of New Jersey subclass);

12.  Violation of the Pennsylvania Unfair Trade Practice and Consumer Protection Law, 73 P.S. §§ 201-1 et seq. (on behalf of Pennsylvania subclass);

13.  Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 110.18 (on behalf of Wisconsin subclass);

14.  Negligent Misrepresentation/Omission (on behalf of all subclasses);

15.  Unjust Enrichment (on behalf of all subclasses).

Additionally, the following eleven counts, multiple of which directly overlap with counts from the CAC, stem from the complaint filed in Zaback (the "Zaback Complaint") (Case No. 20-02845-RBK-JS, ECF No. 1)[4]:

1. Violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq. (on behalf of Plaintiffs and nationwide class);

2. Breach of Express Warranty (on behalf of nationwide class or alternatively all subclasses);

3. Fraud by Concealment, Common Law (nationwide class, all state classes);

---

[4] The Zaback Complaint only names SOA as a defendant, and asserts no claims against SBR.

4. Violation of Delaware Consumer Fraud Act (DCFA), Del. Code. Ann. Tit. 6 §§ 2511-2584 (on behalf of Delaware Class);

5. North Carolina Breach of Implied Warranty of Merchantability (on behalf of Plaintiffs Jones and Garret and the state subclass);

6. Violation of North Carolina Consumer Protection Act (UDTPA), N.C. Gen. Stat. §§ 75-1.1 et seq. (on behalf of North Carolina Class);

7. Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505 et seq. (on behalf of Illinois subclass);

8. Unfair Acts and Practices in Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505 et seq. (on behalf of Illinois subclass);

9. Breach of Implied Warranty of Merchantability under Illinois Law, 810 Ill. Comp. Stat. § 5/2-314 and 5/2A-212 (on behalf of Illinois subclass);

10. Violation of the Indiana Deceptive Consumer Sales Act (IDCSA), Ind. Code § 24-5-0.5-3 (on behalf of Indiana subclass)

11. Indiana Implied Warranty of Merchantability (on behalf of Indiana subclass)

Plaintiffs seek damages, equitable relief, fees, and costs. Defendants moved to dismiss this action on March 6, 2020. (ECF No. 32-7). Defendants then filed a supplemental motion to dismiss on May 13, 2020 to address the new claims presented by consolidation with <u>Zaback</u>. (ECF No. 43-1). This matter has been fully briefed and is ripe for adjudication.

**DISCUSSION**

**I.   Subject Matter Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act (CAFA), which provides, in relevant part, that "district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . (A) any member of a class of plaintiffs is a citizen of a State different from any defendant."

**II.  Standing**

**A.  Standard for a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) governs a motion to dismiss for lack of standing because "standing is a jurisdictional matter." <u>Ballentine v. United States</u>, 486 F.3d 806, 810 (3d Cir. 2007). Standing is a "threshold jurisdictional requirement, derived from the 'case or

19

controversy' language of Article III of the Constitution." Pub.
Interest Research Grp. Of N.J., Inc. v. Magnesium Elektron,
Inc., 123 F.3d 111, 117 (3d Cir. 1997).  A plaintiff must
establish his or her standing to bring a case in order for a
court to possess jurisdiction over his or her claim.  Id.

To establish standing, a plaintiff must establish three
elements: (1) he or she "suffered an injury in fact, an invasion
of a legally protected interest which is (a) concrete and
particularized, and (b) actual or imminent, not conjectural or
hypothetical"; (2) there is a "causal connection between the
injury and the conduct complained of—the injury has to be fairly
. . . traceable opt the challenged action of the defendant, and
not . . . the result of the independent action of some third
party not before the court"; and (3) "the injury will be
redressed by a favorable decision." Lujan v. Defenders of
Wildlife, 504 U.S. 555, 560-61 (1992); see also Anjelino v. N.Y.
Times Co., 200 F.3d 73, 88 (3d Cir. 2000) ("Standing is
established at the pleading stage by setting forth specific
facts that indicate that the party has been injured in fact or
that injury is imminent, that the challenged action is causally
connected to the actual or imminent injury, and that the injury
may be redressed by the cause of action.").

B. **Standing Analysis**

Defendants argue that Plaintiffs lack standing to bring claims related to multiple different Subaru vehicles. Specifically, they argue that because "no Plaintiff has ever owned a Legacy of any model year; a 2017 Crosstrek or Impreza; any 2019 Impreza; or any 2020 Crosstrek, Forester, or Impreza," any claims as to those vehicles must be dismissed for lack of standing. (ECF No. 43-1 at 4).

Plaintiffs, for their part, do not dispute that none of the named plaintiffs in this action have ever purchased or owned any of the vehicles listed above. Generally, "if none of the named plaintiffs purporting to represent a class establishes the requisite case or controversy with the defendant, none may seek relief on behalf of himself or any other member of the class." Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 361 (3d Cir. 2013) (quoting O'Shea v. Littleton, 414 U.S. 488, 494 (1974)). However, the Third Circuit has held that that a plaintiff that lacked standing to pursue a particular claim could still assert that claim in a putative class action because she had standing to pursue two closely related claims against the same defendant. Haas v. Pittsburgh National Bank, 526 F.2d 1083, 1088-89 (3d Cir. 1975); see also Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 58 (3d Cir. 1994) ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury

21

from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.").

Based in part on this case law, courts in this district have divided on the issue of whether plaintiffs like those here have standing to pursue claims for products they themselves did not purchase.  As outlined by the court in Cox v. Chrysler Grp., LLC, "some courts have dismissed the remaining claims concerning the rest of the product line, holding that named plaintiffs lack standing for claims relating to products they did not purchase.  Other courts, following Haas, have refused to dismiss claims for products that the named plaintiffs did not buy themselves."  No. CV 14-7573, 2015 WL 5771400, at *15 (D.N.J. Sept. 30, 2015) (collecting cases on both sides).  Courts that have found dismissal at this stage on the basis of standing premature have generally assessed three elements: whether "the basis for the Plaintiffs' claims [are] the same, the products [are] closely related, and the defendants [are] the same."  Sauer v. Subaru of America, Inc., No. 18-14933, 2020 WL 1527779, at *3 (D.N.J. March 31, 2020) (quoting In re Gerber Probiotic Sales Practices Litig., No. CIV.A. 12-835, 2014 WL 5092920, at *5 (D.N.J. Oct. 10, 2014)).

Having reviewed the competing case law and the facts before it, the Court agrees with those courts that have found dismissal

22

for standing at this stage to be premature.  Here, Plaintiffs'
claims clearly all have the same basis: the allegation that the
windshields on the Class Vehicles are defective.  Similarly, the
Court finds that, for the purposes of this motion, the products
appear to be closely enough related to avoid dismissal; while
Defendants disputes this fact, the evidence they have put into
the record regarding windshield models for different class
vehicles shows that even some vehicles they argue Plaintiffs
don't have standing to pursue claims for, such as the 2017-2020
Legacy, used identical windshields as those used in the 2017-
2020 Outback, a Class Vehicle for which Plaintiffs clearly have
standing to pursue claims.  (See ECF No. 43-1 at 8).
Plaintiffs, for their part, have plead that the central
windshield defect at the core of their complaints is present in
each of the Class Vehicles.  Finally, the claims all target
Subaru.

    The Court finds that at this stage, these allegations and
facts are sufficient to avoid dismissal.  See Forst v. Live
Nation Entm't Inc., No. 14-2452, 2015 WL 4530533, at *4 (D.N.J.
July 27, 2015), recons. denied, 2015 WL 5545542 (D.N.J. Sept.
18, 2015) ("[A] products liability suit involves specific
products that all members of the class have purchased. Defects
found in a subset of these products can be an indicator of
broader defects in identical or similarly manufactured

products."). "Under these circumstances, the Court refuses to dismiss Plaintiffs' claims as they relate to vehicles that named Plaintiffs have not purchased . . . [and] defers the standing inquiry until the class certification stage." <u>Cox</u>, 2015 WL 5771400, at *15; <u>see also</u> <u>In re L'Oreal Wrinkle Cream Mktg. and Sales Practices Litig.</u>, No. 12-3571, 2013 WL 6450701, at *4 (D.N.J. Dec. 9, 2013).

## III. **Legal Standard for a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a motion under Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the pleader. <u>Evancho v. Fisher</u>, 423 F.3d 347, 350 (3d Cir. 2005); see also <u>Philips v. Cnty. Of Allegheny</u>, 515 F.3d 224, 228 (3d Cir. 2008) ("[I]n deciding a motion under Fed. R. Civ. P. 12(b)(6), [a district court is] . . . required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to" the plaintiff). A pleading is sufficient if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

When weighing a motion to dismiss, the Court does not ask "whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims[.]'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562 n. 8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) ("Our decision in Twombly expounded the pleading standard for 'all civil actions.'") (citations omitted).

In applying the Twombly/Iqbal standard, a district court will first "accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusion." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Iqbal, 556 U.S. at 678).  Next, the Court will "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  Id. at 211 (citing Iqbal, 556 U.S. at 679).

To meet this standard, a "complaint must do more than allege the plaintiff's entitlement to relief."  Id.; see also Philips, 515 F.3d at 234 ("The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a

reasonable expectation that discovery will reveal evidence of'
the necessary element.") (citing <u>Twombly</u>, 550 U.S at 556).   The
party moving to dismiss under 12(b)(6) "bears the burden of
showing that no claim has been presented."   <u>Hedges, v. United
States</u>, 404 F.3d 744, 750 (3d Cir. 2005).

**IV.   <u>Analysis of Defendants' Motions to Dismiss</u>**

        Defendants, in their two briefs supporting their motions to
dismiss both the Consolidated Amended Complaint and the Zaback
Complaint, raise a substantial number of often-overlapping
arguments for dismissal that apply to a wide variety of the
twenty-six different counts alleged across the two complaints.
For the sake of clarity, the Court will therefore approach its
analysis through the organizational structure by which
Defendants argue for the dismissal of Plaintiffs' various
claims.

        **A. <u>Choice of Law Overview</u>**

        The Parties agree that Plaintiffs' statutory consumer
protection claims are governed by the particular plaintiff's
state of residence or place of purchase.   The parties do not
agree whether a choice of law analysis to determine which law
applies to Plaintiffs' warranty claims is premature at this
stage.   Defendants argue that the Court should engage in a
choice of law analysis and that this analysis will show that
conflicts exist between the laws of New Jersey and laws of

Plaintiffs' home states.  In contrast, Plaintiffs assert that it is premature to make a determination on choice of law at this stage.  If the Court does conduct a choice of law analysis, Plaintiffs contend that there is no actual conflict between the laws applicable to Plaintiffs' tort and warranty claims.

In diversity cases, federal courts apply the forum state's choice of law rules to determine which state's substantive laws are controlling.  Maniscalco v. Brother Int'l (USA) Corp., 709 F.3d 202, 206 (3d Cir. 2013) (citing Klaxon Co. v. Stentor Elect. Mfg. Co., Inc., 313 U.S. 487, 496 (1941)).  When conducting a choice of law analysis, New Jersey uses the "most significant relationship" test of the Restatement (Second) of Conflict of Laws).  P.V. v. Camp Jaycee, 197 N.J. 132, 155 (2008) ("In balancing the relevant elements of the most significant relationship test, we seek to apply the law of the state that has the strongest connection to the case.").

Choice of law analysis is a two-step process.  First, the Court must determine whether there is an actual conflict between the laws of the two forums; "If there is no conflict or only a 'false conflict,' where 'the laws of the two jurisdictions would produce the same result on the particular issue presented,' the substantive law of the forum state applies."  Skeen v. BMW of North America, LLC, 2014 WL 283628, at *5 n.5 (D.N.J. Jan. 24, 2014) (quoting 15A C.J.S. Conflict of Laws § 30 (2013) and

27

Williams v. Stone, 109 F.3d 890, 893 (3d Cir. 1997)).  If the court finds an actual conflict of laws exists, it proceeds to step two, where it "must determine which state has the 'most significant relationship' to the claim, by 'weigh[ing] the factors set forth in the Restatement section corresponding to the plaintiff's cause of action.'"  Cox, 2015 WL 5771400, at *4 (quoting Snyder v. Farnam Cos., 792 F. Supp. 2d 712, 717 (D.N.J. 2011)); see also P.V. ex rel. T.V. v. Camp Jaycee, 962 A.2d 453, 460 (N.J. 2008).

The Court notes that "'it can be inappropriate or impossible for a court to conduct [a choice of law] analysis at the motion to dismiss stage when little or no discovery has taken place.'"  Snyder, 792 F.Supp.2d at 717 (quoting In re Samsung DLP Television Class Action Litig., 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009)).  However, "'[s]ome choice of law issues may not require a full factual record and may be amendable to resolution on a motion to dismiss.'"  Id. (quoting Harper v. LG Elecs. USA, Inc., 595 F.Supp.2d 486, 491 (D.N.J. 2009)).  The Court should make a threshold inquiry into whether a choice of law analysis is appropriate at the motion to dismiss stage by determining whether the choice of law issues require a full factual record or not.  Id.  The factual record may be sufficient for certain choice of law determinations, but not others.  See id.  "Importantly, this choice-of-law analysis is

conducted on a claim-by-claim basis." Id.  Defendants here have posed select arguments against a series of Plaintiffs' non-statutory claims; accordingly, the Court will address such choice of law questions as they arise in its analysis of Defendants' arguments for dismissal.

**B. Plaintiff's Warranty-Related Claims**

Plaintiffs have plead a number of warranty-related claims, for breach of Defendants' express warranty on the Class Vehicles, breach of implied warranty of merchantability for both the nationwide class in the CAC and under a series of specific states' laws in the Zaback Complaint, and two additional warranty-focused statutory claims.  The Court will first address the choice of law issues Defendants have raised regarding Plaintiffs' non-statutory warranty claims.

**1. Choice of Law for Warranty Claims**

Defendants argue that "various conflicts" exist between New Jersey law and the laws of the CAC Plaintiffs' various home states regarding their breach of warranty claims.[5]  (ECF No. 32-7

---

[5] The Zaback Complaint does not plead any nationwide implied warranty claims, instead alleging a series of specific implied warranty claims under the respective state laws of the named Plaintiffs in that complaint.  While the Zaback Complaint does raise a general express warranty claim on behalf of the nationwide proposed class, neither party has specifically briefed the choice of law analysis to be applied to different plaintiffs under claim.  To the extent the Court finds that arguments raised against those claims necessitate a choice of law analysis, it does so on a claim-by-claim basis.

at 10).  As described above, the Court must first determine
whether any actual conflicts exist.  If they do not, New Jersey
law will apply.  If there are any actual conflicts, the Court
then turns to the relevant Restatement factors for such claims.

The relevant provisions of the Restatement are § 188 and §
6.  Section 188, which applies to contract claims like these,
provides the following factors for assessing choice of law
disputes: the (a) place of contracting; (b) place of negotiation
of the contract; (c) place of performance; (d) location of the
subject of the contract; and (e) domicile, residence,
nationality, place of incorporation and place of business of the
parties.  "With limited exception, the Restatement also provides
that '[i]f the place of negotiating the contract and the place
of performance are in the same state, the local law of this
state will usually be applied.'"  Amato v. Subaru of America,
Inc., 2019 WL 6607148, at *12 (D.N.J. Dec. 5, 2019).  Section 6
provides general principles to consider and apply in all
conflict analyses: "(1) the interests of interstate comity; (2)
the interests of the parties; (3) the interests underlying the
field of [ ] law; (4) the interests of judicial administration;
and (5) the competing interests of the states.'"  P.V. v. Camp
Jaycee, 962 A.2d 453, 463 (N.J. 2008).

Defendants have put forth four separate potential conflicts
between New Jersey law and the laws of various other states.

30

First, they argue that both Texas and Michigan require formal pre-suit notification to a remote seller, and that failure to do so requires dismissal of any warranty claims — accordingly, they argue that Plaintiffs Eckhardt and Moore's warranty claims must be governed by Texas and Michigan law.  They are correct that both states have such requirements, and that New Jersey law does not have a similar one.  Compare Johnston v. PhD Fitness, LLC , No. 16-14152, 2018 WL 646683, at *3 (E.D. Mich. Jan. 31, 2018) (recognizing "buyer must provide reasonable pre-suit notice to even a remote manufacturer" and that "filing suit does not amount to 'reasonable' notice") and In re Lumber Liquidators Chinese Dahse v. C. R. Bard, Inc., No. 12-02701, 2016 U.S. Dist. LEXIS 168922, at *15 (S.D.W. Va. Dec. 7, 2016) (recognizing Texas Law's pre-suit notice requirement for warranty claims "applies to manufacturers as well as sellers"), with In re Volkswagen Timing Chain Prod. Liab. Litig., No. 16-2765, 2017 U.S. Dist. LEXIS 70299, at *41 (D.N.J. May 8, 2017) ("Pre-suit notice is not required when the action is brought against a remote manufacturer and/or seller.").  Accordingly, the question of whether Moore or Eckhardt provided pre-suit notice is potentially dispositive to their claims, and there is an actual conflict between the relevant laws of Texas and Michigan on one hand and New Jersey on the other.

31

The Court therefore must assess which state has the "most significant relationship" to the claims here.  The Court first finds that Michigan law must govern Plaintiff Moore's warranty claims.  Moore is a resident and citizen of Michigan, purchased his vehicle there, sustained the damage to his windshield there, was informed by a Michigan Subaru dealership that the warranty would not cover the cost of the replacement, and finally had the windshield replaced at a Michigan repair shop.  Plaintiff points only to the fact that SOA, which provides the warranties, has its headquarters and principal place of business in New Jersey, and argues that more evidence regarding "the role of SOA's employees in New Jersey with managing and administering the  warranties" is needed before the Court can make a choice-of-law finding.  The Court disagrees.  As just outlined, nearly all of the factors of Restatement § 188 favor application of Michigan law, and the Third Circuit has previously found that similar facts favored application of the Plaintiffs' home state under the factors of Restatement § 6.  See Maniscalco, 709 F.3d at 209.[6]

---

[6] While the specific discussion in Maniscalco involved a misrepresentation claim on summary judgment, rather than one under contract law on a motion to dismiss, the Court finds the Third Circuit's reasoning equally applicable to the analysis here and the facts alleged by Moore sufficient to reach this decision.

However, the Court does not reach the same conclusion for Plaintiff Eckhardt's warranty claims.  Unlike the rest of the Plaintiffs in question, Eckhardt bought his vehicle in California, despite living in Texas and later presenting it for repair in Texas.  Without further evidence regarding where other events or actions relevant to Eckhardt's claims occurred, the Court finds that it would be premature to make a choice-of-law determination regarding his warranty claims.  Accordingly, the Court will analyze the pleading sufficiency of his claims under New Jersey law for the purposes of this motion to dismiss.

While the parties' briefing does not specifically address choice of law questions for Plaintiffs Robbie and Funk's express warranty claims, Defendants do assert that their claims are similarly barred due to their failure to provide pre-suit notice, which they argue is fatal under Illinois and Indiana law.  Accordingly, the Court will also assess whether there is truly a conflict between the law of New Jersey and the laws of those states, so as to determine which law governs their express warranty claims.[7]  Plaintiffs do not appear to argue that

---

[7] The Court notes that this choice-of-law analysis is relevant only to Plaintiffs Robbie and Funk's claims under Count II of the Zaback Complaint for breach of express warranty.  The Zaback Complaint does not allege any claims for breach of the implied warranty of merchantability on behalf of the nationwide class, and instead asserts individual implied warranty claims under the respective Zaback Complaint Plaintiffs' home state's laws.

Illinois and Indiana law does not require pre-suit notice —
instead, Plaintiffs argue the notice requirement is satisfied if
the manufacturer is aware of the problem with the goods.  In re
Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.,
155 F. Supp. 3d 772, 799-800 (N.D. Ill. 2016); Anderson v. Gulf
Stream Coach, Inc., 662 F.3d 775, 782 (7th Cir. 2011).  If
accurate, this would demonstrate that any conflict was a false
conflict and counsel the Court to apply New Jersey law.

        However, as Defendants note, Illinois' standard for whether
a manufacturer is "aware" of an issue with a product is rather
strict.  Parrott v. Family Dollar, Inc., No. 17-222, 2019 WL
4573222, at *2 (N.D. Ill. Sept. 20, 2019) provides a useful
summary of the Illinois Supreme Court's approach:

> The Illinois Supreme Court cited examples of cases where
> actual knowledge was satisfied because: (1) the "seller
> hospital removed [the] defective medical device from [the]
> plaintiff," Malawy v. Richards Mfg. Co., 150 Ill.App.3d 549
> (1986); (2) the "seller's employee visited plaintiff 'to
> get to the bottom of why' the product was malfunctioning,"
> Crest Container Corp. v. R.H. Bishop Co., 111 Ill.App.3d
> 1068 (1982); and (3) the "car was towed to the seller's
> auto dealership and [the] seller's employees were told that
> the car needed major repairs," Overland Bond & Investment
> Corp. v. Howard, 9 Ill.App.3d 348 (1972).  Connick v.
> Suzuki Motor Co., Ltd., 174 Ill.2d 482, 494 (Ill. 1996).
> The Illinois Supreme Court then affirmed the dismissal of
> plaintiffs' warranty claims, concluding that the
> plaintiffs' allegations that defendant knew of safety
> concerns with and unfavorable reviews of the vehicle did
> not suffice to allege "actual knowledge of the alleged

---

Accordingly, Illinois and Indiana law govern Plaintiffs Robbie
and Funk's implied warranty claims.

breach of the particular products purchased by the named plaintiffs in this lawsuit." <u>Connick</u>, 174 Ill.2d at 494.

Plaintiff Robbie makes no allegations remotely approaching those outlined above, and accordingly an actual conflict exists. As Plaintiff Robbie is a resident of Illinois, and alleges no connections to any other states, the Court finds that Illinois has the most significant relationship here, and will apply Illinois law to his express warranty claim.

The Court concludes that Indiana law also imposes a similar notice requirement to that of Illinois; Indiana's notice requirement is satisfied only if the seller has actual knowledge that the plaintiff's goods are nonconforming, rather than general knowledge of any issue with the product line. <u>See</u> <u>Anderson v. Gulf Stream Coach, Inc.</u>, 662 F.3d 775, 781-82 (7th Cir. 2011); <u>In re Nexus 6P Prods. Liab. Litig.</u>, 293 F. Supp. 3d 888, 913 (N.D. Cal. 2018) (outlining requirement under Indiana law). As Funk's allegations are nearly identical to those of Robbie, the Court again finds that an actual conflict exists, and that Indiana has the most significant relationship to Funk's express warranty claim. Accordingly, Indiana law will govern it.

Defendants next argue that the warranty claims of the Plaintiffs located in California, Florida, and Wisconsin must be assessed under their relevant state's law, because those states

require plaintiffs asserting warranty claims to be in direct vertical privity with the defendant, whereas New Jersey does not.  The Court must first determine whether Defendants are correct that an actual conflict exists.

First, the Court notes that New Jersey law does not have such a privity requirement.  See Alloway v. Gen. Marine Indus., L.P., 149 N.J. 620 (1997); Spring Motors Distribs. v. Ford Motor Co., 98 N.J. 555, 561 (1985) (stating that "buyer need not establish privity with the remote supplier to maintain an action for breach of express or implied warranties").  As Plaintiffs point out, an earlier decision by a court in this district, faced with similar questions, previously found that California and Florida both require that the parties be in vertical privity with each other in order for a breach of implied warranty to lie.  In re Volkswagen Timing Chain Product Liability Litigation, 2017 WL 1902160, at *15 (citing cases).  However, at the same time, that court found that California and Florida have exceptions to the vertical privity requirement when "the consumer, rather than the dealer, is the ultimate user."  Id. at *16 (citing In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 983-85 (N.D. Cal. 2014)(acknowledging the third-party beneficiary exception under California law); Keegan v. Am. Honda Motor Co., 838 F. Supp. 2d 929, 947-48 (C.D. Cal. 2012)(stating that in California the purchaser of a vehicle may maintain

36

implied warranty claim against manufacturer when vehicle is
purchased from authorized dealership); Sanchez-Knutson v. Ford
Motor Co., 52 F. Supp. 3d 1223, 1233-34 (S.D. Fla.
2014)(acknowledging the third-party beneficiary exception under
Florida law).

As to California, Defendants cite to Goldstein v. GM
L.L.C., No. 19-01778, 2020 U.S. Dist. LEXIS 64851, at *34 (S.D.
Cal. Apr. 13, 2020), for the proposition that the "Ninth Circuit
has made it clear that under California Commercial Code § 2314
'a plaintiff asserting breach of warranty claims must stand in
vertical contractual privity with the defendant.'"  However,
Goldstein based that claim not on a California state law
decision, but rather on an opinion of the 9th Circuit, Clemens
v. DaimlerChrysler Corp., 534 F.3d 1017 (9th Cir. 2008).  The
only other opinions cited by Goldstein are also federal court
opinions, one of which did not mention the privity requirement,
with the other finding that courts were split on the existence
of third-party beneficiary exception and that those plaintiffs'
claims failed regardless.  As a separate California federal
court found in In re MyFord Touch Consumer Litig., the 9th
Circuit in Clemens acknowledged the existence of exceptions to
California's privity rule, and did not actually appear to
discuss or rule on a third-party beneficiary argument.  46 F.
Supp. 3d at 984.  Accordingly, that court "conclude[d] that the

third-party beneficiary exception remains viable under
California law." Id.  The Court agrees with this conclusion,
and finds that there is no actual conflict on this point.[8]

Regarding Florida, Defendants point the Court to a Northern
District of California case, in which the Court declined to
follow the Sanchez-Knutson case relied upon by the court in In
re Volkswagen.   Johnson v. Nissan N. Am., Inc., No. 17-cv-
00517-WHO, 2018 WL 905850, at *5 (N.D. Cal. Feb. 15, 2018)).
The Court has conducted its own analysis of the case law relied
on by both In re Volkswagen and Johnson, and finds that it
agrees with the North District of California that Sanchez-
Knutson is incorrect as to the correct application of Florida's
vertical privity requirement.  In re Volkswagen cites only to
Sanchez-Knutson, a federal court opinion which itself cites to a
Louisiana federal court opinion; the court in Johnson, on the
other hand, provides a series of Florida state court cases
strictly applying the state's vertical privity requirement to

---

[8] Defendants also argue that there are conflicts between New
Jersey law on warranty claims and California's Song-Berly Act.
However, as California appears to provide for both standard
warranty claims, and separate Song-Berly Act warranty claims,
the Court does not view these differences as posing any conflict
for Plaintiffs' non-Song-Berly Act warranty claims.  See,
e.g., In re MyFord Touch, 46 F. Supp. 3d at 982 (addressing
Plaintiffs' implied warranty claims under both the Song-Berly
Act and a separate California warranty statute).  As Plaintiffs'
Song-Berly Act claim is pursuant to a California statute, and
alleged only on behalf of the California subclass, the Court
agrees that this claim will be governed by California law.

cases much like the one here.  See Ocana v. Ford Motor Co., 992
So. 2d 319, 325 (Fla. Dist. Ct. App. 2008); Rentas v.
DaimlerChrysler Corp., 936 So. 2d 747, 751 (Fla. Dist. Ct. App.
2006) (affirming dismissal of breach of implied warranty claim
by vehicle purchaser for lack of privity); Mesa v. BMW of N.
Am., LLC, 904 So. 2d 450, 458 (Fla. Dist. Ct. App. 2005) ("[A]
plaintiff cannot recover economic losses for breach of implied
warranty in the absence of privity.").  Accordingly, the Court
finds that there is a conflict between New Jersey and Florida
law on this point.

　　　Much like Plaintiff Moore above, Plaintiff Milstein bought
his vehicle in his state of residence, Florida.  Unlike Moore,
however, Plaintiff actually presented his vehicle for repair to
a Subaru in New Jersey, presenting a closer case under § 188 of
the Restatement.  However, the Court finds that, under
Restatement § 6, "[a]pplying New Jersey law to every potential
out-of-state claimant would frustrate the policies of each
claimant's state," and "the interest of [Florida] in having its
law apply to its own consumers outweighs the interests of New
Jersey in protecting out-of-state consumers from consumer
fraud."  Maniscalco, 709 F.3d at 209-210.  Accordingly, the
Court finds that Florida law governs Plaintiff Milstein's
implied warranty claims.  See also Amato, 2019 WL 6607148 at *12
(reaching same conclusion on similar claims and facts).

39

The Court reaches a similar conclusion for Plaintiff Powell's claims under Wisconsin law.  With regard to Wisconsin law requiring vertical privity for an implied warranty claim, Defendants cite to Weaver v. Champion Petfoods USA Inc., 2019 U.S. Dist. LEXIS 109550, at *12-13 (E.D. Wis. July 1, 2019). Plaintiffs assert that this case is distinguishable from the instant case because in Weaver, the plaintiffs had purchased products from an independent third-party unrelated to the defendant-manufacturer.  Plaintiffs assert that the agency relationship between Defendants and the authorized dealers present a case for side-stepping the privity requirement under Wisconsin law.

The Court is unpersuaded by Plaintiffs' argument that Wisconsin law recognizes an exception to the vertical privity requirement in cases such as the current one.  See Hoppe v. SmithKline Beecham Corp., 437. F.Supp.2d 331, 339 (E.D. Pa. 2006) (reiterating "Wisconsin's strict application of the privity rule for implied warranty claims").  Accordingly, an actual conflict exists between New Jersey and Wisconsin law for warranty claims.  And for substantially identical reasons as those expressed above in the Court's analysis of Plaintiff Moore's claims, the Court finds that Wisconsin has the most significant relationship here.  Therefore, Wisconsin law will govern Plaintiff Powell's warranty claims.

40

Defendants next argue that there are additional actual conflicts between the law of New Jersey and the laws of Pennsylvania, California, and Missouri regarding whether evidence of reliance is required to successfully prove a warranty claim.[9]

From the Court's review of the cases put forward by Defendants, that appears to be an accurate summary of the relevant laws, see (ECF No. 32-7 at 11-12), and Plaintiffs have not disputed this argument in their opposition brief.  However, the Court finds that Defendants' argument actually cuts against their desired result.  Although Defendants repeatedly urge the Court to make choice-of-law determinations at this stage, it has put forward a potential conflict that the Court cannot assess with the evidence in front of it.  From its review of the Amended Complaint, the Court is unable to determine whether Plaintiffs would be able to put forth sufficient evidence of reliance, and therefore whether this difference between the relevant states' laws would have an impact on the success of

---

[9] Plaintiffs also make this argument as to the claims of the Florida, Michigan, and Wisconsin Plaintiffs, as well as Plaintiff Eckhardt.  As the Court has already held that Michigan, Florida, and Wisconsin law will apply to the Michigan, Florida, and Wisconsin Plaintiffs' warranty claims, and that it does not have sufficient evidence to determine which state has the most significant relationship to Plaintiff Eckhardt's claims, the Court addresses this argument only as to the Pennsylvania, California, and Missouri Plaintiffs.

Plaintiffs' warranty claims.  Accordingly, the Court cannot
assess whether this would be an actual conflict or a false
conflict, and cannot appropriately determine the proper laws to
govern these claims at this stage in this litigation.[10]  The
Court will therefore apply New Jersey law to the claims of the
Pennsylvania, California, and Missouri Plaintiffs for the
purposes of this motion to dismiss.

## 2. Arguments for Dismissal of Plaintiffs' Express and Implied Warranty Claims

With the relevant choice of law decisions made, the Court
turns next to Defendants' arguments for dismissal.  Given the
procedural history of this action, Defendants' arguments for
dismissal are spread out over the course of two different briefs
and apply to a variety of different claims.  Through a close
reading of the briefing, the Court has determined that
Defendants essentially put forth five separate arguments that
they claim demand dismissal of the express and/or implied
warranty claims of various Plaintiffs.  As these arguments often
apply to multiple Plaintiffs' claims, the Court will address
Defendants' motions to dismiss Plaintiffs' warranty claims

---

[10] The Court also notes that despite presenting this potential
conflict of laws regarding the necessity of evidence of reliance
in their arguments on the choice of law question, Defendants
have not moved to dismissed Plaintiffs' warranty claims for
failure to plead reliance, nor made any other mention of the
reliance requirement in their arguments to dismiss the warranty-
based claims in either complaint.

through the separate arguments they have posed, rather than on a claim-by-claim basis.  It will then turn to Defendants' arguments for dismissal of the Plaintiffs' two statutory warranty claims, under the MMWA and the Song-Beverley Act.

### i. **Lack of Pre-Suit Notice**

Defendants first argue that both the express and implied warranty claims of Plaintiffs Eckhardt, Moore, Robbie, and Funk must be dismissed because they failed to provide pre-suit notice of their warranty claims to Defendants.  In the Court's choice of law analysis above, it held that Plaintiff Eckhardt's claims would be analyzed under New Jersey law — as Defendants have themselves conceded that New Jersey does not have a pre-suit notice requirement for warrant claims, their motion to dismiss will be denied as to Eckhardt's claims.  See In re Volkswagen, 2017 WL 1902160, at *41 ("Pre-suit notice is not required when the action is brought against a remote manufacturer and/or seller.").

Plaintiffs Moore, Robbie, and Funk's warranty claims are governed by Michigan, Illinois, and Indiana law, respectively. As outlined above, the Court found that Michigan, Illinois, and Indiana all impose pre-suit notice requirements before a plaintiff can assert warranty claims.  All three states require Plaintiffs to demonstrate more than simply general knowledge of an issue with the product line on the part of the defendant —

43

instead, they must allege that the defendant had "actual
knowledge of the alleged breach of the particular products
purchased by the named plaintiffs in this lawsuit." Parrot,
2019 WL 4573222 at *2 (quoting Connick, 174 Ill.2d at 494)
(outlining requirement under Illinois law); Anderson, 662 F.3d
at 781-82 (outlining similar requirement under Indiana law);
Johnston, 2018 WL 646683, at *3 (outlining similar requirement
under Michigan law).  Plaintiffs Moore, Robbie, and Funk have
made no allegations whatsoever that they provided the required
notice to Defendants; nor do Plaintiffs appear to argue they
did, instead defending their claims on the basis that Defendants
were aware of the general issues with the windshields of the
Class Vehicles, allegations that do not satisfy the pre-suit
notice requirements of the relevant states.  Therefore,
Plaintiffs Moore, Robbie, and Funk's express and implied
warranty claims will be dismissed.

### ii.  SBR's Relationship to the New Vehicle Limited Warranty

Second, Defendants argue that every Plaintiffs' warranty
claims fail as to Defendant SBR because it was not a party to
the express warranties for the Class Vehicles.  Their rather
straightforward argument is based on the fundamental, settled
tenet of contract law "that non-parties to a contract cannot be
held liable for a breach of that agreement." Taylor v. New

44

Jersey, No. 13-6594 (PGS)(DEA), 2014 WL 4215440, at *10 (D.N.J. Aug. 25, 2014) (citing FDIC v. Bathgate, 27 F.3d 850, 876 (3d Cir. 1994)). Plaintiffs argue that SOA is an agent of SBR, and that "[b]y virtue of their agency relationship, SBR is bound by the provisions of the new vehicle express warranty." (ECF No. 50 at 11).

The Court's review of the NVLW confirms that SBR is not a party to it, as the NVLW explicitly states that "[t]hese warranties are made by Subaru of America, Inc. ('SOA')," and makes no reference to SBR as a warrantor. (ECF No. 32-7-3, Def. Ex. A at 4). Nor is the Court convinced by Plaintiffs' agency argument. Plaintiffs entirely fail to refer the Court to any case law, either under New Jersey law or the law of any of the other potentially relevant states in this action, that would render SBR liable for a breach of the NVLW that they did not sign and are not referenced in. Instead, Plaintiffs cite only to two cases discussing agency in the context of a personal jurisdiction dispute — however, whether this Court has personal jurisdiction over SBR has not been disputed by Defendants, and the Court fails to see how this case law would be sufficient to render SBR sufficiently liable for breach of a contract it was not a party to.

Accordingly, Plaintiffs' express warranty claims will be dismissed as to Defendant SBR. However, neither party appears

45

to brief what impact this decision would have on the CAC
Plaintiffs' implied warranty claims against SBR, and Defendants
themselves concede that the "implied warranty claims . . . are
the only claims to which SBR's role in the supply chain possibly
could be relevant."  Without the issue having been briefed
further, and with Defendants' acknowledgment that such facts
might be relevant, the Court will decline to dismiss the CAC
Plaintiffs' implied warranty claims against SBR at this stage in
this litigation.

### iii. Defendants' Argument that the Express Warranty Does Not Cover Design Defects

Defendants next argue that every Plaintiffs' express
warranty claims fail as a matter of law because the NVLW
explicitly covers defects in material or workmanship and does
not cover design defects.  Defendants assert that Plaintiffs
attempt to skirt this matter of law by alleging that the
windshields are defectively designed *or* manufactured.  However,
Defendants argue this attempt is unsuccessful because Plaintiffs
lack any factual allegations relating to a manufacturing defect.
Defendants highlight that Plaintiffs allege three potential
causes of the windshield defect: (1) the combination of ceramic
materials for the black-colored printed perimeter with the
silver-colored material used for the wiper deicer portion of the
windshield glass; (2) the selection of "acoustic glass" for the

46

windshields of the Class Vehicles; and (3) the specified
thickness of the windshields.  According to Defendants, these
potential causes are design-related decisions that involve no
failure to manufacture the windshields correctly.

Plaintiffs contend that Defendants have mischaracterized
their claims as design defects rather than material or
workmanship claims.  According to Plaintiffs they have alleged
in part that a manufacturing defect allows for too much tension
in the glass when manufacturing and installing windshields.
This defect is caused, at least in part, by certain materials
(use of acoustic glass) and faulty workmanship (increased
tension), in addition to a potential design defect.  Plaintiffs
further contend that at this stage, this Court should "reject[]
efforts to create an artificial distinction between design and
materials/workmanship defects."  ECF No. 50, at 14.

The Court will decline to dismiss Plaintiff's express
warranty claims on this basis at this stage.  Courts in this
district have previously "refused to apply a distinction between
a defect in design and a defect in materials or workmanship at
the pleadings stage of litigation." In re Volkswagen, 2017 WL
1902160 at *12.  See also Alin v. Am. Honda Motor Co., 2010 WL
1372308, at *6 (D.N.J. Mar. 31, 2010) (holding that "where the
distinction between defect in design and defect in materials or
workmanship is a matter of semantics, and sufficient facts are

alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives."); Cox, 2015 WL 5771400, at *6 (same). Construing these claims in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged that these defects could be at least partly caused by a manufacturing defect.  The fact that Plaintiffs' allegations could be construed as design defects is insufficient to defeat these claims at the motion to dismiss stage.

### iv. __Reasonable Opportunity to Cure__

Defendants fourth argument is that Plaintiffs Geisler, Nevarez, Armstrong, Binkley, and Barr's breach of express warranty claims must be dismissed because they do not allege they presented their vehicles to Defendants for repair. Defendants argue that these claims therefore fail, because the New Vehicle Limited Warranty "require[s] that the vehicle be presented to an authorized Subaru retailer for warranty repairs."  ECF No. 32-7 at 19 (citing Walters Decl., Ex. A, at 6, 12, 16, 22 (2017 Warranty & Maint. Booklet)).

As noted above, the claims of Plaintiffs Geisler, Nevarez, and Armstrong, who all reside in California, will be assessed under New Jersey law for the purposes of this motion.  Plaintiff Barr is from New Jersey, and the parties do not dispute that New

Jersey law applies to his claim as well.  Finally, Plaintiff
Brinkley resides in Colorado and purchased his vehicle there.

While the parties do not address which state law should
apply to Plaintiff Brinkley's claim, the court finds that it
does not matter — under both New Jersey and Colorado law, such a
condition precedent must be satisfied before bringing an express
warranty claim.  See Platt v. Winnebago Indus., No. 18-1408,
2020 U.S. App. LEXIS 17469, at *8-12 (10th Cir. June 3, 2020)
(dismissing Colorado express warranty claims when plaintiffs
failed to provide opportunity to repair RV and "terms of the
warranty conditioned a breach on [defendant's] failure to repair
the RV"); Kearney v. Bayerische Motoren Werke AG., No. 17-13544,
2018 U.S. Dist. LEXIS 147746, at *45 (D.N.J. Aug. 29, 2018)
(dismissing express warranty claims when "none of Plaintiffs'
allegations claim that they presented their vehicles to BMW NA
for repair.").  And, as Defendants note, Plaintiffs' briefing
does not address this argument or dispute that they did not
provide Defendants with a reasonable opportunity to cure.
Accordingly, Plaintiffs Geisler, Nevarez, Armstrong, Binkley,
and Barr's breach of express warranty claims will be dismissed.

### v. **Lack of Privity**

Defendants next argue that the implied breach of warranty
claims of Plaintiffs Armstrong, Geisler, Mills, Moreno, Nevarez,
Vierra, Milstein, Powell, and Robbie must be dismissed for lack

of privity with SOA.  As the Court has already found the
Plaintiff Robbie's warranty claims must be dismissed on other
grounds, it is unnecessary to address them here.

Plaintiffs Armstrong, Geisler, Mills, Moreno, Nevarez,
Vierra all reside in California.  The Court concluded above that
it would be premature to make a choice of law decision at this
stage as to these Plaintiffs, and therefore New Jersey law will
be applied to the California Plaintiffs' claims.  Here, however,
the choice of law makes no difference: New Jersey law does not
have a privity requirement, see Alloway v. Gen. Marine Indus.,
L.P., 149 N.J. 620 (1997), and as outlined above, the Court
concludes that California has an exception to the vertical
privity requirement when "the consumer, rather than the dealer,
is the ultimate user."  In re Volkswagen, 2017 WL 1902160 at *16
(citing In re MyFord Touch Consumer Litig., 46 F. Supp. 3d at
983-85 (acknowledging the third-party beneficiary exception
under California law)).  Accordingly, the Court declines to
dismiss these claims.

Plaintiffs Milstein and Powell reside in Florida and
Wisconsin, respectively.  As the Court found above, Florida and
Wisconsin law govern their claims, and both states strictly
apply their vertical privity requirements to cases like this
one.  See Ocana, 992 So. 2d at 325; Rentas, 936 So. 2d at 751
(affirming dismissal of breach of implied warranty claim by

50

vehicle purchaser for lack of privity under Florida law); <u>Mesa</u>, 904 So. 2d at 458 ("[A] plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity."); <u>Hoppe</u>, 437. F.Supp.2d at 339 (reiterating "Wisconsin's strict application of the privity rule for implied warranty claims"). Accordingly, as Plaintiffs Milstein and Powell are not in strict vertical privity with Defendants, their implied warranty claims will be dismissed.

### 3. **Plaintiffs' Magnuson-Moss Warranty Act Claims**

Defendants next put forth multiple arguments regarding Plaintiffs' claims under the Magnuson-Moss Warranty Act. First, Defendants argue that this Court lacks subject matter jurisdiction over Plaintiffs' MMWA claims. Specifically, Defendants argue that Plaintiffs have failed to satisfy any of the three jurisdictional requirements under the MMWA. According to Defendants, these requirements are: (1) the amount in controversy of any individual claim is not less than $25; (2) the aggregate amount in controversy is greater than $50,000; and (3) the number of named plaintiffs is at least 100. 15 U.S.C. § 2310(d)(1)(B). Defendants argue that Plaintiffs have failed to meet requirement three because they do not have at least 100 named plaintiffs. Defendants allege that Plaintiffs attempt to sidestep the jurisdictional requirements of MMWA by asserting jurisdiction under the Class Action Fairness Act of 2005 (CAFA),

and refer the Court to a recent Ninth Circuit holding that "CAFA may not be used to evade or override the MMWA's specific numerosity requirement."  Floyd v. American Honda Motor Co., Inc, 966 F.3d 1027, 1035 (9th Cir. 2020).

Plaintiffs counter that they have properly plead Magnuson-Moss Warranty Act claims.  Plaintiffs assert that this Court has subject matter jurisdiction over these claims under 15 U.S.C. § 2310(d)(1)(A) and 28 U.S.C. § 1367.  Plaintiffs contend that although Defendants have chosen to focus on the jurisdictional requirements of 15 U.S.C. § 2310(d)(1)(B), the MMWA creates two bases for jurisdiction. According to Plaintiffs, § 2310(d)(1)(A) provides an alternative ground for jurisdiction in "any state or the District of Columbia," and because this Court has jurisdiction over claims properly asserted under CAFA, this Court has supplemental jurisdiction over MMWA claims.  Put more simply, Plaintiffs' argument is that, as another judge of this Court previously concluded, "the MMWA expressly contemplates alternative jurisdiction 'in any court of competent jurisdiction' and CAFA provides the means by which alternative jurisdiction' may be obtained."  McGee v. Cont'l Tire N. Am., Inc., No. 06-6234, 2007 WL 2462624, at *4 (D.N.J. Aug. 27, 2007).  Plaintiffs rely on McGee and cases from other judges in this district and other districts, which reached similar conclusions.  See ECF No. 50 at 23-24 (collecting cases); see

also <u>Barclay v. ICON Health & Fitness Inc.</u>, No. 19-cv-2970
(ECT/DTS), 2020 WL 6083704, at * 7 (D. Minn. Oct. 15, 2020)
(reaching similar conclusion and collecting cases from other
districts).

However, having reviewed the competing case law and the
statutory language, the Court finds that it agrees with the
Ninth Circuit's <u>Floyd</u> decision and Defendants, and that the 100-
named plaintiff jurisdictional requirement applies to
Plaintiffs' MMWA claims here.  The Court agrees with Defendants'
reading of the statute: namely, that § 2310(d)(1)(A) governs
those cases brought in state or local courts in any state or the
District of Columbia, while subsection (B) provides for
jurisdiction in federal courts, with the corresponding
requirements for such claims brought in federal court outlined
above.  To find that subsection (A) also includes federal courts
would be to render subsection (B) superfluous.  Such an
interpretation would violate the "anti-surplusage" canon, under
which "[i]t is our duty to give effect, if possible, to every
clause and word of a statute."  <u>United States v. Jackson</u>, 964
F.3d 197, 203 (3d Cir. 2020) (quoting <u>Duncan v. Walker</u>, 533 U.S.
167, 174, 121 S. Ct. 2120, 150 L.Ed.2d 251 (2001)).

Defendant may not use CAFA as a means to evade the explicit
jurisdictional requirements of the MMWA.  "Construing CAFA to
provide jurisdiction over MMWA claims despite Plaintiffs'

failure to satisfy the plain-language requirement of at least one hundred named plaintiffs would have the effect of overriding a part of the MMWA" — and, as the Ninth Circuit noted, there is no "clear and manifest" showing of Congress's intent to do so. Floyd, 966 F.3d at 1035.  Accordingly, as neither of the complaints contains 100 named plaintiffs, either separately or together, the Court finds that it does not have jurisdiction over the claims asserted under the MMWA, and those claims must be dismissed.  Having reached this dispositive conclusion, the Court need not address Defendants' other arguments regarding Plaintiffs' MMWA claims.

### 4. **Plaintiff Armstrong's Song-Beverley Act Claim**

Plaintiffs final warranty-based claim is on behalf of the California Plaintiffs for a violation of California's Song-Beverly Act, Cal. Civil Code §§ 1792 and 1791.1, et seq.  With regard to this claim, Defendants point to the Song-Beverly Act's definition of "consumer goods" as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables."  Cal. Civ. Code § 1791(a).  Defendants argue that this definition does not cover automobiles, and would therefore not apply to Plaintiff Armstrong's used vehicle purchased from First Kia of Simi Valley.  Therefore, Defendants argue that

Plaintiff Armstrong lacks standing to pursue relief for an implied warranty claim.

Plaintiffs contend that the Song-Beverly Act has been interpreted to extend to the purchase of a used vehicle when that vehicle is still within its warranty period.  Plaintiffs further contend that the cases Defendants cite are inapposite because they either involve used vehicles sold "as is" without accompanying warranties, or cases where the defendant was not a distributor of the class of vehicles.

The Song-Beverly Act is pro-consumer legislation designed to expand the protections of the implied warranty of merchantability beyond that in the Uniform Commercial Code. Mexia v. Rinker Boat Co., Inc., 174 Cal.App.4th 1297, 1303-04 (2009).  To that end, the Song-Beverly Act expressly provides that the implied warranty of merchantability for used goods runs "coextensive in duration with an express warranty which accompanies the consumer goods . . . but in no event shall such implied warranty be less than 30 days or more than three months following the sale of used consumer goods to a retail buyer." Cal. Civ. Code § 1795.5(c).  A judge of this Court has previously held that "[t]he viability of Plaintiffs' Song-Beverly Act claim is contingent upon the existence of an express warranty at the time of sale."  Gray v. BMW of North America, LLC, 22 F.Supp.3d 373, 384 (D.N.J. 2014).

The parties disagree whether Plaintiff Armstrong in particular is covered by the Song-Beverly Act because he purchased his vehicle used.  The Court agrees with Defendants that the Song-Beverly Act allows a used car purchaser to pursue implied warranty claims against a distributor or retailer where an express warranty remains in effect, but stops short of creating "additional obligations on a manufacturer vis-à-vis used car purchasers." See Short v. Hyundai Motor Co., 444 F. Supp. 3d 1267, 1288 (W.D. Wash. 2020).  Instead, the Song-Beverly Act simply states that the retailer or distributor is also subject to whatever obligations already apply to the manufacturer. See id. Because neither Defendant was a distributor or retailer in relation to Plaintiff Armstrong's used vehicle, the Court will grant Defendant's motion to dismiss Plaintiff Armstrong's claim under the Song-Beverly Act.

### C. **Plaintiff's Fraud Claims**

Plaintiffs also plead a number of fraud-based claims. Specifically, Counts IV-V and VII-XIII of the CAC allege a series of statutory fraud claims based on a variety of state laws. The Zaback Complaint adds a common law claim of fraud by concealment, (Zaback Complaint Count III), as well as additional statutory fraud claims.  (Zaback Complaint Counts IV, VI-VIII, and X).

56

Defendants, unsurprisingly, put forward a number of different arguments for why these claims must be dismissed. First, Defendants argue that all 14 of Plaintiffs fraud-based claims are subject to the heightened pleading standard of Rule 9(b), and that Plaintiffs have failed to adequately plead misrepresentations or omissions that constitute fraud under that standard.   The Court will turn first to that argument.[11]

## 1. **Sufficiency of Plaintiffs' Fraud Allegations under Fed. R. Civ. P. 9(b)**

Defendants argue that Plaintiffs' fraud claims are subject to a heightened pleading standard under Rule 9(b). Specifically, Defendants assert that Plaintiffs fail to sufficiently plead any affirmative misrepresentations, or fraudulent omissions.   Plaintiffs counter that they have plead sufficient detail to give Defendants notice of the precise misconduct with which they are charged.   Plaintiffs also contend that most courts relax the pleading requirements of Rule 9(b) in the context of fraud by omission.

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on fraud-based claims.   This rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

---

[11] The Court notes here that both parties have agreed that Plaintiffs' state statutory fraud claims are governed by the particular Plaintiff's state of residence or place of purchase.

Fed. R. Civ. P.9(b) (emphasis added).  The 9(b) standard is
independent of the standard applicable to motions made under
12(b)(6).  <u>Cal. Pub. Employees Ret. Sys. v. Chubb Corp.</u>, 394
F.3d 126, 144 (3d Cir. 2004).  Because of this difference in
standards, plaintiffs may not benefit from the same inferences
they enjoy under a 12(b)(6) analysis if they fail to meet the
heightened pleading requirements.  See <u>id.</u> at 156.

Rule 9(b) does not "requir[e] every material detail of the
fraud, such as date, location, and time" but "plaintiffs must
use alternative means of injecting precision and some measure of
substantiation into their allegations of fraud." <u>In re
Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 216 (3d
Cir. 2002) (internal quotation marks omitted).  The purpose of
this requirement is to "place the defendant on notice of the
precise misconduct with which is it charged." <u>Frederico v. Home
Depot</u>, 507 F.3d 188, 200 (3d Cir. 2007).  Courts will be
"sensitive to situations in which sophisticated defrauders may
successfully conceal the details of their fraud" and relax the
rigid requirements of Rule 9(b) as appropriate.  <u>In re
Rockefeller</u>, 311 F.3d at 216 (citing <u>In re Burlington Coat
Factory Sec. Litig.</u>, 114 F.3d 1410, 1417 (3d Cir. 1997)).
Nevertheless, even in cases where the defendant "retains control
over the flow of information, 'boilerplate and conclusory
allegations will not suffice.  Plaintiffs must accompany their

legal theory with factual allegations that make their theoretically viable claim plausible.'"  Id. (quoting In re Burlington, 114 F.3d at 1418).

As an initial point, the Court must assess whether all of Plaintiffs' 13 statutory claims are in fact governed by Rule 9(b).  Plaintiffs note that "state-law consumer protection claims under Florida (Count VIII), Missouri (Count X) and Pennsylvania (Count XII) law are not subject to Rule 9(b) to the extent they rely upon deceptive or unfair conduct."  (ECF No. 50 at 26).  While Plaintiffs assert only one count for each of these statutes, the Court's review of those counts shows that Plaintiffs have plead both fraud and deceptive or unfair conduct under each.  Accordingly, the Court agrees that, even if it were to find that Plaintiffs had failed to sufficiently plead fraud under Rule 9(b), those claims would survive.  Similarly, Plaintiffs have pled separate claims for deceptive and unfair practices under the ICFA, (Zaback Complaint Counts VII and VIII).  Since "the heightened pleading requirement of Rule 9(b) does not apply to ICFA claims based on unfair practices (as opposed to those based on fraud or misrepresentation)," Plaintiffs' ICFA unfair practices claim in Count VIII would also survive either way.  O'Brien v. Landers, No. 10-02765, 2011 WL 221865, at *6 (N.D. Ill. Jan. 24, 2011) (citing Windy City Metal

<u>Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.</u>, 536 F.3d 663, 669-70 (7th Cir. 2008).

The Court turns next to the sufficiency of Plaintiffs' fraud allegations under Rule 9(b).  Defendants do not attempt to parse through the sufficiency of Plaintiffs' pleading of fraud on a claim-by-claim basis, and instead argue that, writ large, Plaintiffs have failed to plead any fraudulent misrepresentations or fraudulent omissions with sufficient particularity to avoid dismissal.  Accordingly, the Court will approach its analysis in the same manner.

The Court first finds that Plaintiffs have sufficiently plead fraudulent misrepresentations to avoid dismissal at this stage.  Courts in this district have previously found that advertisements and representations made by a car manufacturers' sales and marketing departments can suffice to plead a fraudulent misrepresentation.  Here, Plaintiffs allege multiple such misrepresentations.  They point not only to repeated representations about the relative quality and reliability of the Class Vehicles, (<u>see, e.g.</u>, CAC at ¶¶ 5, 44; Zaback Complaint at ¶¶ 77a-77d), but also point specifically to the representations made by Defendants that their "Eyesight Driver Assist Technology" increases safety and reduces crashes.  (CAC at ¶¶ 14, 45-47).  Plaintiffs allege that these statements were misrepresentations because the defective windshields rendered

the vehicles of lesser quality, reliability, and safety and hindered the effectiveness of the Eyesight technology.  While Defendants argue that these representations are insufficient under Rule 9(b), even one of the cases cited by Defendants, In re MyFord Touch, acknowledged that when "a product manufacturer makes claims about, e.g., a product's quality or reliability, [a] claim based on an affirmative misrepresentation is viable." 46 F. Supp. 3d at 954.  Plaintiffs here have alleged that Defendants did exactly that for the Class Vehicles.

Courts in this district have further found that Plaintiffs have sufficiently pled fraudulent misrepresentations when they "allege that Defendant misrepresented that the NLVWs would cover all defects occurring within the mileage limitations despite the fact that they knew it intended to deny coverage for anything that it deemed a 'design defect,' without actually ever defining that term," much like Plaintiffs claims here.  In re Volkswagen, 2017 WL 1902160, at *18.  While a close question, the Court finds Plaintiffs have adequately plead fraudulent misrepresentations at this stage in the litigation.

Even if they had not, the Court finds that Plaintiffs have clearly sufficiently pled actionable omissions under Rule 9(b). Defendants' central argument on this point is that Plaintiffs have failed to sufficiently plead knowledge on the part of Defendants of the alleged defect in the Class Vehicles.

However, the Court finds that Plaintiffs have more than sufficiently pled knowledge.  Plaintiffs plead that Defendants possessed "exclusive knowledge of non-public, internal data about the Defect, including: pre-release testing data; early consumer complaints about the Defect to Defendants' dealers who are their agents for vehicle repairs; aggregate data from Defendants' dealers; consumer complaints to the NHTSA and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; and other internal sources of aggregate information about the problem."  (CAC at ¶¶ 50; see also Zaback Complaint at ¶ 63).

Plaintiffs also allege that Defendants issued specific Technical Service Bulletins (TSB) that "show[ed] [Defendants'] knowledge of a defect as it existed in prior model years for two of the Class Vehicles at issue here."  (CAC at ¶¶ 48, 151; see also Zaback Complaint at ¶ 65).  While Defendants argue that because these TSBs did not relate to one of the Class Vehicles they should not be considered here, the Court finds that they are still relevant.  While not sufficient to demonstrate knowledge on their own, the issuance of a TSB for the exact defect Plaintiffs allege here for other classes of Defendants' vehicles, at the very least, bolsters somewhat Plaintiffs'

allegations that Defendants had knowledge of potential issues with the windshields on their vehicles.

Allegations such as these have previously been found to sufficiently plead knowledge. See In re Volkswagen, 2017 WL 1902160 at *19 (citing Majdipour v. Jaguar Land Rover N. Am., LLC, 2013 WL 5574626, *17 (D.N.J. Oct. 9, 2013); In re MyFord Touch, 46 F. Supp. 3d at 960; Feldman v. Mercedes-Benz USA, LLC, 2012 WL 6596830, *11 (D.N.J. Dec. 18, 2012)). Finally, Plaintiffs' complaints also include numerous consumer complaints made with the NHTSA regarding the specific defect here and the specific Class Vehicles. Plaintiffs here have not only pointed to dated complaints that help demonstrate potential knowledge before or at the time each Plaintiff purchased their vehicle, but also have specifically alleged that federal law requires Defendants to be in "close contact" with the NHTSA, and that automakers like Defendants monitor complaints on the NHTSA website. (AC at ¶¶ 74-75, 78-127; Zaback Complaint at ¶¶ 61a-61s). "Moreover, the NHTSA complaints specifically state that the engine issues were reported to Subaru by way of warranty claims," Amato, 2019 WL 6607148, at *16, and even note that the defect appears similar to one experienced in earlier models of Subaru vehicles; the complaints similarly repeatedly discuss the fact that their warranty claims for damage related to the defect had been denied. While the NHTSA complaints might not be

sufficient to survive dismissal on their own, the Court finds
that they are relevant to its assessment of Plaintiffs'
fraudulent omission claims, and further strengthen them.
Plaintiffs have sufficiently plead fraudulent omissions, and
those claims survive dismissal at this stage.

Simply put, the Court is "satisfied that Plaintiffs'
Complaint[s] 'sufficiently place Defendant[s] on notice
regarding the specific misconduct that Plaintiffs' assert was
fraudulent and deceptive" in connection with their fraud claims.
Amato, 2019 WL 6607148, at *16 (quoting In re Volkswagen Timing
Chain, 2017 WL 1902160, at *23).  Plaintiffs have pleaded which
vehicles are included in the class, when and where these
vehicles were purchased, and what repairs these vehicles
ultimately required.  Plaintiffs have pointed to specific
representations they allege were false or deceptive, and have
also alleged that Defendants had knowledge of the defects
through certain reports and complaints regarding Defendants'
vehicles.  Taken together, the Court finds that Plaintiffs have
met their burden under Rule 9(b) to defeat a motion to dismiss
at this stage.

Defendants also move for dismissal of Plaintiffs' fraud
claims on multiple other grounds, with their remaining arguments
applying to different sets of statutory claims.  Accordingly,

the Court will next address those arguments as they apply to different individual claims from the two complaints.

### 2. Separate and Distinct Conduct Doctrine

Defendants argue that Plaintiffs' claims under the DCFA, UDTPA, and ICFA must be dismissed because they are based on the same conduct that underlies their breach of express warranty claims, and therefore fail under the separate and distinct conduct rule.

As for Plaintiff Zaback's DCFA claim, Defendants argue that the claim is "based on the same conduct supporting [his] breach of express warranty claims," (ECF No. 43-1 at 15), and that fraud claims "cannot 'survive a motion to dismiss' where 'the alleged conduct giving rise to the fraud and the breach of contract [are] the same.'" Ridley v. Bayhealth Med. Ctr., Inc., No. N17C-04-306 JRJ, 2018 WL 1567609, at *5 (Del. Super. Ct. Mar. 20, 2018). Plaintiffs, alternatively, argue that Defendant has mischaracterized and conflated their separate claims, and that "Delaware courts do not 'apply the [bootstrapping] doctrine where the defendant's alleged fraud takes place prior to contracting and thus to induce the plaintiff's signature and willingness to close on the transaction.'" (ECF No. 50) (quoting In re Bracket Holding Corp. Litig., No. N15C-02-233 WCC CCLD, 2017 Del. Super. LEXIS 377, at *22 (Del. Super. Ct. July 31, 2017)).

The Court agrees with Plaintiff Zaback.  Defendants rely in large part on Ridley, in which the Delaware Superior Court applied the separate and distinct conduct rule to a DCFA claim. There, the Plaintiff brought a DCFA claim based on alleged misrepresentations designed to convince them they needed to pay higher fees to receive copies of their medical records, which the Court ultimately found was "virtually identical" to their breach of contract claim for the act of charging them those higher fees.  Ridley, 2018 WL 1567609, at *2, 5-6.

Here, Zaback's breach of warranty claim is directly focused on his claim that Defendants were "unable or unwilling to provide an adequate, effective, and lasting remedy" under the warranty for the Class Vehicles for the allegedly defective windshield, and instructed dealerships "to refuse to repair or replace defective windshields under warranty." (Zaback Complaint at ¶¶ 66, 124-32).  Plaintiff's DCFA claim, alternatively, alleges that Defendants misrepresented that their windshields were in merchantable condition and omitted to tell consumers of their defects, inducing Plaintiffs to purchase the vehicles at a higher price than they might otherwise have paid.

Accordingly, the conduct at the center of Plaintiff's DCFA claim is the misrepresentations allegedly made by Defendants to induce purchase of the Class Vehicles, before those purchases were made.  This is in contrast to Ridley, where the exact same

central allegation, that the Defendant had charged improperly high fees for access to medical records, was the focus of both claims.  Here, Plaintiffs' breach of express warranty and DCFA claims focus on two separate acts: Defendants' alleged misrepresentations designed to induce Plaintiffs to purchase the Class Vehicles at higher prices, made before prior to execution of a contract, and Defendants' later refusal to provide adequate remedies under their express warranty and alleged instructions to dealerships not to do so either.  The Court finds that these claims are sufficiently separate and distinct for Plaintiff's DCFA claims to avoid dismissal on this ground.

Defendants put forward the same arguments regarding the application of the separate and distinct conduct rule to Plaintiffs' UDTPA and ICFA claims, and their arguments fail for essentially the same reasons.  Both North Carolina and Illinois law apply similar versions of the separate and distinct conduct theory to analysis of related claims under both tort and breach of contract.  See Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 347 (4th Cir. 1998) (describing it under North Carolina law); Reid v. Unilever U.S., Inc., 964 F. Supp. 2d 893, 913 (N.D. Ill. 2013) (same under Illinois law).  However, as described above, Plaintiffs' statutory fraud claims here are certainly not "duplicative of their breach of express warranties action," Reid v. Unilever U.S., Inc., 964 F. Supp. 2d 893, 913

(N.D. Ill. 2013), or centered on a "mere breach of contract" given their clear focus on Defendants' actions *prior* to any contract was signed, rather than any acts in refusing to provide a remedy under the express warranty.  <u>Hancock v. Americo Fin. Life & Annuity Ins. Co.</u>, 799 F. App'x. 179, 181 (4th Cir. 2020). Simply put, Plaintiffs have sufficiently "alleged [] deceptive conduct beyond the express warranty" claims at this stage in the litigation.  <u>Parrott v. Family Dollar, Inc.</u>, No. 17 C 222, 2019 WL 4573222, at *2 (N.D. Ill. Sep. 20, 2019).  Accordingly, their claims under the UDTPA and ICFA will also not be dismissed on this ground.[12]

Defendants also make a similar argument that Plaintiff Zaback has not plead separate damages for his DCFA and breach of express warranty claims.  Under Delaware law, "[f]raud damages allegations cannot simply 'rehash' damages that were allegedly caused by a claimed breach of contract . . . [and] [f]ailure to plead separate damages is an independent ground for dismissal. <u>Ridley</u>, 2018 WL 1567609, at *6 (citing <u>Cornell Glasgow, LLC v. La Grange Props., LLC</u>, No. N11C-05-016 JRS CCLD, 2012 WL

---

[12] Defendant also argues that the common law fraud claims under Delaware, North Carolina and Illinois law also fail under the separate and distinct conduct doctrine.  While the parties have not sufficiently briefed the relevant choice of law questions for these claims, the Court finds that, even were it to apply the relevant states' laws to this claim, they would not fail under this doctrine for the same reasons outlined above for Plaintiffs' statutory fraud claims.

2106945, at *8-9 (Del. Super. Ct. June 6, 2012)).  According to Defendants, Plaintiff's damages allegations for these two claims are "virtually identical."  (ECF No. 43-1 at 17).

Plaintiff Zaback argues that, contrary to Defendants' claim, he did plead separate damages by alleging economic injury in the form of "paying out of pocket and by being 'charged a higher amount than [he and the Delaware Subclass] otherwise would have paid had they known of the Class Vehicles' material defects.'"  (Def. Br. at 41-42 (quoting Zaback Complaint at ¶¶ 145, 147)).  The Court is unsure how "paying out of pocket" for windshield repairs is separate and distinct from the damages Plaintiff alleges he suffered from Defendants' failure to provide remedy for those damages under the express warranty. However, Plaintiff's allegation that Defendants' misrepresentations and omissions regarding the condition of the Class Vehicle's windshield caused him to pay a higher amount for the vehicle does appear to be sufficiently separate from any damages alleged for his breach of express warranty claim. Defendants, for their part, argue that "Zaback provides no case law to suggest that is actually a meaningful distinction" between this and his benefit of the bargain damages pled for the breach of express warranty claim.  The Court notes, however, that neither have Defendants provided any case law suggesting there is not a meaningful distinction.  At this stage in the

69

litigation, the Court finds that these damages are sufficiently separate to avoid dismissal.

### 3. **Economic Loss Doctrine**

Next, Defendants argue that a number of Plaintiffs' fraud claims are barred under the economic loss doctrine.  The economic loss doctrine "defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort."  Peters v. Countrywide Home Loans, Inc., 2016 WL 2869059, at *4 (D.N.J. 2016) (citing Travelers Indem. Co. v. Dammann & Co., 594 F.3d 238, 244 (3d Cir. 2010)).  The rationale for this doctrine is that "[t]ort principles . . . are better suited for resolving claims involving unanticipated injuries, and contract principles are generally more appropriate for determining claims for consequential damages that parties have or could have address[ed] in their agreement."  Id.

Defendants assert that Plaintiffs' statutory UDTPA, UTPCPL, and FDUTPA claims are also barred under the economic loss doctrine.  First, they argue the doctrine bars Plaintiff Jones's North Carolina UDTPA claim; Plaintiff, on the other hand, argues that the economic loss doctrine does not apply to UDTPA claims. The parties' briefs lay out clearly the disagreement amongst different district courts that have been faced with this question.  Defendants rely most centrally on two cases from the

District of Massachusetts, which held that the economic loss doctrine does apply to UDTPA claims under North Carolina law. See ECF No. 43-1 at 14-15 (citing Duncan v. Case, 305 F. Supp. 3d 311, 325-26 (D. Mass. 2018)). Alternatively, Plaintiff points the Court to a number of cases from the Northern District of California, which found the opposite. See ECF No. 50 at 38-39 (citing Sloan v. General Motors LLC, 2020 WL 1955643, *26 (N.D. Cal. Apr. 23, 2020) and additional cases).

However, this case is not the first one in the District of New Jersey to raise this issue. In a recently published opinion, Ponzio v. Mercedes-Benz USA, LLC, 447 F.Supp.3d 194, 241-42 (D.N.J. 2020), a judge of this court was faced with this very question. The court there noted that "whether the economic loss rule bars UDTPA claims under North Carolina law is an unsettled issue," and recognized that multiple courts in the Northern District of California therefore declined to apply the economic loss doctrine to certain UDTPA claims. Id. at 241 (citing In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 967 (N.D. Cal. 2014); In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig., 295 F. Supp. 3d 927, 1021 (N.D. Cal. 2018)). Importantly, while some earlier federal district courts in North Carolina had extended the economic loss doctrine to UDTPA claims, Ponzio highlighted that a court in the Eastern District of North Carolina had alternatively found that

"in the face of such uncertainty, federal courts have declined to extend the [economic loss] rule to bar UDTPA claims." Id. at 242 (quoting Martin v. Bimbo Foods Bakeries Dist., LLC, No. 5:15-CV-96, 2015 WL 1884994, at *7 (E.D.N.C. Apr. 24, 2015)). This point is further strengthened by the fact that the Fourth Circuit has explicitly stated that "North Carolina courts have never addressed whether NCUDTPA claims are subject to the [economic loss doctrine]." Ellis v. Louisiana-Pac. Corp., 699 F.3d 778, 787 n.5 (4th Cir. 2012).

The Ponzio court ultimately "decline[d] to extend the North Carolina economic loss rule to preclude the statutory claim under UDTPA." Id. Nor was Ponzio the first District of New Jersey case to address this question and reach a similar conclusion — at least one other court in this district has similarly declined to dismiss UDTPA claims based on the economic loss theory, finding that it was "not bound to find Plaintiffs' North Carolina consumer protection claims barred by the economic loss doctrine in the absence of clear direction from the North Carolina state courts." See In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig., No. 1:14-CV-3722, 2015 WL 4591236, at *36 (D.N.J. July 29, 2015).

Having reviewed the competing case law, the Court agrees with these holdings, and will similarly decline to extend the economic loss doctrine to Plaintiff's UDTPA and common law fraud

72

claims absent such a holding from North Carolina's state courts. The Court will therefore deny Defendant's motion to dismiss with respect to these claims.

Defendants next pose an identical argument that Plaintiff Wotring's Pennsylvania UTPCPL claim, Count Twelve, is barred by the economic loss doctrine.  Defendants cite Werwinski v. Ford Motor Co., for the proposition that the economic loss doctrine applies to statutory misrepresentation claims under the UTPCPL the same way it does to common law fraud claims.  286 F.3d 661, 681 (3d Cir. 2002).  Defendants argue that the claims regarding the windshields' alleged defects relate to the "quality or character of the goods sold" and are "interwoven" with the breach of warranty claims.

Plaintiffs argue that the economic loss doctrine does not apply to the Pennsylvania UTPCPL because this case falls into an exception for consumer fraud claims.  Plaintiffs assert that Werwinski is no longer authoritative on the application of economic loss doctrine in Pennsylvania.  See ECF No. 50, at 37 (citing Kantor v. Hiko Energy, LLC, 100 F.Supp.3d 421, 429 (E.D. Pa. 2015).

Plaintiffs are correct in pointing out that the status of Werwinski as authoritative law has been cast into doubt by a number of decisions by the Pennsylvania Superior Court, which held that UTPCPL claims are not barred by the economic loss

73

doctrine, and subsequent district court opinions following those state intermediate court decisions.  See Catena v. NVR, Inc., 2020 WL 3412348, at *5-6 (W.D. Pa. June 22, 2020) (discussing Dixon v. Northwestern Mutual, 146 A.3d 780, 790 (Pa. Super. Ct. 2016) and Knight v. Springfield Hyundai, 81 A.3d 940 (Pa. Super. Ct. 2013) as well as district court cases following Dixon, Knight, and Werwinski).  As the District Court for the Western District of Pennsylvania observed in Catena, "'[t]he current divergence between the federal and state courts,' on the question of whether a UTPCPL claim survives the economic loss doctrine 'means that the outcome of a case is currently a function of forum.'"  2020 WL 3412348, at * 6 (quoting Landau v. Viridian Energy Pa, LLC, 223 F.Supp.3d 401, 414 (E.D. Pa. 2016)).  Though this Court does not sit in diversity as was the case in Catena, the parties have agreed that Plaintiffs' statutory consumer protection claims are governed by the Plaintiff's residence or place of purchase.  (See ECF No. 50, at 8).  Plaintiff Wotring is a resident of Pennsylvania who purchased her vehicle in Pennsylvania.  The Court will therefore apply Pennsylvania law.

    As other courts that have grappled with the question of whether to apply the economic loss doctrine to the UTPCPL have done, this Court concludes that "the UTPCPL and its relation to the economic loss doctrine . . . supports deference to the

state's intermediate court preference." Id. (citing Landau, 223
F. Supp. 3d 413); see also Kantor v. Hiko Energy, LLC, 100 F.
Supp. 3d 421, 428 (E.D. Pa. 2015) ("We cannot ignore what the
Pennsylvania courts have decided and how the law in Pennsylvania
has evolved since Werwinski was decided."). As mentioned above,
Pennsylvania's intermediate courts have held that UTPCPL claims
are not barred by the economic loss doctrine. Accordingly, The
Court will deny Defendants' motion to dismiss this count.

Finally, Defendants also argue that Plaintiff Milstein's
Florida FDUTPA claim is barred by the economic loss doctrine.
Defendants claim that Florida's economic loss doctrine applies
to statutory misrepresentation claims in the same way that it
applies to common law fraud claims. In contrast, Plaintiffs
assert that courts are split on whether the economic loss
doctrine applies to the FDUTPA. See ECF No. 50, at 26 (citing
Morano v. BMW of North America, LLC, 928 F. Supp. 2d 826, 834
(D.N.J. 2013)).

A court in this District has previously recognized that a
claim brought under the FDUTPA is not necessarily a fraud claim.
See Morano, 928 F.Supp.2d at 833 (discussing the applicability
of Rule 9(b) to claims brought under the FDUTPA). It would
follow, then, that the Court should independently analyze
whether the economic loss doctrine applies to a claim brought
under the FDUTPA. Because Defendant has not presented any case

law showing that a claim for deceptive trade practices brought under the FDUTPA must be dismissed under the economic loss doctrine,[13] and Plaintiff has shown that at least some courts have allowed an FDTUPA claim to forward, the Court will deny Defendants' motion to dismiss with respect to this claim.

Finally, Defendants also argue that Plaintiffs Zaback and Jones's common law fraud by concealment claims are barred by the economic loss doctrine.  (ECF No. 43-1 at 13).  Neither party has fully briefed the relevant choice of law issues for these common law fraud claims.  However, the Court finds the question of which law to apply irrelevant, as the application of the economic loss doctrine to common law fraud claims in both states appears highly similar to the analysis under the separate and distinct conduct doctrine: namely, "whether the defendant has breached some duty other than a contractual duty, such that the tort claim is "identifiable and distinct" from the breach of contract claim," Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 166 (4th Cir. 2018), and whether the fraud "allegations directly relate to the *inducement* of the contract, instead of the *performance* of the contract, and thus establish an independent tort claim." R. Keating & Sons, Inc., Plaintiff,

_____

[13] The Court notes that Defendants do not explicitly argue that the economic loss doctrine applies to the FDUTPA.  Instead, Defendants refer to their arguments presented for Plaintiffs' UTPCPL claim.  (See ECF No. 32-7, Part III.F.2.b.).

V. Chiselcreek Development, LLC, et al., No. N17C-05-195 VLM,
2020 WL 6390676, at *4 (Del Super. Ct. Oct. 30, 2020).
Accordingly, for substantially the same reasons outlined above,
the Court finds that Zaback and Jones's common law fraud claims
are not barred by the economic loss doctrine.

### 4. Claims Related to Vehicles Purchased from Unaffiliated Third Parties

Defendants next argue that Plaintiff Armstrong's CLRA
claim, and Plaintiffs Binkley and Hicks's Colorado Consumer
Protection Act ("CCPA") claims, must be dismissed because they
purchased their vehicles from unaffiliated third-party dealers,
and therefore Defendants did not have the opportunity to have
made any misrepresentations or omissions to those Plaintiffs.
Plaintiffs argue instead that Defendants have failed to put
forward any cases demonstrating that the "use of a broker to
purchase a new car from an authorized dealer insulates the
vehicle manufacturer or its marketing and distribution
subsidiary from liability under any of the relevant consumer
protection statutes." (ECF No. 50 at 36).

The Court agrees with Plaintiffs.  Regarding Armstrong's
CLRA claim, Defendants' case law demonstrates that the central
inquiry for an individual who purchased their vehicle from a
third-party dealer is "what channels of information he depended
on and whether [Defendants] could have taken action to

disseminate information about the [Windshield] Defect through
those channels." Steele v. General Motors LLC, CV 17-04323 TJH
(SKx), 2018 WL 6039838, at *3 (C.D Cal. Aug. 8, 2018) (citing
Sloan v. General Motors LLC, 287 F. Supp. 3d 840, 875 (N.D. Cal.
Feb. 7, 2018)).  In Steele, the court dismissed one plaintiff's
claim because he had only pled "vague allegations that he
reviewed the Cadillacs' marketing materials and test drove a
version of the Cadillac at an auto show," id., while in Sloan
the plaintiffs had made "general allegations concerning GM's
advertising campaigns targeting the public." Sloan, 287 F.
Supp. 3d at 876.

Here, however, Plaintiff Armstrong has pled not only that
he "visited SOA's website to research the vehicle," but also
that he actually "visited Subaru Sherman Oaks in Van Nuys, CA
to learn more about and inspect the model vehicle" before later
purchasing the vehicle from the third-party dealer.  (ECF No. 27
at ¶ 164).  The Court finds that Defendants could have taken
action to disseminate information about their windshields
through these channels, and that Plaintiff's pleadings
sufficiently demonstrate that "Plaintiff[] *would have* received"
those disclosures to avoid dismissal at this stage in the
litigation.  Sloan, 287 F. Supp. 3d at 875 (emphasis in
original).

As Plaintiffs note, Defendants have entirely failed to cite any Colorado case law for the proposition that Binkley and Hick's CCPA claims must be dismissed because they bought their vehicles through a broker who obtained them from an authorized dealer.  The single Colorado case Defendants have cited, <u>Garcia v. Medved Chevrolet, Inc.</u>, 240 P.3d 371, 380 (Co. App. Ct. 2009), only discusses the question of whether there is a presumption of reliance under Colorado law — an argument for dismissal Defendants did not make in their moving briefs and appear to have raised only in response to Plaintiffs' arguments in support of their California, not Colorado, claims. Accordingly, with no support for Defendants' argument in front of it, the Court will not dismiss Plaintiffs' CCPA claims for this reason either.

### 5. **Plaintiff Robbie's ICFA Unfair Practices Claim**

Defendants assert that Plaintiff Robbie has not sufficiently plead an ICFA unfair practices claim, because he has failed to show how the alleged unfair practice is oppressive or in violation of public policy.  In support of their argument, Defendants argue that, under Illinois law, "[a plaintiff] must 'describe how the [unfair practice] is oppressive or violates public policy. Without such a description, [a] complaint fails to state a cause of action.'"  (ECF No. 43-1 at 17) (quoting

Boone v. MB Fin. Bank, N.A., 375 F. Supp. 3d 987, 996 (N.D. Ill. 2019)).

While Defendants have accurately stated the requirement under Illinois law, the Court finds that Plaintiff has provided a sufficient description.  Robbie specifically alleges that SOA's practices were unfair and violated public policy because it failed to disclose that a product it was selling posed a safety hazard, and used its decision not to disclose this information to entice consumers to purchase the Class Vehicles at a higher price than they otherwise might have, unjustly enriching itself.  (Zaback Complaint at ¶¶ 178-79).  Robbie's ICFA unfair practices claim therefore survives dismissal.

### 6. **Plaintiffs' Restitution-Based UCL Claims**

Defendants argue that the California Plaintiffs' UCL claims must be dismissed to the extent they seek monetary relief and they may not seek restitution from SOA or SBR.  They believe that the California Plaintiffs may only seek injunctive relief, not monetary relief or restitution.  Furthermore, Defendants argue that such restitution is not available from the Defendants because third-party retailers are the entities who received money for the repairs at issue in this case, and restitution is only available in situations where the defendant directly took property from the plaintiff.

Plaintiffs counter that a plaintiff who purchased a used or new vehicle from a third-party dealer can properly bring a restitution claim against the manufacturer so long as the remedy sought is "truly restitutionary in nature" and "represents the return of money or property the defendant acquired through its unfair practices." ECF No. 50, at 35 (citing Cabebe v. Nissan of North America, Inc., 2018 WL 5617732, at *5 (N.D. Cal. Oct. 26, 2018) and Aberin v. American Honda Motor Co., Inc., 2018 WL 1473085, at *8-*9 (N.D. Cal. Mar. 26, 2018)). Plaintiffs allege that they are seeking the return of money improperly acquired through Defendants' unfair practices. In sum, Plaintiffs assert that they are entitled to restitution, but do not contest Defendant's argument that California's Business & Professions Code, California Code § 17200, et seq., does not allow for monetary relief.

In McDermott v. Cummins, a judge of this Court previously considered the issue of restitution for plaintiffs who purchase vehicles from a third-party, rather than from a defendant directly. No. 14-4209 (WHW) (CLW), 2016 WL 3287335, at * 6 (D.N.J. June 7, 2016). In that case, Judge Walls observed that the Central District of California in Asghari v. Volkswagen Group of America, Inc. dismissed an unfair competition law claim for restitution because the plaintiff had bought an allegedly defective used vehicle from a third party. 42 F.Supp.3d 1306,

81

1324 (C.D. Cal. 2013).  According to the <u>Asghari</u> court, the plaintiff could not show that defendants had obtained her money or property and was therefore not entitled to restitution.  <u>Id.</u> The <u>McDermott</u> Court distinguished its case from <u>Asghari</u> by highlighting that the plaintiffs in its case had purchased a new vehicle, and held that this entitled the plaintiff to "discovery in order to locate evidence that [defendant] is in possession of money acquired by means of unfair competition." <u>McDermott</u>, 2016 WL 3287335, at *6.  As such, the Court finds that Plaintiffs are similarly entitled to discovery to locate evidence that Defendants are in possession of money acquired by means of unfair competition.

The Court finds that Plaintiffs are not entitled to monetary relief under Count V of the CAC, but may seek restitution and injunctive relief.

### 7. **Plaintiff Barr's NJCFA Claim**

Finally, Defendants argue that the New Jersey Product Liability Act is an exclusive remedy for Plaintiff Barr's New Jersey Consumer Fraud Act claim, Count Eleven.  According to Defendants, the New Jersey Products Liability Act (NJPLA) would also subsume Plaintiff Barr's claims for negligent misrepresentation, breach of implied warranty of merchantability, and unjust enrichment.  Defendants assert that

this merger of claims is caused by Plaintiff Barr's assertion of the risk of personal injury.

Plaintiffs contest Defendants' characterization of Barr's claims as relating to personal injury.  Plaintiffs explain that while they allege that defective windshields are a safety hazard, they do not allege that any Plaintiff suffered personal injuries or seek to recover for any bodily harm.  Plaintiffs point to the fact that the Amended Complaint explicitly excludes from all classes and subclasses any "persons who have suffered personal injuries as a result of the facts alleged herein." (CAC at ¶ 296).

The Court finds that Plaintiff Barr's claim is not barred by the New Jersey Product Liability Act.  Construing the claim in the light most favorable to Plaintiff, the Court does not agree with Defendants that Barr's claims under the New Jersey Consumer Fraud Act as well as his claims for breach of implied warranty of merchantability and unjust enrichment are preempted by the NJPLA.  The Court will deny Defendants' motion to dismiss.

### D. Negligent Misrepresentation Claim

Plaintiffs have also alleged a negligent misrepresentation claim against Defendants under Count XIV of the Amended Complaint.  Defendants argue that the economic loss doctrine bars Plaintiffs' negligent misrepresentation claim.  Defendants

83

argue that these claims are barred because a purchaser cannot sue in tort based on the allegation that the product he or she purchased did not meet his or her expectations.  Defendants assert that Plaintiffs are "simply recasting their breach of warranty claims as 'negligent misrepresentation/omission' claims."  ECF No. 32-7 at 36.  Defendants warn that "to hold otherwise would allow the economic loss rule to be manipulated such that any time a purchaser received a defective product that did not cause any injuries or damage to other property, such a purchaser could assert claims for negligent and fraudulent concealment regarding the defect to avoid the economic loss rule."  Id. (quoting Burns v. Winnebago Indus., No. 13-1427, 2013 U.S. Dist. LEXIS 116377, at *9 (M.D. Fla. Aug. 16, 2013)).

Plaintiffs counter that virtually every state recognizes an exception to the economic loss doctrine that permits claims to proceed that are based on misrepresentation, fraud, fraudulent inducement, and other grounds.  Plaintiffs also highlight that other courts have rejected Defendants' arguments.  Plaintiffs allege that their claims do not relate only to the benefit of the bargain, but instead allege "intentional or negligent concealment of the Defect in the windshields, as well as omissions, affirmative misrepresentations and failure to disclose the Defect to consumers about the Defect and Subaru's warranty coverage."  (ECF No. 50, at 45).  Plaintiffs further

allege that simple stating that fraud claims are "intertwined" with breach of contract/warranty claims is not sufficient to support dismissal.

A judge of this Court has previously recognized that while "[t]he economic loss doctrine stands for the principle that a plaintiff who is dissatisfied with a product must bring a breach of contractor warranty claim," Alloway v. Gen. Marine Indus., L.P., 695 A.2d 264, 270 (N.J. 1997) "the doctrine does not always bar claims for negligent misrepresentation." Amato, 2019 WL 6607148, at *21 (citing In re Volkswagen Timing Chain Prod. Liab. Litig., 2017 WL 1902160, at *21 (D.N.J. May 8, 2017)). While it seems "clear that the economic loss rule is not uniformly applied to negligent representation claims," the Court must at minimum determine whether the "allegedly tortuous conduct is extraneous to the contract." Amato, 2019 WL 6607148 at *21.

Plaintiffs have pleaded that Defendants both made affirmative misrepresentations and failed to disclose a defect in the windshield, outside of any contractual duty. As explained above in the Court's analysis of Plaintiffs' numerous statutory fraud claims, against which Defendants make similar arguments, the Court finds that the tortuous conduct alleged here is sufficiently extraneous to any contract, and therefore these allegations are sufficient to survive a motion to dismiss.

85

See Id. (citing Saltiel v. GSI Consultants, Inc., 788 A.2d 268, 280 (N.J. 2002) and In re Volkswagen, 2017 WL 1902160, at *18)).

### E. **Unjust Enrichment Claims**

Defendants make multiple arguments for dismissal of various of Plaintiffs' unjust enrichment claims.  First, Defendants argue that Plaintiffs' claims fail because they "did not purchase their vehicles directly from SOA or SBR."  (ECF No. 53 at 18).

As Defendants note, this Court has previously found that in "the majority of cases concerning claims similar to the ones asserted here — fraud and breach of warranty claims against a product manufacturer — a plaintiff may not maintain an unjust enrichment claim against the manufacturer if he did not purchase the product directly from the manufacturer." Defillippo v. Whirlpool Corp., No. 18-12523, 2019 WL 4127162, at *14 (D.N.J. Aug. 30, 2019).  Since Plaintiffs did not purchase any of the Class Vehicles directly from Defendants, but rather from an authorized dealer or other third parties, their unjust enrichment claim must be dismissed.  See Schechter v. Hyundai Motor America, No. 18-13634 (FLW), 2019 WL 3416902, at *11 (D.N.J. July 29, 2019).  As this holding is dispositive, the Court need not address Defendants' other arguments for dismissal of Plaintiffs' unjust enrichment claim.

**V.    Defendants' Motion for a More Definite Statement**

Defendants assert that the consolidated complaint fails to plead which claims in the CAC are asserted against which Defendant, and that these claims should either be dismissed, or alternatively that Defendants are entitled to a more definite statement.  Federal Rule of Civil Procedure 12(e) allows a defendant to request a "more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).  Defendants must file this motion "before filing a responsive pleading and must point out the defects complained of and the details desired."  Fed. R. Civ. P. 12(e). In the Third Circuit, a motion for a more definite statement is granted when "the pleading is too vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith, without prejudice to [itself]."  MK Strategies, LLC v. Ann Taylor Stores Corp., 567 F.Supp.2d 729, 736-37 (D.N.J. 2008) (citing Clark v. McDonald's Corp., 214 F.R.D. 198, 232-33 (D.N.J. 2003) (internal citations omitted)).

In general, these motions are disfavored "particularly in light of the liberal pleading standards under the Federal Rules."  Marley v. Donahue, No. 14-1597, 2014 WL 5152618, at *1. (D.N.J. Oct. 14, 2014) (citation omitted).  As such, these motions will be granted only when "the allegations lack

87

sufficient specificity to enable a defendant to determine the propriety of interposing his answer with a waivable defense, where the nature of the complaint leaves the defendant unable, without prejudicing itself, to respond with a general denial, or in order to pare down shotgun pleadings." Id. (citing Clark, 213 F.R.D. at 232).  "Resolution of a motion under Rule 12(e) rests 'largely [in] the discretion of the district court.'"  Id. at *2 (citing Clark, 213 F.R.D. at 232).  However, "[b]ecause there is potential that Rule 12(e) could require more specificity than that required by Rule 8(a)(2) and therefore be prone to abuse by defendants, its exercise should be cast in the mold of strictest necessity."  Gittens v. Experian Info. Sols., Inc., No. 13-5534, 2014 WL 1744851, at *2 (D.N.J. Apr. 30, 2014).

The Court finds that Plaintiffs' Consolidated Amended Complaint is not so vague or ambiguous that Defendants cannot reasonably prepare a response.  Fed. R. Civ. P. 12(e).  While Defendants point out several elements of Plaintiffs' CAC that could perhaps be clearer, the Court finds that Plaintiffs' allegations against Defendants are specific enough to enable them to provide a good faith response.  The Court will deny Defendant's motion for a more definite statement.

**CONCLUSION**

For the reasons stated above, the Court will grant in part and deny in part Defendants' motions to dismiss.  Given the complexity of this case, and the number of claims and arguments for dismissal presented here, the Court will briefly outline its holding.  The following claims will be dismissed:

- Count I (both complaints) for Violation of the MMWA – Claims of all Plaintiffs;

- Count II (both complaints) for Breach of Express Warranty – Claims of Plaintiffs Geisler, Nevarez, Armstrong, Binkley, Barr, Moore, Robbie, and Funk, as well as all claims against Defendant SBR;

- Count III (CAC) for Breach of Implied Warranty – Claims of Plaintiffs Milstein, Powell, Moore, Robbie, and Funk;

- Count VI (CAC) for Violation of the Song-Beverly Act – Claim of Plaintiff Armstrong;

- Count XV (CAC) for Unjust Enrichment – Claims of all Plaintiffs.

Defendants' motion to dismiss will be denied as to all other claims alleged in the two complaints.  Finally, Defendants' motion for a more definite statement will also be denied.

An appropriate Order will be entered.


Date: November 24, 2020          /s Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.